**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------------- X

Towaki Komatsu,

                        Plaintiff,

            -vs-

The City of New York, Marco Carrion, Dustin Ridener, Harold Miller,
Pinny Ringel, Shauna Stribula, NYPD Detective Raymond Gerola
(shield #: 6577), NYPD Detective Nicholas Mason (shield #: 6995),
NYPD Lieutenant Ralph Nieves, NYPD Inspector Howard Redmond,
NYPD John Doe1 11/2/17, Bill de Blasio, Lawrence Byrne, Jr., James
O'Neill, Jessica Ramos, Anthony Shorris, Cyrus Vance, Jr.,


• All of the defendants listed above who are people are being sued in
  their individual and official capacities,

                        Defendants.
------------------------------------------------------------------------------- X

## 20-cv-9151

### <u>COMPLAINT</u>

### JURY DEMAND

# TABLE OF CONTENTS

I.  Preliminary Remarks ....................................................................................... 4

II.  Jurisdiction ................................................................................................... 15

III.  Parties ........................................................................................................ 15

IV.  Background Facts ......................................................................................... 23

    A.  Treatment of Thomas Lopez-Pierre at a town hall meeting that the Mayor conducted in December of 2018 established a precedent in which the Mayor's staff and NYPD illegally barred critics of the New York City government officials from town hall meetings that the Mayor conducted ................... 24

    B.  My illegal exclusion by the defendants since 4/27/17 from public forums that the Mayor conducted mostly with other government officials that were comprised of public town hall meetings, public resource fair meetings, and public hearings as well as a publicity stunt ..................................................... 27

    C.  E-mails from Jessica Ramos confirmed that I was being illegally barred prospectively from town hall meetings that the Mayor conducted as an abuse of process and First Amendment retaliation that was tied to my HRA lawsuit as the Mayor's office was illegally being apprised of updates in that sealed lawsuit as early as 4/10/17 that was just 1 day before the Mayor's 4/11/17 public resource fair in Staten Island .................................................. 35

    D.  Criticism of the Mayor and other rowdiness were tolerated during the Mayor's 9/28/17 town hall ............................................................................ 50

V.  Retrospective Facts ...................................................................................... 61

    A.  Defendant Ioveno's intervention on my behalf on 11/30/17 that enabled me to attend the Mayor's 11/30/17 town hall ......................................... 67

    B.  The fact that other Asian-Americans who boisterously expressed opposition to New York City Schools Chancellor Richard Carranza were initially prevented from attending a public town hall meeting on 2/4/20 in Sheepshead Bay in Brooklyn by members of the NYPD and members of the New York City Department of Education prior to ultimately being permitted to attend that town hall meeting confirms that those who prevented me from attending town hall meetings, resource fair meetings, and public hearings that the Mayor conducted with others government officials violated my Fourteenth Amendment due process and equal protection rights as well as my First Amendment rights to attend them ......................................................................................... 68

C. How David Rem lawfully expressed himself during the Mayor's 2/19/20 town hall, was applauded for that by audience, and was retaliated against for that by Defendant Redmond and the Mayor ................................................................ 70

D. The fact that Defendant Ridener told me on 11/13/19 that I could attend the public town hall meeting that the Mayor conducted in Queens on that date right after I began to tell Mr. Ridener that I had just been illegally kicked out of a public meeting and was then also being illegally prevented from entering New York City Hall's grounds sufficiently confirms that I had a Fourteenth Amendment due process and equal protection right as well as a First Amendment right retrospectively to have been able to attend the Mayor's 11/2/17 town hall meeting in Queens ................................................................ 79

E. My conversations with David Cole of the ACLU and Arthur Eisenberg of the New York Civil Liberties Union on 10/30/17 about attending public forums that the Mayor conducted ................................................................ 81

VI.     Legal Standards ................................................................ 83

VII.    Main Statement of Facts ................................................................ 94

A. A reminder about e-mail messages sent on 6/28/17 and 6/28/17 by Defendants Redmond and Ramos that are a smoking gun in regards to a conspiracy among them and other senior members of the Mayor's staff to illegally prevent me from attending town hall meetings that the Mayor conducted within the room in which they were and would continue to be conducted ................................................................ 95

B. Whistleblowing objectives I had for attending the Mayor's 11/2/17 town hall ................................................................ 103

C. Facts about the Mayor's 11/2/17 town hall ................................................................ 152

VIII.   Causes of Action ................................................................ 187

IX.     Jury Demand ................................................................ 197

X.      Prayer for Relief ................................................................ 197

Plaintiff Towaki Komatsu (hereinafter referred to in the first-person as "I", "me", and "my"), proceeding pro se in this action, does hereby state and allege all that follows in this pleading.

## PRELIMINARY REMARKS

1.      The following applies throughout this complaint in the interests of brevity:

   a.      Acronyms and aliases in the second column of the following table will be used throughout this pleading instead of the entries in the third column to which they correspond:

| # | Abbreviation | Corresponds To |
|---|---|---|
| 1 | ACLU | American Civil Liberties Union |
| 2 | Bronx DA | Bronx District Attorney's office |
| 3 | CCRB | New York City Civilian Complaint Review Board |
| 4 | City Council | New York City Council |
| 5 | City Hall email excerpts | Excerpts from a 374-page PDF file that I was provided on 2/15/19 by the New York City Mayor's office in response to a Freedom of Information Law demand that I submitted to it. Those excerpts correspond to e-mail messages that appear on pages 211 212, and 361 thru 374 in that file. Information shown on those pages was provided to me with redactions. Copies of e-mail messages about me that were sent 4/10/17, 6/28/17, and 6/29/17 appear on those pages. Those e-mail messages partly concern litigation that I commenced against the New York City Human Resources Administration ("HRA") in which I was then involved that are closely related to my claims in this action. Senior members of the New York City Mayor's administration and the head of the Mayor's NYPD security detail (Defendant Redmond) sent those e-mail messages to HRA Commissioner Steven Banks and amongst themselves. Those excerpts are available in a PDF file that is available on the Internet at https://drive.google.com/file/d/16wSpJ7kk-aOtx7Bkg8MeqUpyWd5Io2hR/view?usp=sharing |
| 6 | Defendant City | Defendant City of New York |
| 7 | DHS | New York City Department of Homeless Services |
| 8 | DOE | New York City Department of Education |
| 9 | DOI | New York City Department of Investigations |
| 10 | DOJ | U.S. Department of Justice |

| 11 | DSS | New York City Department of Social Services |
|----|-----|---------------------------------------------|
| 12 | FOIL | Freedom of Information Law |
| 13 | FRCP | Federal Rule of Civil Procedure |
| 14 | HPD | New York City Department of Housing, Preservation and Development |
| 15 | HRA | New York City Human Resources Administration |
| 16 | IAB | The NYPD's Internal Affairs Bureau |
| 17 | K1 | The related federal lawsuit that I commenced against the City of New York, Defendant Nieves, and others in April of 2018 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) that my claims in this case relate back to and amplify. The judges in that case refused to grant me sufficient time to file a further amended complaint in that case that would have otherwise enabled me to assert my claims in that case instead of in this case. In fact, Judge Lorna Schofield explicitly directed me to instead commence a new civil action for additional claims that I sought to assert in that case. |
| 18 | K2 | The related federal lawsuit that I commenced against the City of New York, Mr. Banks, and others on 8/14/20 that corresponds to the case of *Komatsu v. City of New York*, No. 18-cv-6510(LLS)(S.D.N.Y.) that is pending appeal and that my claims in this case relate back to and amplify. |
| 19 | K3 | The related federal lawsuit that I commenced against the City of New York, Defendant Redmond, and others on 8/29/20 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-7046 (ER)(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 20 | K4 | The related federal lawsuit that I commenced against the City of New York, Defendant Mason, and others on 9/13/20 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-7502(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 21 | K5 | The related federal lawsuit that I commenced against the City of New York, Defendant Mason, and others on 9/25/20 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-8004(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 22 | K6 | The related federal lawsuit that I commenced against the City of New York, Defendant Mason and others on 10/5/20 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-8251(ER)(S.D.N.Y.) that my claims in this case relate back to and amplify. |

| 23 | K7 | The related federal lawsuit that I commenced against the City of New York, Defendant Mason, and others on 10/11/20 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-8540 (S.D.N.Y.) that my claims in this case relate both back and forward to and amplify. |
|----|----|-----------------------------------------------------------|
| 24 | K8 | The related federal lawsuit that I commenced against the City of New York, Defendant Mason, and others on 10/25/20 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-8933 (S.D.N.Y.) that my claims in this case relate both back and forward to and amplify. |
| 25 | The Mayor | New York City Mayor Bill de Blasio |
| 26 | Mayor's 3/15/17 town hall | The town hall meeting that the Mayor conducted on 3/15/17 in the Chelsea district in Manhattan as New York City Councilman Corey Johnson was its moderator |
| 27 | Mayor's 4/27/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, New York City Councilman Jimmy Van Bramer, and other government officials as a mostly traditional public forum on 4/27/17 in Long Island City in Queens that was subject to New York State's Open Meetings Law and was used a campaign event to support the Mayor's re-election interests that I was illegally barred from attending while I had active litigation against HRA. |
| 28 | Mayor's 5/23/17 resource fair | The public resource fair meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 5/23/17 inside of the Bronx Supreme Court. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
| 29 | Mayor's 9/8/17 public hearing | The public hearing that the Mayor conducted on 9/8/17 at 2 pm in the Blue Room in City Hall that partly concerned proposed legislation about reforming the NYPD as I was illegally prevented from attending that hearing. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor conducted. |

| 30 | Mayor's 9/14/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, New York City Councilman Chaim Deutsch, and other government officials as a mostly traditional public forum on 9/14/17 at 2525 Haring Street in Brooklyn. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it from within the room in which it was conducted while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
|---|---|---|
| 31 | Mayor's 9/26/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, former New York City Councilman Dan Garodnick, and other government officials as a mostly traditional public forum on 9/26/17 at 245 East 56th Street in Manhattan. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it from within the room in which it was conducted while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
| 32 | Mayor's 9/27/17 resource fair | The public resource fair meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 9/27/17 at 3940 Broadway in Manhattan. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
| 33 | Mayor's 9/28/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, former New York City Councilwoman Melissa Mark-Viverito, and other government officials as a mostly traditional public forum on 9/28/17 at 1833 Lexington Avenue in Manhattan. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |

| 34 | Mayor's 10/4/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, New York City Councilman Ritchie Torres, and other government officials as a mostly traditional public forum on 10/4/17 at 2452 Washington Avenue in the Bronx. That public forum was subject to New York State's Open Meetings Law. I was illegally barred from attending that public forum: |
|---|---|---|
| | | **a)** While I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted, |
| | | **b)** Just 1 day after Defendant Mason and another member of the NYPD illegally prevented me from attending a public press conference in front of City Hall that concerned reforming the NYPD. |
| | | **c)** Just 1 day after both Manhattan District Attorney Cyrus Vance, Jr. and Lawrence Byrne, Jr. informed me during a meeting that was conducted at the New York City Bar Association that was partly recorded on audio that they would willfully violate their Fourteenth Amendment affirmative legal duty as law-enforcement officials to intervene on my behalf to uphold my constitutional rights by refusing to do their jobs as I apprised them of crimes that members of the NYPD were committing against me at public forums that the Mayor was conducting and they told me then that they would not do anything about that. |
| | | **d)** Just 2 days after I testified to New York City Councilman Eric Ulrich and others during the public hearing that the City Council's Committee on Veterans conducted in City Hall partly about being illegally barred from public forums that the Mayor conducted. |

| 35 | Mayor's 10/12/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, former New York City Councilwoman Rosie Mendez, and other government officials as a mostly traditional public forum on 10/12/17 in a school located at 442 E Houston Street in Manhattan. That school is controlled by the New York City Department of Education. That public forum was subject to New York State's Open Meetings Law. I was illegally barred from attending that public forum by Defendant Stribula and others:<br><br>**a)** While I continued to have active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted,<br><br>**b)** While I was engaged in protected activity on 10/12/17 partly by distributing literature containing whistleblowing information against the Mayor's administration and NYPD security detail that I prepared to members of the public as I waited in line with them to attend that town hall before I was illegally coerced by Defendant Stribula to leave that line as she then threatened me by telling me that she would arrange for Defendant Redmond to coerce me to leave that line if I didn't immediately exit it.<br><br>**c)** While Defendant Stribula flat out lied to my face by claiming that I had turned down offers of legal assistance that she claimed I had received as a result of referrals that I received to legal services organizations. Contrary to her deceit, I never received any offers that to be provided legal assistance.<br><br>**d)** Just 8 days after Defendant Mason and others illegally prevented me from attending the Mayor's 10/4/17 town hall. |
| 36 | Mayor's 10/12/17 town hall video | The video recording that the Mayor's office arranged to be recorded of the Mayor's 10/12/17 town hall. That video is available on the Internet at https://www.youtube.com/watch?v=seUP48e0KUY |

| 37 | Mayor's 10/18/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner as the Mayor, Mr. Banks, New York City Councilwoman Stephen Levin, and other government officials as a mostly traditional public forum on 10/18/17 at 180 Remsen Street in Brooklyn. That public forum was subject to New York State's Open Meetings Law |
| 38 | Mayor's 10/18/17 town hall video | The video recording that the Mayor's office arranged to be recorded of the Mayor's 10/12/17 town hall. That video is available on the Internet at https://www.youtube.com/watch?v=QJ9MnU8so4E. |
| 39 | Mayor's 10/25/17 resource fair | The public resource meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a traditional public forum on 10/25/17 at Brooklyn College that is located at 2705 Campus Road in Brooklyn. That public forum was subject to New York State's Open Meetings Law. I was illegally barred from attending that public forum by Defendant Redmond and others while I continued to have active litigation against HRA. |
| 40 | Mayor's 10/26/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, New York City Councilwoman Stephen Levin, and other government officials as a mostly traditional public forum on 10/18/17 at 350 Fifth Avenue in Brooklyn. That public forum was subject to New York State's Open Meetings Law |
| 41 | Mayor's 10/26/17 town hall video | The video recording that the Mayor's office arranged to be recorded of the Mayor's 10/26/17 town hall. That video is available on the Internet at https://www.youtube.com/watch?v=RCqp7aOToOY. |
| 42 | Mayor's 11/2/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a traditional public forum on 11/2/17 in a public school controlled by the DOE that is located at 230-17 Hillside Avenue in Queens Village in Queens. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I still had ongoing litigation against HRA. |
| 43 | Mayor's 11/2/17 town hall video | The video recording that the Mayor's office arranged to be recorded of the Mayor's 11/2/17 town hall. That video is available on the Internet at https://www.youtube.com/watch?v=u2hrR4BPVdc. |
| 44 | Mayor's CAU | The Mayor's Community Affairs Unit |
| 45 | Mr. Banks | HRA Commissioner Steven Banks |

| 46 | My HRA lawsuit | The hybrid lawsuit that I commenced against HRA in January of 2017 that corresponds to _Komatsu v. New York City Human Resources Administration_, No. 100054/2017 (Sup. Ct., New York Cty.) and is being appealed. I asserted claims in that case that my claims in this case relate back to and amplify. Prior to 6/8/17, I asserted claims in that case that concerned illegal acts and omissions that were committed against me by defendants in this action that caused me to have been illegally barred from attending both the Mayor's 4/27/17 town hall and the Mayor's 5/23/17 public resource fair meeting. |
| 47 | NTT Data, Inc. | NTT |
| 48 | NYCHA | New York City Housing Authority |
| 49 | NYCLU | New York Civil Liberties Union |
| 50 | OCA | New York State Office of Court Administration |
| 51 | OTDA | The New York State Office of Temporary and Disability Assistance |
| 52 | Second Circuit | United States Court of Appeals for the Second Circuit |
| 53 | Urban | Urban Pathways, Inc. It is the slumlord for the building in which I reside. |

2.    Every reference that I make in this pleading that concerns my efforts to have attended the Mayor's 11/2/17 town hall concerns those that I made to lawfully attend it from within the room in which the Mayor, Mr. Banks, and/or other government officials jointly conducted it as it was conducted, shortly before it began, and shortly after it ended.

3.    References to HRA, DHS, and DSS will be used interchangeably in this pleading for simplicity.

4.    The first page of what appears in the annexed **Exhibit A** is a public notice that the City of New York issued on the Internet for the Mayor's 11/2/17 town hall. That notice contains the following details:

a.    The fact that the Mayor's 11/2/17 town hall would be conducted in Queens on 11/2/17 at 230-17 Hillside Avenue in Queens Village and begin at 7 pm.

b.    The fact that that town hall meeting would be conducted inside of the Martin Van Buren High School that is located at that address.

c.       The fact that admission to that event would begin at 6 pm and end at 7:30 pm.

d.       Information about how those who sought to attend that public forum could

register in advance to do so.

e.       The identities of some of the government officials and government agencies with

which the Mayor conducted that public forum as a mostly traditional public forum.

f.       The identities of various groups that helped to sponsor that public forum.

5.       The second page of what appears in the annexed **<u>Exhibit A</u>** shows a confirmation report

that appeared in my Internet browser on 10/29/17 that confirmed a registration that I just

submitted with an online form to attend the Mayor's 11/2/17 town hall.

6.       The illegal acts and omissions that were committed against me on 11/2/17 at the site of

the Mayor's 11/2/17 town hall that my claims in this complaint concern were committed in

relation to my efforts to have exercised my legal right to have done the following:

a.       Lawfully attended that public forum in accordance with my constitutional rights.

b.       Exercised the full extent of my rights while attending it partly by engaging in

protected whistleblowing about a broad array of matters of public concern and private

matters.

7.       This is a civil rights action to vindicate my rights in response to illegal acts and omissions

that were committed against me on 11/2/17 at the site of public town hall meeting that the Mayor

conducted with other government officials in relation to my efforts to have lawfully attended it

while Defendant Redmond was **a)** the head of the Mayor's NYPD security detail and **b)** the

primary defendant in *Sherrard v. City of New York*, No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13,

2018). Since 4/27/17, I was aware of his status as the defendant in *Sherrard v. City of New York*

by having conducted research about him then in the wake of illegal acts and omissions that he

and others committed against me on 4/27/17 that caused me to be illegally barred from attending the Mayor's 4/27/17 town hall in flagrant violation of my constitutional rights and other applicable laws. Those who committed such illegal acts and omissions against me on 11/2/17 mostly did so as part of a conspiracy in retaliation against me that was mainly for protected whistleblowing and litigation activities that I continued to be engaged in against Mr. Redmond, themselves, other members of the NYPD, members of the Mayor's staff, HRA, HRA's business partners, Mr. Banks, New York State court officers, and others. Such protected whistleblowing and litigation activities that this concerns were largely related to my HRA lawsuit and earlier illegal acts and omissions that were committed against me in flagrant violation of the Hatch Act (5 U.S.C. §1502(a)(1)) and other laws for the mutual benefit of the Mayor, members of the City Council, and those who committed such illegal acts and omissions leading up to the 2017 New York City government election in the interest of extending their job security and maintaining their access to opportunities to further advance their careers. Such illegal acts and omissions wee committed against me on the following dates by the defendants in this action and others in relation to efforts that I previously undertook to exercise my constitutional rights to lawfully attend and participate in 17 earlier public forums that **a)** would have otherwise been conducted partly by me on 4/12/17 with respect to a scheduled oral arguments hearing in my HRA lawsuit that Jeffrey Moszyc of HRA illegally stole from me by engaging in illegal ex-parte communications to request an adjournment and **b)** were partly conducted by the Mayor, Mr. Banks, and others that included public town hall meetings, public resource meetings, public hearings, a publicity stunt that the Mayor conducted on 7/25/17 in a public area of a subway station, and a public press conference on 10/3/17 that about reforming the NYPD:

4/12/17, 4/27/17, 5/23/17, 6/8/17, 7/12/17, 7/25/17, 8/30/17, 9/8/17, 9/14/17, 9/26/17, 9/27/17, 9/28/17, 10/3/17, 10/4/17, 10/12/17, 10/18/17, 10/25/17

8.      While committing such illegal acts and omissions against me on 11/2/17 that my claims in this complaint concern, that was done to extend a campaign of harassment, retaliation, and unequal and discriminatory acts against me at public forums dating back to 4/27/17 that the Mayor and other government officials conducted with members of the public in a collaborative manner as the Mayor and such other government officials were running for re-election and using those public forums to try to improve their re-election prospects partly by trying to attract publicity.

9.      The illegal acts and omissions that were committed against me on 11/2/17 as well as on earlier dates that go as far back as 4/27/17 at public forums that the Mayor conducted with other government officials and continued long after 11/2/17 at additional public forums that they conducted were acts of voter suppression, voter fraud, whistleblower retaliation, a malicious and naked abuse of process, illegal selective-enforcement, standardless discretion, viewpoint discrimination in violation of the Hatch Act, my constitutional rights, federal and New York State criminal statutes, New York State's Open Meetings Law, and other applicable laws that were against me directly and others indirectly largely by illegally depriving the public of relevant and significant information that it could use to make informed voting decisions during the 2017 New York City government elections that I sought to lawfully and widely broadcast by attending public forums that the Mayor conducted within the rooms in which they were conducted while they were recorded on video that could amplify and extend the reach of the critical views against the Mayor's administration, the NYPD, the Mayor's administration's business partners, and whistleblower news censors in journalism that I sought to lawfully express.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C.

§§1331 and 1343. This action is brought pursuant to 42 U.S.C. §§1983, 1985, 1988 and the First,

Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution.

2.      My claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§2201 and

2202, FRCP Rules 57 and 65, and the general legal and equitable powers of this Court.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because I reside in the Bronx and

though the illegal acts and omissions that were committed against me that this complaint

concerns occurred in Queens, they were committed by defendants whose typical place of

business is in Manhattan and, upon information and belief, decisions were made by the

defendants about how the Mayor's 11/2/17 town hall meeting would be conducted that included

deciding to illegally prevent me from attending that town hall meeting.

4.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

5.      Consistent with the requirements of New York General Municipal Law § 50-e, I filed a

timely Notice of Claim with the New York City Comptroller within 90 days of the accrual of my

claims under New York law.

6.      My claims have not been adjusted by the New York City Comptroller's Office.

## PARTIES

1.      I am, and was at all times relevant to this action, a resident of Bronx County in the State

of New York. I am also a U.S. Navy veteran, who swore to defend the U.S. Constitution against

all of its enemies indefinitely and without exceptions. I have honored that oath and continue to

do so.

2.      At all times relevant herein Defendant Bill de Blasio and Defendant James O'Neill were

employees of the City of New York.

3.      At all times relevant herein, **a)** Defendant de de Blasio has been the Mayor of the City of New York, **b)** Defendant James O'Neill was the commissioner of the NYPD, and **c)** Defendant Lawrence Byrne, Jr. was the Deputy Commissioner for Legal Matters for the NYPD. As the commissioner of the NYPD, Defendant O'Neill was among others who were responsible for how the NYPD operated, how the NYPD's personnel were trained, how they were supervised, and how they were disciplined. In his capacity as the Deputy Commissioner for Legal Matters for the NYPD, Defendant Byrne, Jr. was similarly responsible for having the members of the NYPD operate within the bounds of applicable laws while they were on-duty as members of the NYPD. Defendant de Blasio was also partly responsible for how the NYPD operated and was supervised at all times relevant herein partly by having the power to replace Defendant O'Neill as the NYPD's commissioner and set the budget for the NYPD.  In regards to this point, Mr. de Blasio was recorded on video on 11/30/17 during the public town hall meeting that he conducted in Queens as he stated the following:

"If you have a problem with policing, I am ultimately responsible."

4.      Mr. De Blasio is shown and heard as he made that remark in that video at the elapsed time of 1 hour, 49 minutes, and 19 seconds. That video recording is available on the Internet at https://www.youtube.com/watch?v=CRV0IKbg5tQ.

5.      Defendant City of New York is a municipal corporation duly incorporated and authorized under the laws of the State of New York pursuant to §431 of its Charter. The City of New York is authorized under the laws of the State of New York to maintain a police department, the NYPD, which is supposed to act as its agent in the area of law-enforcement and for which it and the Mayor are ultimately responsible. The City and the Mayor both assume the risks incidental to

the maintenance of a police force and the employment of police officers.

6.      The following defendants in this action were at all times relevant herein officers,

employees, and agents of the NYPD and the City of New York:

> NYPD Detective Raymond Gerola (shield #: 6577), NYPD Detective Nicholas Mason
> (shield #: 6995), NYPD Lieutenant Ralph Nieves, NYPD Inspector Howard Redmond,
> Lawrence Byrne, Jr., James O'Neill

7.      Defendants Nieves, O'Neill and Byrne, Jr. have retired from the NYPD.

8.      Upon information and belief, Defendants Gerola, Mason, Nieves, and Redmond were at

all times relevant herein members of the NYPD security detail for the Mayor.

9.      At all times relevant herein, Mr. Redmond helped to direct and supervise how the

Mayor's NYPD security detail operated.

10.     At all times relevant herein, Defendant NYPD John Doe1 11/2/17 was a male NYPD

officer, employee, and agent of the City of New York whose identity I don't know and whose

NYPD shield number I don't know. The next screenshot is from the elapsed time of 9 seconds in

a video recording that has the filename of "IMG_3008.MOV" that I recorded on 11/2/17 at 7:51

pm as I stood near the entrance to the school that hosted the Mayor's 11/2/17 town hall meeting.

That video recording is available on the Internet at

https://drive.google.com/file/d/1xAxfLSe9fkI0Auwfi7UKm3HPEhaPPhh4/view?usp=sharing.

Defendant NYPD John Doe1 11/2/17 appears in it as he then wore a blue uniform and a hat as he

stood near Defendants Stribula, Nieves, and Gerola while they and others were illegally

preventing me from attending that town hall meeting while Defendant NYPD John Doe1 11/2/17

had an affirmative Fourteenth Amendment legal duty to intervene on my behalf to try to enable

me to attend that town hall meeting. However, he illegally made no such effort. A video security

camera was then installed on the exterior of the school that hosted that town hall meeting near

where he stood and one or more additional video security cameras may have then been installed in that school near where he stood. Defendant NYPD John Doe1 11/2/17's identity can likely be determined from work assignment records that the NYPD likely maintained that may have indicated which members of the NYPD were assigned to be in the immediate area of where he was on 11/2/17 at 7:51 pm.



11.    At all times relevant herein, Defendant Vance, Jr. has been the Manhattan District Attorney and has been responsible for enforcing applicable laws that include New York State's Penal Code in New York City by commencing prosecutions.

12.    At all times relevant herein, Defendant Anthony Shorris was an employee of the City of New York and worked for the Mayor's office as the First Deputy Mayor of New York City.

13.    At all times relevant herein, Defendants Carrion, Miller, Ringel, and Stribula were employees of the City of New York who worked for the Mayor's CAU as Mr. Carrion was the commissioner of the Mayor's CAU.

14.    The next table contains links to the LinkedIn profiles on the Internet for Defendants

Carrion, Miller, Ridener, Ringel, and Stribula that contain summary information about their

careers and educational backgrounds:

| # | Name | Link to LinkedIn Profile |
|---|------|--------------------------|
| 1 | Marco Carrion | https://www.linkedin.com/in/marco-a-carrion/ |
| 2 | Harold Miller | https://www.linkedin.com/in/harold-miller-305502171/ |
| 3 | Dustin Ridener | https://www.linkedin.com/in/dustinridener/ |
| 4 | Pinny Ringel | https://www.linkedin.com/in/pinny-ringel-24b9045/ |
| 5 | Shauna Stribula | https://www.linkedin.com/in/shauna-stribula-294912a7/ |

15.    At all times relevant herein, Defendants Dustin Ridener and Jessica Ramos were

employees of the City of New York who worked for the Mayor's office.

16.    The defendants in this action who are people violated oaths that they were required to

take through the illegal acts and omissions that they committed against me on 11/2/17 in relation

to my efforts to lawfully attend the Mayor's 11/2/17 town hall. The specific oaths that the

defendants violated then in regards to me were those that they were required to take upon **a)**

joining the NYPD and/or **b)** otherwise working for the City of New York. Those oaths required

them to swear or affirm that they would perform their duties as members of the NYPD and/or

other personnel of the City of New York in accordance with the U.S. Constitution and New York

State Constitution to the best of their abilities. In regards to this point, the Mayor's press office

made a transcript available on the Internet of a swearing-in ceremony for new members of the

NYPD that the Mayor presided over on 10/8/15. That transcript is available on the Internet at

https://www1.nyc.gov/office-of-the-mayor/news/702-15/transcript-mayor-de-blasio-delivers-

remarks-nypd-swearing-in-ceremony.

17.    The next screenshot shows an excerpt from that transcript that reflects how those new

members of the NYPD pledged to uphold the U.S. and New York Constitution and to faithfully

discharge their duties as members of the NYPD to the best of their abilities after the defendant in

this action who are members of the NYPD most likely did the same before they committed

illegal acts and omissions against me that this action concerns. Hindsight therefore confirms that

they lied in the oaths that they took upon joining the NYPD to become part of a criminal mob as

liars and con artists instead of joining the ranks of actual law-enforcement.

**Mayor:** I do hereby pledge – I'm sorry, I should say repeat after me – I do hereby pledge and declare –

**Recruits:** I do hereby pledge and declare –

**Mayor:** – to uphold the Constitution of the United States –

**Recruits:** – to uphold the Constitution of the United States –

**Mayor:** – and the Constitution of the State of New York –

**Recruits:** – and the Constitution of the State of New York –

**Mayor:** – and faithfully discharge my duties –

**Recruits:** – and faithfully discharge my duties –

**Mayor:** – as a New York City Police Officer –

**Recruits:** – as a New York City Police Officer –

**Mayor:** – to the best of my ability –

**Recruits:** – to the best of my ability –

**Mayor:** – so help me God.

**Recruits:** – so help me God.

18.     In a similar vein, other personnel of the City of New York are required upon working for

the City of New York by New York State Civil Service Law §62 to take and file an oath or

affirmation in which they pledge and declare that they will support the U.S. and New York State

Constitution and faithfully discharge the duties of their jobs with the City of New York to the

best of their abilities. The terms of New York State Civil Service Law §62 are shown on the New

York State Senate's web site at https://www.nysenate.gov/legislation/laws/CVS/62. The

following are two relevant excerpts from that law:

a.    "Every person employed by the state or any of its civil divisions, except an employee in the labor class, before he shall be entitled to enter upon the discharge of any of his duties, shall take and file an oath or affirmation in the form and language prescribed by the constitution for executive, legislative and judicial officers, which may be administered by any officer authorized to take the acknowledgment of the execution of a deed of real property, or by an officer in whose office the oath is required to be filed. In lieu of such oath administered by an officer, an employee may comply with the requirements of this section by subscribing and filing the following statement: **"I do hereby pledge and declare that I will support the constitution of the United States, and the constitution of the state of New York, and that I will faithfully discharge the duties of the position of ............, according to the best of my ability.** " Such oath or statement shall be required only upon original appointment or upon a new appointment following an interruption of continuous service, and shall not be required upon promotion, demotion, transfer, or other change of title during the continued service of the employee, or upon the reinstatement pursuant to law or rules of an employee whose services have been terminated and whose last executed oath or statement is on file."

(boldface formatting added for emphasis)

b.    "The refusal or wilful failure of such employee to take and file such oath or subscribe and file such statement shall terminate his employment until such oath shall be taken and filed or statement subscribed and filed as herein provided."

19.    On a closely related note, the following shows the terms of New York City Charter Section 435(a) that address the legal duties that all members of the NYPD have and underscores the fact that the defendants in this action who were members of the NYPD on 11/2/17 committed illegal acts and omissions against me in relation to my claims in this case by flagrantly violating and disregarding their legal duties as members of the NYPD:

"**The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public** streets, **sidewalks**, parks and places; **protect the rights of persons** and property, **guard the public health**, **preserve order at** elections and **all public meetings and assemblages**; subject to the provisions of law and the rules and regulations of the commissioner of traffic,* regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; **remove all nuisances in the public** streets, parks and **places**; arrest all street mendicants and beggars; provide proper police attendance at fires; inspect and observe all

places of public amusement, all places of business having excise or other licenses to carry on any business; **enforce and prevent the violation of all laws and ordinances in force in the city**; and for these purposes **to arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses**.

(boldface formatting added for emphasis)

20.     By committing the illegal acts and omissions against me that my claims in this action concern, the defendants who did so and were then personnel of the City of New York violated New York City Charter §1116 that requires them to be promptly fired and prohibited from working for the City of New York again.

21.     The individual defendants are being sued herein in their individual and official capacities.

22.     At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD and City of New York. They were acting for and on behalf of the NYPD, Mayor, Mr. Banks, HRA, and one another at all times relevant herein. While doing so, the defendants in this action who are members of the NYPD did so with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

23.     The individual defendants' acts hereafter complained of were carried out intentionally, recklessly, and oppressively with malice and egregious, callous, and wanton disregard of plaintiff's rights.

24.     At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## BACKGROUND FACTS

1.      I incorporate by reference the statements that I made in all of the preceding paragraphs as though fully set forth herein.

2.      In the interests of brevity and pursuant to FRCP Rule 10(c), I incorporate by reference as though fully set forth herein both **a)** the "Background Facts" section and **b)** the "Legal Standards and Additional Background Facts" section that appear in the following:

        a.      The First Amended Complaint that I filed in K4 on 10/5/20. That submission corresponds to docket number 4 in that case.

        b.      The complaint that I filed in K5 on 9/25/20. That submission corresponds to docket number 2 in that case.

        c.      The complaint that I filed in K6. That submission corresponds to docket number 2 in that case.

3.      For the same reasons, I also incorporate by reference as though fully set forth herein the "Background Facts" sections that appear in the following:

        a.      The First Amended Complaint that I submitted in K7 on 10/18/20 that corresponds to docket number 3 in that case. That section begins on page 54 in that submission.

        b.      The complaint that I submitted in K8 on 10/25/20 that corresponds to docket number 2 in that case. That section begins on page 27 in that submission.

4.      Long before I was first prevented from attending a public forum that the Mayor conducted, a news organization named DNAInfo published a news article on the Internet on 12/18/16 at https://www.dnainfo.com/new-york/20161217/upper-west-side/mayor-de-blasio-town-hall-upper-west-side/ that was written by Carolina Pichardo and is entitled, "De Blasio's

Town Hall Initially Bars Media Due to 'Miscommunication'" in which that article reported that members of the press were initially prevented from attending a town hall meeting that the Mayor conducted on 12/15/16 while Mr. Levine was the moderator for that town hall meeting that was a public forum. That article also reported that someone named Thomas Lopez-Pierre was barred from that public forum and wasn't eventually permitted to attend that town hall. Mr. Lopez-Pierre was then a political rival of New York City Councilman Mark Levine who was seeking to be Mr. Levine's replacement on the City Council. This means that the illegal acts and omissions that the defendants in this action committed against me in relation to town hall meetings, a resource fair meeting, and a public hearing that the Mayor conducted were a resumption of illegal acts and omissions that were part of a municipal custom and practice by members of the Mayor's office and members of the NYPD to illegally bar people from public forums that the Mayor conducted in violation of the U.S. Constitution and other applicable laws. The following is a relevant excerpt from that news article that sufficiently confirms that Mr. Levine and/or people who acted on his behalf violated the Hatch Act by barring Thomas Lopez-Pierre from that town hall meeting:

> The local tenant activist Thomas Lopez-Pierre — who is running against Levine for City Council — said he was also barred, after registering for the event and receiving a call for confirmation from the Mayor's office on Monday.
>
> Levine said Lopez-Pierre has a "violent history" and "has behaved in threatening ways at numerous such events."
>
> Levine said there was "some vetting for security concerns," but that a mixture of about two dozen community organizations, including nonprofits and NYCHA tenant groups, brought their own constituents. There was open registration as well, in which those interested could register by calling or emailing a designated number.
>
> Lopez-Pierre said he also spoke to Paola Ruiz, the Manhattan Borough Director for the mayor's community affairs unit, on Dec. 6 to directly register for the event.

5.      The next screenshot is from a Twitter posting that Mr. Lopez-Pierre posted on the

Internet at https://twitter.com/VoteLopezPierre/status/809560855151071232 on 12/15/16 at 7:48

pm by using a Twitter account that is registered to him and has the username of

"@VoteLopezPierre". His remarks in that posting sufficiently confirm that Mr. Levine violated

the Hatch Act (5 U.S.C. §1502(a)(1)) by causing Mr. Lopez-Pierre to be barred from that town

hall meeting and that town hall meeting was illegally conducted inside of a public school in

violation of _Bloomberg v. The New York City Department of Education_, No. 17-cv-3136 (PGG)

(S.D.N.Y. Sept. 24, 2019).



6.      The next screenshot is from a Twitter posting that a journalist named Brigid Bergin posted on the Internet at https://twitter.com/brigidbergin/status/809555592125759488 on 12/15/16 at 7:27 pm by using a Twitter account that is registered to her and has the username of "@brigidbergin". Her remarks in that posting confirm that she observed Mr. Lopez-Pierre on 12/15/16 as he was being illegally barred from attending the public town hall meeting that the Mayor conducted with New York City Councilman Mark Levine at a time when Mr. Lopez-Pierre sought to be Mr. Levine's replacement on the City Council.



Brigid Bergin
@brigidbergin

Mayor @BilldeBlasio praises  @MarkLevineNYC. Thomas Lopez-Pierre who is challenging Levine next year was not being allowed in when I arrived

7:27 PM · Dec 15, 2016 · TweetDeck

7.      On a related note, on 12/16/16, a news organization named Pix11 published a news article that was written by a Mario Diaz that is entitled "Demonstrators Brave the Cold to Protest De Blasio's Homeless Policy Outside Town Hall Meeting" and available on the Internet at https://pix11.com/2016/12/16/demonstrators-brave-the-cold-to-protest-de-blasios-homeless-policy-outside-town-hall-meeting/. That article reported the following:

        a.      Mr. Lopez-Pierre was prevented from attending the town hall meeting that the Mayor conducted on 12/15/16 with Mr. Levine.

        b.      Mr. Lopez-Pierre told a journalist outside of that public town hall meeting on 12/15/16 that though he received confirmation that he would be able to attend that town hall, he was prevented from doing so once officials of Defendant City learned that he was

a political candidate who was running against New York City Councilman Mark Levine in an election to become a member of the City Council.

c.      Journalists observed Mr. Lopez-Pierre joking with members of the NYPD outside of that town hall meeting as they left it as temperatures outside were then well below freezing.

d.      d. A press secretary named Rosemary Boeglin for the Mayor thereafter claimed that Mr. Lopez-Pierre skipped a line for entering the school that hosted that town hall meeting in order to cause a scene and that he asked to be arrested then. However, that clearly was a fraudulent pretext that was designed to illegally cover-up the fact that Mr. Lopez-Pierre was illegally barred from that public forum in violation of applicable laws.

8.      Long before Defendants Stribula, Miller, Gerola, and Nieves were among those who illegally prevented me from attending the Mayor's 11/2/17 town hall, I took a photograph of Ms. Stribula and Mr. Ringel at 7:46 pm on 4/27/17 near the entrance to the school that hosted the Mayor's 4/27/17 town hall as I was being illegally prevented from attending that public forum by Defendants Redmond, Ringel, Miller, and others as Ms. Stribula was aware of that and didn't intervene on my behalf to enable me to attend that town hall. The next screenshot is from that 4/27/17 photograph and shows Ms. Stribula on the far-left as Mr. Ringel appears near its center.



9.      Hindsight suggests that Ms. Stribula's failure to intervene on my behalf on 4/27/17 to enable me to attend the Mayor's 4/27/17 town hall was a clear sign that she was then a co-conspirator with Defendants Redmond, Ringel, Miller, and others in a criminal scheme to violate my constitutional right to attend that town hall while those conspirators were violating the Hatch Act (5 U.S.C. §1502(a)(1)) in the process partly by engaging in voter suppression, whistleblower retaliation, and viewpoint discrimination against me and the public by extension while the Mayor used that town hall partly as a campaign event to attract publicity and goodwill to bolster his re-election prospects. Prior to that 4/27/17 town hall, Ms. Stribula sent an e-mail message on 4/27/17 at 2:46 pm to various people to communicate work assignments that she was issuing to people who included Defendant Miller for that town hall. Those work assignments partly pertained to tasks that would be performed in granting members of the public access to that town hall. A copy of that e-mail message appears in the annexed **Exhibit B**. I received a copy of that e-mail message on 2/18/20 from Hannah Faddis of the New York City Law Department. The redactions that appear in that e-mail message reflect how Ms. Faddis provided it to me. Also, Defendant City illegally engaged in spoliation of critically significant video recording evidence

that it was legally required to have preserved that was recorded on 4/27/17 between 5:30 pm and 6:30 pm by a video security camera that was installed on 4/27/17 by the entrance to the school that hosted the Mayor's 4/27/17 town hall. That video security camera is controlled by the DOE and the video recording that Defendant City illegally didn't preserve was recorded between 5:40 pm and 6:30 pm on 4/27/17 by that specific video security camera.

10.     Additionally, long before Defendant Stribula illegally prevented me from attending the Mayor's 11/2/17 town hall, an eyewitness of mine sent an e-mail message on 6/24/17 at 4:26 pm to a whistleblower news censor in journalism named Graham Rayman and I in which that witness discussed illegal acts that Ms. Stribula committed against that witness on 6/8/17 during the public town hall meeting in Rego Park in Queens. That witness asked me to keep that witness' identity confidential and I agreed to do so. As a result, I will refer to that witness as "Person X" in this complaint. Person X worked for the New York State Attorney General's office on 6/8/17 and 6/24/17. It's ironic that this means that Defendant Stribula illegally violated the constitutional rights of someone on 6/8/17 by refusing to allow that person to access the room in which the Mayor conducted his 6/8/17 town hall while seating was available in that room as that town hall was being conducted. In short, the following excerpt from that e-mail message that Person X sent on 6/24/17 at 4:26 pm about Ms. Stribula, the Mayor's 6/8/17 town hall, and I confirms that Ms. Stribula illegally subjected me to stigma-plus defamation on 6/8/17 in remarks that she made to Person X by baselessly referring to me as a "harasser" as I watched Ms. Stribula and Person X talk in a stairwell in the building that hosted the Mayor's 6/8/17 town hall:

> **Subject:** Re: Information about police misconduct on 6/8 at Mayor's public town hall meeting in Rego Park
> **Date:** June 24, 2017 at 4:26:20 PM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Cc:** "Rayman, Graham" <grayman@nydailynews.com>

I would just like to add that I was allowed to write my question on a card, after which the guard told me they would allow me in to ask the question after they reviewed it and people emptied the room. As the room emptied, they did not let me in saying that the room was full even though we saw empty seats in the TV screens. When I asked a Mayor's staff member why they wouldn't let me in, she explained it was because I was associated with Towaki and he was a "harasser", but did not explain anything else to me. I think maybe she was referencing Towaki's litigation history with different city agencies, but I am not sure since I just met him that day. I also think maybe they did not let me in because they did not like my question which was about police accountability, but I'm not sure about that since I know someone else in the room was allowed to ask a question about broken windows policing. Also, please keep my name anonymous. Thanks.

11.     Person X mistakenly expressed in the preceding e-mail message that I had litigation against different agencies of Defendant City. Although I used my HRA lawsuit prior to 6/8/17 to pursue entirely valid claims against personnel who worked for Defendant City and were assigned to different agencies of Defendant City, the sole opposing party in my HRA lawsuit on 6/8/17 continued to be HRA. When I met Person X for the first and only time on 6/8/17 while attending the Mayor's 6/8/17 town hall from within an overflow room in the basement of the building in which the Mayor conducted that town hall in a room elsewhere within that building, I then had ongoing and entirely valid litigation against HRA through my HRA lawsuit and had just presented oral arguments in that case on 6/7/17 because Jeffrey Mosczyc of HRA illegally colluded and conspired with New York State Judge Nancy Bannon in between 4/5/17 and 4/11/17 to illegally adjourn the scheduled 4/12/17 oral arguments hearing in that case through an illegal ex-parte adjournment application that he faxed on 4/5/17 to Judge Bannon's chambers to illegally prevent me from being able to oppose his illegal adjournment application before Judge Bannon illegally granted it on 4/11/17 in flagrant violation of my due process rights while she then was running for re-election as a judge. In hindsight, it appears that Ms. Stribula told Person X on 6/8/17 that I was a harasser simply because I commenced litigation against HRA in which I also asserted entirely valid claims on 5/19/17 through an order to show cause application that

concerned illegal acts and omissions that were committed against me on 4/27/17 that caused me

to be illegally prevented from attending the Mayor's 4/27/17 town hall and illegally assaulted by

NYPD Officer Rafael Beato on that date on a public sidewalk next to the school that hosted the

Mayor's 4/27/17 town hall by being shoved 3 times without cause as I lawfully sought to apprise

the Mayor from a sufficient distance away as he left the building that hosted that town hall partly

about the fact that I was illegally barred from that town hall and assaulted by Mr. Beato.

12.     Before others who Ms. Atcheson worked with illegally prevented me from attending the

Mayor's 11/2/17 town hall, Ms. Atcheson was recorded on video on 4/27/17 that confirms that

she was present then in the immediate vicinity of where I was near the entrance to the school that

hosted the Mayor's 4/27/17 town hall as Defendants Redmond, Ringel, and Miller were illegally

preventing me from entering that school to attend that town hall from within an overflow room

that was setup for that town hall after I was issued an admission ticket for that purpose. Ms.

Atcheson then was among others who illegally prevented me from attending the public resource

fair meeting that the Mayor conducted on 5/23/17 inside of the Veteran's Memorial Hall

chamber inside of the Bronx Supreme Court while I was conducting myself in an entirely lawful

manner in that courthouse on that date. That was after I registered in advance to attend that

5/23/17 resource fair. I thereafter received video recordings from OCA that were recorded in that

courthouse on 5/23/17 that show Ms. Atcheson as she used a variety of body language toward

me in conjunction with remarks to illegally direct me to move away from the entrance to the

Veteran's Memorial Hall chamber in that courthouse that was then being used to grant other

members of the public access to that public forum. Coincidentally, that 5/23/17 resource fair was

conducted during the U.S. Navy's annual Fleet Week event in New York City while I continued

to be a U.S. Navy veteran and as that 5/23/17 resource fair was conducted in **Veteran's**

Memorial Hall. The next screenshot is from one of the video recordings that I received from

OCA that was recorded on 5/23/17 by a video security camera it controls that is installed inside

of the Bronx Supreme Court. Ms. Atcheson and I appear on the left in that screenshot that

corresponds to the time of 9:30.24.444 am on 5/23/17. Ms. Atcheson was then using her left

hand to illegally direct me to move away from the entrance to the Veteran's Memorial Hall

chamber in that courthouse in spite of the fact that she and I were then in a public corridor in that

courthouse over which she certainly had absolutely no control whatsoever. Andrew Berkowitz of

the Mayor's NYPD security detail also appears in that screenshot as he then had his left hand

near his mouth while apparently engaging in a radio communication by using a device that was

installed near his left wrist. A female member of the NYPD is also shown in that screenshot as

she doing something with a cell phone instead of performing her legal duty to uphold my

constitutional rights by intervening on my behalf to enable me to attend that 5/23/17 resource

fair.



13.     New York State Court Officers Anthony Manzi (badge #: 182), Matthew Brunner (badge

#: 478), and Ramon Dominguez (badge #: 508) all were eyewitnesses to the illegal acts and

omissions that were committed against me on 5/23/17 inside of the Bronx Supreme Court that

caused me to be illegally prevented from attending the Mayor's 5/23/17 resource fair meeting in

it. They then jointly prepared an official report on 5/24/17 that is known as an "Unusual

Occurrence Report" that was submitted to their supervisors. I received a copy of that report from

OCA on 8/28/20 in response to a FOIL demand that I submitted to it.  The first page in that

report contains the following relevant statement about me and the fact that I was illegally

prevented at 9:50 am on 5/23/17 from attending the Mayor's 5/23/17 resource fair by them and

Defendants Atcheson, Gerola, Nieves, and Mr. Berkowitz as all of them then worked as co-

conspirators for that purpose:

"AT ABOVE T/P/O, THE ABOVE UNKNOWN SUBJECT WAS DENIED ENTRY
INTO A CITY HALL EVENT BEING HELD IN THE ROTUNDA BY CITY HALL
STAFF AND MAYOR DEBLASIO'S NYPD DETAIL. SUBJECT WAS ASKED TO
VACATE THE AREA HE WAS STANDING IN"

14.    No facts in that report exist that indicate that valid grounds existed to bar me from the

Mayor's 5/23/17 resource fair nor move from where I lawfully stood in a hallway in that

courthouse as I waited to be granted access to that public resource fair. Ms. Atcheson also

illegally refused to issue me admission tickets on 9/14/17 and 9/26/17, and 10/18/17 to enable

me to attend the town hall meetings that the Mayor conducted near the buildings that hosted

those public forums on the dates when they were conducted in spite of the fact that I registered in

advance to attend those town hall meetings and I conducted myself in an entirely lawful manner

at the sites of those town hall meetings on the dates when they were conducted in contrast to her.

The circumstance clearly foreshadowed further such illegal acts by her against at the sites of

town hall meetings that the Mayor conducted on the dates when they would be conducted. That

circumstance was also an indication of an apparent addiction that Ms. Atcheson had to remaining

a faithless servant on account of the fact that she was willfully violating her oath of office for her

job with Defendant City by virtue of how she was illegally treating me at the sites of public

forums that the Mayor conducted. In short, Ms. Atcheson proved to be an incorrigible addict

with others who were all addicted to violating my constitutional rights at public forums that the

Mayor conducted to steal the 2017 New York City government elections by voter suppression,

voter fraud, and whistleblower retaliation largely to protect their careers. An equitable remedy

that I hope such addicts promptly receive to cure that addition would entail having them receive

the lasting gift that the coronavirus can offer them largely because that would likely greatly

improve my chances at the same time of being able to lawfully attend public forums in the future

without any unreasonable interference and reduce crime.

15.     E-mail messages that Defendant Ramos sent on 6/28/17 and 6/29/17 confirm that I was being illegally barred prospectively from public town hall meetings that the Mayor conducted as an abuse of process and First Amendment retaliation that was tied to my HRA lawsuit as the Mayor's office was illegally being apprised of updates in that sealed lawsuit as early as 4/10/17 that was just 1 day before the Mayor's 4/11/17 public resource fair in Staten Island. The following is a link to a PDF file that is 16 pages in length that I have made available on the Internet that is comprised of relevant excerpts from a 374-page PDF file that I was provided on 2/15/19 by the New York City Mayor's office in response to a FOIL demand that I submitted to it:

https://drive.google.com/file/d/16wSpJ7kk-aOtx7Bkg8MeqUpyWd5Io2hR/view?usp=sharing

16.     Those excerpts correspond to e-mail messages that appear on pages 211 212, and 361 thru 374 in that file. Information shown on those pages was provided to me with redactions. Copies of e-mail messages about me that were sent on 4/10/17, 6/28/17, and 6/29/17 appear on those pages. Those e-mail messages partly concern litigation that I commenced against HRA in which I was then involved that are closely related to my claims in this action. Senior members of the New York City Mayor's administration and the head of the Mayor's NYPD security detail (Defendant Redmond) sent those e-mail messages to Mr. Banks and/or amongst themselves.

17.     The next screenshot is a relevant excerpt of text that appears in the e-mail message that Defendant Ramos sent on 6/28/17 at 3:27 pm to a whistleblower news censor in journalism named Erin Durkin while Ms. Ramos worked for the Mayor's office and Ms. Durkin worked for the New York Daily News. Ms. Durkin now works for a news organization named Politico New York. That e-mail message appears on page 15 in the 16-page PDF file that I just discussed above that corresponds to page 373 in the 374-page PDF file that I discussed earlier.

**From:** Ramos, Jessica
**Sent:** Wednesday, June 28, 2017 3:27 PM
**To:** Erin Durkin
**Cc:** Phillips, Eric
**Subject:** RE: town halls

Hi Erin,

Mr. Komatsu has never RSVP'd to a town hall. He is allowed to enter the overflow room.

Security detail first learned he's threatened Commissioner Steve Banks at the LIC town hall. When approached, Mr. Komatsu made a physical threat against a member of the security detail after one of them lightly touched his arm while speaking. This threat was officially investigated by the NYPD. He has also made several threats against other members of the security detail.

Jessica

18.     Ms. Ramos lied in that e-mail message by claiming that I **a)** hadn't registered in advance to attend town hall meetings that the Mayor conducted and **b)** threatened Mr. Banks and members of the of the NYPD. I never threatened them and I registered in advance with the Mayor's office for every town hall meeting that the Mayor conducted that I sought to attend. I have incontrovertible proof of that mainly because I sent e-mail messages to register for that purpose. Also, Ms. Ramos confirmed in her remarks that appear in this screenshot that she and others were then illegally subjecting me to an illegal prior restraint of my First Amendment and Fourteenth Amendment right to lawfully attend public town hall meetings that the Mayor conducted within the specific rooms in which he conducted them as he did so instead of having to remotely observe how they were conducted on TV screens that were setup within separate overflow rooms that were used in the buildings in which those town hall meetings were conducted.

19.     On a related note, U.S. District Judge Edgardo Ramos previously issued the following

key findings about viewpoint discrimination in _Hoefer v. Board of Education of the Enlarged_

_City School District of Middletown_, No. 10-cv-3244 (ER) (S.D.N.Y. June 6, 2017):

> ""[s]uspicion that viewpoint discrimination is afoot is at its zenith when the speech
> restricted is speech critical of the government, because there is a strong risk that the
> government will act to censor ideas that oppose its own." _Nat'l Council of Arab_
> _Americans, Act Now to Stop War & End Racism Coal. v. City of N.Y._, 478 F. Supp. 2d
> 480, 491 (S.D.N.Y. 2007) (quoting _Ridley v. Mass. Bay Transp. Auth._, 390 F.3d 65, 86
> (1st Cir. 2004))."

20.     Judge Ramos coincidentally issued that decision just 2 days before I was illegally

prevented from attending the Mayor's 6/8/17 town hall meeting and 1 day before I presented oral

arguments in my HRA lawsuit. The only reason why I presented oral arguments in my HRA

lawsuit on 6/7/17 was because an attorney for HRA named Jeffrey Mosczyc conspired and

colluded with New York State Supreme Court Judge Nancy Bannon while she was running for

re-election in 2017 to steal away my First Amendment right to instead present oral arguments in

my HRA lawsuit on 4/12/17 that Judge Bannon had scheduled to occur then on 1/26/17. My

4/12/17 oral arguments hearing would have occurred just 1 day after I participated in related

parallel litigation against HRA that was assigned to the New York State Office of Temporary

and Disability Assistance ("OTDA") in its capacity as a New York State administrative appellate

forum for claims asserted against HRA. Mr. Mosczyc illegally sent a fax to Judge Bannon's

chambers on 4/5/17 to submit an illegal ex-parte application to adjourn the 4/12/17 oral

arguments hearing. I thereafter received a voicemail message from Judge Bannon's clerk

(Jerome Noriega) at 9:56 am on 4/11/17 in which he apprised me that Judge Bannon granted Mr.

Mosczyc's adjournment application in spite of the fact that I was never notified that such an

application had been made before it was granted. That violated my First Amendment and

Fourteenth Amendment right to receive notice of that adjournment application before that

application could be granted and to submit opposition in response to that application and have

that opposition fully considered by Judge Bannon before Mr. Mosczyc's illegal adjournment

could possibly be legally granted. The theft by Judge Bannon and Mr. Mosczyc of my First

Amendment and Fourteenth Amendment right to participate on 4/12/17 in an oral arguments

hearing in my HRA lawsuit was the primary catalyst for my decision to use public town hall

meeting and public resource fair meetings that the Mayor conducted with Mr. Banks and others

as well as public hearings that the New York City Council conducted as an alternate time, place,

and manner in which to conduct such oral arguments in a very public manner while those public

forums were being conducted and recorded on video as a result of arrangements that the

organizers of them made that was broadcast over the Internet to countless others.

21.      The illegal prior restraint on my First Amendment and Fourteenth Amendment rights to

attend town hall meetings that the Mayor conducted that Ms. Ramos addressed in the e-mail

message that she sent to Ms. Durkin on 6/28/17 at 3:27 pm that I just discussed was the result of

illegal viewpoint discrimination that Ms. Ramos, other members of the Mayor's staff, other

members of the Mayor's administration, and members of the NYPD jointly subjected me to as

the Mayor and other government officials used those public forums and others as campaign

events to attract publicity and goodwill from the public to boost Bill de Blasio's prospects for

being re-elected as New York City's Mayor in 2017. Such public forums were being conducted

as the Mayor, members of the New York City Council, and others that include New York City

Borough Presidents, New York City Comptroller Scott Stringer ran for re-election.

22.      In addition to lying to Ms. Durkin on 6/28/17 by fraudulently claiming to her that I never

registered to attend town hall meetings that the Mayor conducted in 2017 and that I threatened

Mr. Banks and members of the NYPD, Ms. Ramos also further and blatantly lied about me in

additional e-mail messages that she sent to Ms. Durkin on 6/28/17 and 6/29/17 in order to concoct a fraudulent pretext to try to justify the illegal acts and omissions that were perpetrated against me by members of the NYPD, members of the Mayor's staff, and New York State court officers on 4/27/17, 5/23/17, and 6/8/17 at the sites of public town hall meetings, public resource fair meetings that thereafter continued to be perpetrated against me. Those additional e-mail messages also appear in the 16-page PDF file that I discussed earlier and Ms. Ramos joined in that conspiracy to violate my civil rights by trying to illegally cover-that up as she also lied about my HRA lawsuit in those e-mail messages. In short, she lied about me in those e-mail messages in all of the following ways:

a.   She claimed that I stated on 4/27/17 at the site of the Mayor's 4/27/17 town hall that I was trained in hand-to-hand combat. I never said that then. My training on 4/27/17 in hand-to-hand combat was no different than what many other people experience as kids when forced to defend themselves against bullies.

b.   She fraudulently insinuated that I stated on 4/27/17 at the site of the Mayor's 4/27/17 town hall that I would use physical force against one or more people in order to attend the Mayor's 4/27/17 town hall. I never stated that and never suggested any such thing. I instead suggested that I would walk around those who were illegally preventing me from attending that town hall and would move physical obstructions that included a metal barrier that were used to illegally prevent me from attending that town hall.

c.   She fraudulently concealed that my alarming behavior on 4/27/17 at the site of the Mayor's 4/27/17 town hall was limited to **a)** engaging in protected whistleblowing against HRA and its business partners while I talked with other members of the public there, **b)** reporting an entirely valid complaint against Defendant Redmond to the

CCRB by telephone, and **c)** calling 911 to try to have a NYPD Commanding Officer

meet me at that site to have him overrule Defendant Redmond and others to enable

me to exercise my constitutional right to attend the Mayor's 4/27/17 town hall.

d.      She claimed that I conducted myself in a disruptive manner in June of 2017 while I

was in an HRA office. That was also a total lie by her. I conducted myself in an

entirely lawful and calm manner instead.

e.      She claimed that legal papers were served upon me that were part of my HRA lawsuit

in response to behavior that she alleged I exhibited, described as having been

disruptive, and claimed had occurred in an HRA office. This was a total lie because

no such legal papers were served upon me nor filed in my HRA lawsuit.

23.     The next two screenshots that follow are from what appears on page 10 of the 16-page

PDF file and corresponds to page 368 in the 374-page PDF file. That information shows

additional e-mail messages that Ms. Ramos and Ms. Durkin exchange don 6/28/17 about me in

which Ms. Ramos retracted her fraudulent claim in which she lied by claiming that I had

threatened Mr. Banks. However, she again lied about me in those e-mail messages by claiming

that I was disruptive while visiting HRA's headquarters that are located at 150 Greenwich Street

in Manhattan that is also known as "4WTC" and is an abbreviation for 4 World Trade Center.

| | |
|---|---|
| **From:** | Durkin, Erin |
| **To:** | Ramos, Jessica |
| **Subject:** | Re: town halls |
| **Date:** | Wednesday, June 28, 2017 6:18:56 PM |

But isn't that after the first town hall where he was stopped because the detail learned he had threatened Banks? Is that a separate incident?

Sent from my iPhone

On Jun 28, 2017, at 6:13 PM, Ramos, Jessica <JRamos@cityhall.nyc.gov> wrote:

> He showed up to HRA (4 WTC) in early June and was disruptive.
>
> Sent from my BlackBerry 10 smartphone.
>
> **From:** Durkin, Erin
> **Sent:** Wednesday, June 28, 2017 18:10
> **To:** Ramos, Jessica
> **Subject:** Re: town halls
>
> Not totally following the Banks thing. What was the appearance where he behaved disruptively and what did he do, how was Banks involved?
>
> Sent from my iPhone

> On Jun 28, 2017, at 6:01 PM, Ramos, Jessica
> <JRamos@cityhall.nyc.gov> wrote:
>
> On the former, there was only disruptive behavior.
>
> Working on latter.
>
> Sent from my BlackBerry 10 smartphone.
>
> **From:** Erin Durkin
> **Sent:** Wednesday, June 28, 2017 17:51
> **To:** Ramos, Jessica
> **Cc:** Phillips, Eric
> **Subject:** Re: town halls
>
> Thanks. What was the threat against Banks?
>
> Also, on the RSVP issue - he has now provided emails he sent RSVP'ing for the LIC and Rego Park town hall. He also sent an RSVP confirmation from the Bronx Resource Fair (believe I said Bronx town hall before but it was actually the resource fair he was barred from). Want to double check on this?

24.     The next screenshot corresponds to the e-mail message that Ms. Ramos sent to Ms. Durkin about me on 6/28/17 at 5:42 pm that appears between pages 11 and 12 in the 16-page PDF file that corresponds to pages 368 and 369 in the 374-page PDF file. In short, her remarks about a storage benefit are entirely irrelevant largely because HRA issued me a storage allowance as a government benefit after she sent that e-mail message while nothing had changed in applicable law nor my circumstances to cause HRA to issue that storage benefit. This means that legal services providers were wrong to have refused to provide me assistance against HRA to have it provide me a government benefit to which I was both eligible and legally entitled to receive from it. Also, contrary to Ms. Ramos' remarks, referrals that I received to legal services

providers weren't strictly about storage matters and their refusal to assist me was partly because

their areas of practice didn't cover that particular matter and they instead focused on helping

single-mothers that I am not among. Moreover, Ms. Ramos also blatantly lied in this e-mail

message partly by claiming that an order to show cause application was served upon me due to

an appearance that I made at an HRA office in June of 2017. As I stated earlier, no such order to

show cause application to which she then referred was served upon me.

---

On Wed, Jun 28, 2017 at 5:42 PM, Ramos, Jessica
<JRamos@cityhall.nyc.gov> wrote:

Page 368

---

Mr. Komatsu wanted a storage allowance, for which he was
ineligible because he had an apartment. We also referred him to
multiple legal services providers about this specifically and all of
them denied him.

Mr. Komatsu has been served an Order to Show Cause due to his
appearance at HRA in June, when he showed disruptive behavior.
That OSC and another pending matter were submitted to the
court for a decision on June 7. HRA is still waiting for the written
decision.

Sent from my BlackBerry 10 smartphone.

25.     The next screenshot corresponds to an e-mail message that appears on page 7 in the 16-page PDF file and corresponds to page 365 in the 374-page PDF file. That e-mail message was about me and town hall meetings that the Mayor conducted with others since 4/27/17 that I was illegally prevented from attending. Jaclyn Rothenberg sent that e-mail message at 5:18 pm on 6/28/17 to Ms. Ramos, Defendant Redmond, and more than 5 other senior members of the Mayor's staff while Ms. Rothenberg was among such senior members of the Mayor's staff. Ms. Rothenberg's remarks in that e-mail message confirm that Ms. Ramos lied about me in her remarks to Ms. Durkin about an order to show cause application having been served upon me because Ms. Rothenberg pointed out that I instead served an order to show cause application upon HRA on 6/6/17 when I visited HRA's offices located at 150 Greenwich Street in Manhattan and that order to show cause application was part of my HRA lawsuit.

**From:** Rothenberg, Jaclyn
**Sent:** Wednesday, June 28, 2017 17:18
**To:** Ramos, Jessica
**Cc:** Phillips, Eric; Redmond, Howard DI.; Hagelgans, Andrea; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
**Subject:** RE: town halls

Confirmed that he appeared at 4WTC on June 6 and served an Order to Show Cause.  That OSC and another pending matter were submitted to the court for a decision on June 7.  HRA is still waiting for the written decision.

26.     The next screenshot corresponds to an e-mail message that appears on page 8 in the 16-page PDF file and corresponds to page 366 in the 374-page PDF file. That e-mail message was

provided to me in the totally redacted form in which it appears here. That e-mail message was also about me and town hall meetings that the Mayor conducted with others since 4/27/17 that I was illegally prevented from attending. Defendant Redmond sent that e-mail message at 2:18 pm on 6/28/17 to Ms. Ramos and 6 other senior members of the Mayor's staff.



27.     The next screenshot corresponds to an e-mail message that appears on page 16 in the 16-page PDF file and corresponds to page 374 in the 374-page PDF file. That e-mail message was sent by Ms. Durkin on 6/28/17 at 1:53 pm about me to Eric Phillips while Mr. Phillips was the

Mayor's mouthpiece as his spokesman. Ms. Durkin sent that e-mail message on the same date

that I was in contact with one of her colleagues whom she referred to as Shack in that e-mail

message.



From: Erin Durkin <​███████████​> on behalf of Erin Durkin <edurkin@nydailynews.com>
Date: Wednesday, June 28, 2017 at 1:53 PM
To: Eric Phillips <efphillips@cityhall.nyc.gov>
Subject: town halls

Hi Eric,
We're writing about a man named Towaki Komatsu who says he has been barred repeatedly from the
mayor's town halls. He is filing a CCRB complaint, though I don't believe it's been filed yet. Shack is taking
the lead on the story but asked us to reach out. He says he was barred from the town halls on 4/27 in Long
Island City, May 23 at the Bronx Supreme Court, and June 8 in Rego Park, each time by members of the
mayor's security detail. The first two he was barred from entering, the third he was sent to an overflow
room with a video feed and not allowed into the main event after other people had left. Wondering if this
is accurate, and if so why he's been barred?


Thanks,
Erin

28.     It's objectively reason to infer that her reference to Shack was a nickname that was used

to refer to another whistleblower news censor in journalism named Graham Rayman, who still

works for the New York Daily News. I received 3 e-mail messages from him on 6/28/17 that

concerned whistleblowing that I was engaged in to him about the fact that I was illegally

prevented form attending the public town hall meetings and public resource fair meeting that the

Mayor conducted on 4/27/17, 5/23/17, and 6/8/17. The next screenshot shows such e-mail

correspondence between Mr. Rayman and I on 6/28/17.



29.     The next screenshot is a relevant excerpt from the beginning of the e-mail message that

appears on page 1 in the 16-page PDF file and corresponds to page 211 in the 374-page PDF file.

That e-mail message was sent by someone named Raquel Lucas on 4/10/17 at 5:24 pm to Mr.

Banks, Ms. Rothenberg, and 4 other senior members of the Mayor's staff that included a Harvard

Law School graduate.



30.     That e-mail message was about me and partly concerned my scheduled attendance on

4/11/17 at the public resource fair meeting that the Mayor conducted with Mr. Banks and others

in Staten Island. Litigation that I commenced against HRA that I continued to be engaged in was

discussed in that e-mail message. Ms. Lucas then worked as an assistant to Mr. Banks and

apprised everyone who received that e-mail message that I would have a fair hearing conducted

on 4/12/17 for claims that I asserted against HRA that pertained to a storage government benefit.

OTDA conducted that fair hearing by telephone and both OTDA and I recorded that hearing on

audio. It's also objectively reasonable to infer from the totality of the circumstances that Ms.

Lucas expressed remarks in that e-mail message in which she flagrantly violated the sealing

order that New York State Supreme Court Judge Barry Ostrager granted me in January of 2017

in my HRA lawsuit that caused that case to be thereafter sealed. The sole opposing party in my

HRA lawsuit throughout the entire period between January of 2017 and 4/11/17 was HRA. This

means that HRA was prohibited from sharing updates about my HRA lawsuit with the majority

of the people to whom Ms. Lucas sent that e-mail message on 4/10/17 at 5:24 pm about me

because they were not parties in that sealed lawsuit.

31.     The next screenshot shows e-mail messages that appears on page 4 in the 16-page PDF

file and corresponds to page 362 in the 374-page PDF file. Those e-mail messages were sent by

Ms. Ramos on 6/28/17 about me to numerous senior members of the Mayor's staff. The subject

of those e-mail messages indicates that they were about town hall meetings. It's objectively

reasonable to infer from the totality of the circumstances that include the fact that they were

presented to me in totally redacted form that the information in those e-mail messages concerned

a conspiracy to violate my constitutional rights to have attended public town hall meetings that

the Mayor conducted.



32.     What follows shows an e-mail message that I received on 9/27/17 at 9:49 am that was

sent to me by someone named Judith Lê while she then worked for the CCRB as an investigator.

She sent me that e-mail message in response to an e-mail message that I sent to her on that date

at 9:27 am in which I apprised her that Defendants Gerola, Mason, and Atcheson acted in concert

on 9/26/17 to illegally prevent me from attending the public town hall meeting that the Mayor

conducted then in Manhattan with Mr. Banks and other government officials.  In her e-mail

message to me on 9/27/17 at 9:49 am, Ms. Lê claimed that the Mayor's staff and Mayor's CAU

were then in charge of admittance to town hall meetings that the Mayor conducted.

> **From:** "Le, Judith (CCRB)" <JLe@ccrb.nyc.gov>
> **Subject:** RE: New viewpoint discrimination by NYPD's Howard Redmond & Lt. Nieves
> at Mayor's 8/30 town hall in Brooklyn
> **Date:** September 27, 2017 at 9:49:27 AM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
>
> Hi Mr. Komatsu,
>
> As we previously discussed, unfortunately, admittance in and out of the Town Hall
> events falls outside the jurisdiction. Again, if you'd like, I can forward the complaint to
> Internal Affairs, or recommend that you speak to the Mayor's staff/Community Affairs
> office, as they are in charge of admittance to the Town Halls.
>
> Best,
>
> Judith Lê
>
> Investigator, Squad 8
> Civilian Complaint Review Board
> 100 Church Street, 10th Floor
> New York, NY 10007
> (212) 912-2081

33.     On 9/28/17, the Mayor conducted a town hall in Harlem during which members of the

audience did a fantastic job of criticizing the Mayor about various matters. They did so after

New York City Councilman Bill Perkins urged the audience for that town hall to speak freely

about whatever was on their mind during that town has as they addressed the Mayor and other

government personnel during it. While urging them to do so, he told the audience that he didn't

want its members to feel restrained and to be shy in doing so. He instead then explicitly urged

that audience's members to shout out whatever was on their minds as they addressed the Mayor

and other government personnel who attended that that town hall. The Mayor's office arranged

for that town hall meeting to be recorded on video that is available on the Internet at

https://www.youtube.com/watch?v=4s9fYZNLK8o. Mr. Perkins is shown in the next screenshot at the elapsed time of 5 minutes and 37 seconds as he urged the audience members for that town hall to conduct themselves during it in the manner that I just discussed. Mr. Perkins' remarks then were a clear indication that it was certainly permissible pursuant to the First Amendment and Fourteenth Amendment for members of the public to shout their remarks to all government personnel who attended town hall meetings that the Mayor conducted following 9/28/17 because due process and equal protection was applicable to being able to be as vocal during such subsequent public forums.



34.     While following the instructions that Mr. Perkins gave during that town hall meeting, a Black woman rose to the occasion and marched to the center of the room in which the Mayor conducted that town hall as it was being conducted to lawfully express her irritation about something to the audience. All of that and more was recorded in the video recording that I just discussed. The next screenshot is from the elapsed time of 1 hour, 26 minutes, and 2 seconds in

the video recording that I just discussed. It shows the fantastic Black woman on the right to whom I just referred as she stood and hilariously stole the stage from the Mayor during his 9/28/17 town hall as she raised a finger on her left hand, wore an circular earring on her right ear and a blue denim jacket as she had her mouth open and had her right hand near her right hip.



35.     The Mayor appears on the right in the preceding screenshot as he wore a white shirt and stood. Defendant Redmond appears in the upper-left corner in that screenshot. The fantastic Black woman that I just discussed was very boisterous during that town hall and was permitted to continue to attend that town hall for more than 30 minutes after she stole the stage from the

Mayor in the manner that I just described and was recorded on video. The next screenshot is

from the elapsed time of 1 hour, 59 minutes, and 10 seconds in that video and shows her again as

she talked to the Mayor while she held a microphone in her right hand and was lawfully

expressing a grievance to him about inadequate public notice that was issued for the Mayor's

9/28/17 town hall.



36.    The next screenshot is from the elapsed time of 1 hour, 59 minutes, and 50 seconds in

that same video as I played it back with the closed-captioning feature enabled. That screenshot

shows that same fantastic Black woman on the far left as she continued to talk to the Mayor

while using a microphone. As she did so, she brilliantly told the Mayor, "you're in with the criminals". I totally agree with her remark about him and genuinely appreciate her outspokenness then for having reminded him quite clearly, publicly, and loudly about his status as a criminal while she stood next to Defendant Redmond. Mr. Redmond promptly thereafter coerced her to leave that town hall meeting in retaliation for her remarks to the Mayor. Although the Mayor and Defendant Redmond certainly didn't like her remarks to the Mayor then, an excerpt from _Cohen v. California_, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) that appears in this complaint's Legal Standards section confirms that what I just stated about that fantastic Black woman's speech may have been another person's "lyric" at the same time that others objected to it.



37.     The next screenshot is from the elapsed time of 1 hour, 50 minutes, and 37 seconds in that video and shows another fantastic woman as she stood up and assertively addressed the

Mayor while lawfully criticizing him about his policies that concern rezoning and affordable

housing matters as other members of that audience certainly supported her. At that time, she was

a teacher and was schooling the Mayor about his lack of honesty, transparency, accountability,

and leadership. I would have loved to have witnessed her addressing the Mayor firsthand as she

did so by having been permitted to exercise my constituonal right to have attended that town

hall from within the room in which it was conducted and seen her face that is not shown in that

video recording. If I had been able to attend that town hall within that room, I would have tried

to lawfully thank her for her criticism of the Mayor and recorded a video of her as she then

delivered her remarks to the Mayor. I had a First Amendment and Fourteenth Amendment right

to have recorded her conversation with the Mayor on video in a way that showed her face and the

defendants in this action.



38.     The next screenshot is from the elapsed time of 1 minute, 51 minutes, and 58 seconds in

that same video as it shows an unknown bald male as he looked in the direction of the video

camera that recorded that video and stood near the woman who had just schooled the Mayor

about his rezoning policies. That bald man whio is shown wearing a pink shirt and dark colored

sportscoat was recorded on video as he was present on 4/27/17 at the site of the Mayor's 4/27/17

town hall near its entrance as I was being illegally prevented from attending it by members of the

NYPD as well as Defendant Miller and Pinny Ringel of the Mayor's CAU. That bald man who

wore the pink shirt during the Mayor's 9/28/17 town hall illegally didn't make any effort on

4/27/17 to allow me to attend the Mayor's 4/27/17 town hall as he was aware that I was being

prevented from attending it. The totality of the circumstances on 9/28/17 strongly suggests that

he was then in the middle of harassing that woman in response to her remarks to the Mayor then

in spite of the fact that her remarks to the Mayor then had been protected speech about matters of

public concern.



39.      The next screenshot is from the elapsed time of 1 minute, 52 minutes, and 18 seconds in

that same video as it shows an unknown Black woman harassing the teacher who schooled the

Mayor about his rezoning policies. The bald man who was then wearing a pink shirt and dark

colored sportscoat that I just discussed also appears in that screenshot as he also appeared to then

be harassing that teacher.



40.     The next screenshot is from the elapsed time of 1 minute, 52 minutes, and 20 seconds in that same video as it shows an unknown female staff member of the Mayor's office on the right as she stood near the fantastic teacher that I have been discussing while she continued to address the Mayor.



41.    The next screenshot is from the elapsed time of 1 minute, 52 minutes, and 6 seconds in that video as it showed Melissa Mark-Viverito, who was then both the Speaker of the City Council and the moderator for that town hall. She was then telling the audience that people have a First Amendment right to **a)** express their views and disagree with others and that **b)** people had a First Amendment right to express their views in that room then.



42.     She made those remarks while I was being illegally prevented from attending that town

hall and before she told me on 9/28/17 as she left that event in front of the building that hosted it

and near a street that didn't know what the NYPD's problems with me were as I apprised her of

the fact that I was illegally prevented from attending that town hall in flagrant violation of my

First Amendment rights as I then expected her to promptly and effectively intervene on my

behalf to immediately remedy that. Instead, she illegally did nothing about that in spite of the

fact that she then had the power to introduce legislation that could have addressed and resolved

that.

43.     I wasn't recorded on video attending the Mayor's 9/28/17 town hall primarily because

Defendants Mason, Ringel, NYPD John Doe1 11/2/17, and others illegally prevented me from

attending that town hall after I arrived to the site of that public forum to do so in accordance with

my constitutional rights.  People who attended that town hall were illegally ejected from it while

that was also recorded on video. That occurred mainly because the Mayor has proven to be

incapable of tolerating valid criticism in contrast to his talents and apparent addiction for violating civil rights at public forums that is an criminal addition that he appears to share with several of the other defendants in this action. What I just discussed confirms that I had a Fourteenth Amendment due process and equal right to attend the Mayor's 11/2/17 town hall meeting and be as vocal and critical of the Mayor, his administration, and the NYPD as those who attended the Mayor's 9/28/17 town hall in Harlem were.

44.     On a related note, the next screenshot is a composite that shows **a)** a screenshot on the left that is from the elapsed time of 21 seconds within a video recording that I recorded on 9/28/17 at 5:58 pm as I lawfully waited in front of a woman named Marie Miranda to be granted access to the Mayor's 9/28/17 town hall in front of the building in which it would be conducted on that date with **b)** a screenshot on the right that shows Ms. Miranda as she spoke to the Mayor during that town hall while attending it from within the room in which it was conducted.



45.     The screenshot on the right in the preceding screenshot is from the elapsed time of 1

hour, 26 minutes, and 36 seconds within the video recording that the Mayor's office arranged to be recorded of the Mayor's 9/28/17 town hall. This screenshot further and overwhelmingly confirms that I had a Fourteenth Amendment due process and equal protection right to have attended that town hall during which Ms. Miranda talked with the Mayor about one of the very same types of housing issues that was among the types of matters that I sought to discuss with government officials while attending the Mayor's 11/2/17 town hall. As she talked with the Mayor during that 9/28/17 town hall, Ms. Miranda told the Mayor that she needed assistance from his administration to contend with a landlord her landlord who wasn't properly maintaining conditions in her apartment building. In response, Vito Mustaciuolo told Ms. Miranda that HPD was suing her landlord. Mr. Mustaciuolo was then a senior member of HPD and I have talked with him face-to-face a few times. Ms. Miranda also told the Mayor then that she and other tenants in her building were suing that same landlord, but she needed conditions in her apartment building to be properly addressed in the interim. The sum and substance of what she discussed with the Mayor was very closely-related to problems that I have had with Urban and HRA in relation to conditions in the building in which I reside about which I sought to have the Mayor commit to immediately remedying while attending the Mayor's 11/2/17 town hall.

## **RETROSPECTIVE FACTS**

1.      This section is comprised of relevant facts about matters that occurred after most of the events occurred that gave rise to my claims in this action. These facts support my claims in this action by hindsight and what they reveal about a propensity and proclivity by the defendants to violate my rights at public forums that the Mayor conducted.

**Facts about my interactions with the defendants on 11/30/17 at the site of the Mayor's town hall on that date**:

2.      To mercilessly and legally kill any possible doubt that anyone may have about whether it's objectively reasonable to infer from the totality of the circumstances that **a)** Defendant Stribula was personally involved with others that included Defendant Ringel in causing me to be illegally prevented from attending the Mayor's 11/2/17 town hall through their acts and omissions, I will next discuss a critically significant video recording that I recorded of Defendants Stribula and Ringel well as NYPD Officer Baez (shield #: 5984) and Harold Miller of the Mayor's CAU on 11/30/17 at 5:30 pm in front of the building that hosted the town hall meeting that the Mayor conducted in Queens as I conducted myself in an entirely lawful manner in stark contrast to Ms. Stribula, Mr. Ringel, Mr. Baez, and Mr. Miller as I stood in front of eyewitnesses that were comprised of other members of the public who were also waiting to attend that town hall.

3.      The next screenshot is from the elapsed time of 3 seconds in a video recording that I recorded on 11/30/17 at 5:30 pm that has the filename of "IMG_3280.MOV" as I stood in front of the building that hosted the public town hall meeting that the Mayor conducted in Queens on that date.



4.      As I recorded that video, I stood in front of other members of the public who also were lawfully conducting themselves and were also waiting to be granted access to that building to lawfully attend that town hall. As I recorded that video, I recorded Ms. Stribula, Mr. Ringel, Mr. Miller, Dustin Ridener of the Mayor's office, and Mr. Baez in it as well as members of the public who certainly then were eyewitnesses. A copy of that video is available on the Internet at https://drive.google.com/file/d/1p43pfi4DWQYVZi8b1GkHkcunEoN2Lhm4/view?usp=sharing. This screenshot shows Defendant Stribula as she was about to tell me again that she was not allowing me to attend the Mayor's 11/30/17 town hall.

5.      The next screenshot from that same video is from the elapsed time of 5 seconds and reflects what appears in it as Mr. Miller appears on the right. At that point in that video, Ms. Stribula was about to tell me that I couldn't attend that town hall simply because she said that she wouldn't allow me to do so without any additional clarification about that. I had just asked her to

provide me a valid legal basis for why she was attempting to prevent me from attending that

town hall meeting that was certainly a public forum and subject to my constitutional rights and

New York State's Open Meetings Law. How she treated me on 11/30/17 by trying to prevent me

from attending that town hall is comparable to how **a)** she and other defendants treated me on

11/2/17 in regard to my efforts to have lawfully attended the Mayor's 11/2/17 town hall; **b)** she

and defendants Ringel, Atcheson, and others illegally barred me from the Mayor's 10/18/17

town hall; and **c)** Defendants Redmond, NYPD John Doe1 11/2/17, and others illegally barred

me from the Mayor's 10/25/17 resource fair as I was subjected to illegal standardless discretion

by them on 10/18/17, 10/25/17, and 11/30/17 in that regard.



6.      Defendant Stribula never provided me any due process nor an objectively valid legal

justification on 11/30/17 about her decision to try to illegally exclude me from being able to

lawfully attend the Mayor's 11/30/17 town hall meeting and Mr. Baez, Mr. Miller, Mr. Ringel,

and Mr. Ridener certainly made no attempt to enable me to exercise my constitutional right to

lawfully attend that town hall. One of the members of the public who was also waiting in line

near me as I recorded that video is heard in that video as he agreed to a request that I then made

to him to also record what was occurring in his presence with respect to the fact that I was then

being illegally prevented from attending that town hall.

7.      The next screenshot from that same video that I recorded is from the elapsed time of 42

seconds and shows Defendant Ringel right after he nodded his head to express agreement with a

remark that I made as I was narrating information about what I was then experiencing in regards

to being illegally prevented from attending that town hall without being provided an objectively

valid legal justification for that. Right before he nodded his head to express that agreement, I

stated that I wasn't being provided such a legal justification and showed a printout from a news

article that was written by Margo Schlanger, is entitled "The Supreme Court Gives a Subtle

Boost to Free Speech", and was published on the Internet at

https://newrepublic.com/article/117925/woodv- moss-subtle-victory-free-speech on 5/28/14 by a

news organization named New Republic. That news article focused on the U.S. Supreme Court's

decision in _Wood v. Moss_, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014).



8.      The next screenshot is from that same video from the elapsed time of 36 seconds and shows the news article that I just discussed.



9.      The only reason why I was able to eventually able to attend the Mayor's 11/30/17 town

hall was because Defendant Ioveno intervened on my behalf to enable me to do so after I

apprised both him and New York City Councilman Rory Lancman in front of the building that

hosted that town hall about the fact that I was being illegally prevented from attending that town

hall. Mr. Lancman was the moderator for that town hall meeting and flagrantly violated his legal duty pursuant to 42 USC §1986, the constitutional oath he took to work for the City of New York, New York City Charter §1116, and NYPL §195.00 to have attempted to intervene on my behalf to enable me to attend that town hall. Mr. Ioveno then intervened on my behalf by briefly talking with Defendant Carrion and Mr. Ridener on a sidewalk before he returned to where I was and told me that I would be able to attend that town hall. I had a Fourteenth Amendment due process and equal protection right on 11/2/17 to have had Mr. Ioveno and other members of the NYPD to have similarly intervened on my behalf then and overruled those who were illegally preventing me from attending the Mayor's 11/2/17 town hall to enable me to attend that public forum.

**The fact that other Asian-Americans who boisterously expressed opposition to New York City Schools Chancellor Richard Carranza were initially prevented from attending a public town hall meeting on 2/4/20 in Sheepshead Bay in Brooklyn by members of the NYPD and members of the New York City Department of Education prior to ultimately being permitted to attend that town hall meeting confirms that those who prevented me from attending town hall meetings, resource fair meetings, and public hearings that the Mayor conducted with others government officials violated my Fourteenth Amendment due process and equal protection rights as well as my First Amendment rights to attend them:**

10.    On 2/5/20, the New York Post published a news article on the Internet at https://nypost.com/2020/02/05/asian-protesters-temporarily-barred-from-carranza-town-hall/ that was written by Selim Algar and is entitled "Asian Protesters Temporarily Barred From Carranza Town Hall". That article concerned the fact that members of the NYPD and the New York City

Department of Education initially violated the rights of a group of New Yorkers pursuant to the

First Amendment, Fourth Amendment, Fourteenth Amendment, and New York State's Open

Meetings Law while violating additional applicable laws to attend a public town hall meeting

that was conducted on 2/4/20 inside of the James Madison High School in Sheepshead Bay I

Brooklyn that was conducted by representatives of the New York City Department of Education.

That article reported that that group of people was prevented from attending that public forum as

those in that group expressed opposition against New York City Schools Chancellor Richard

Carranza directly outside of the school that hosted that town hall meeting. A video recording that

was recorded as that occurred confirms that group of people were quite boisterous and held

protest signs outside of that school in accordance with their First Amendment right to conduct

themselves in that manner there and then as they were being illegally barred from attending that

public town hall meeting. The video recording to which I'm referring is available on the Internet

from the YouTube web site at https://www.youtube.com/watch?v=FL0x_iAecwA. A fascinating

man named David Rem appears to be shown in that video recording as having been among those

who were initially being prevented from attending that town hall meeting as he lawfully

conducted himself and was quite vocal about the fact that he and others were being illegally

barred from that public forum. That New York Post article also confirms that everyone who was

initially prevented from being able to attend that 2/4/20 public town hall meeting that was a

public forum were ultimately allowed to attend it. The illegal acts and omissions that caused that

group to be barred from that town hall meeting also violated 18 U.S.C. §245(b)(5), NYPL

§240.20, 18 U.S.C. §241, 42 U.S.C. §1985, 42 U.S.C. §1986, NYPL §240.65, New York City

Charter §1116, NYPL §195.00, and the constitutional oaths that employees of the City of New

York take upon becoming such employees. Additionally, the illegal acts and omissions that were

committed against those people that caused them to be temporarily barred from attending that town hall meeting caused some of those who experienced that to commence the lawsuit of _Payne v. De Blasio_, No. 20-cv-8924 (LAK)(S.D.N.Y.) on 10/26/20 to have the illegal acts and omissions that were committed them as they tried to lawfully attend that public town hall meeting properly addressed.

**Facts about how David Rem lawfully expressed himself during the Mayor's 2/19/20 town hall, was applauded for that by audience, and was retaliated against for that by Defendant Redmond and the Mayor**:

11.     I will next briefly jump forward to a discussion of remarks that were made on 2/19/20 by another trailblazer named David Rem, who followed the lead of the fantastic Black woman who attended the Mayor's 9/28/17 town hall and stole the stage from him that I talked about earlier. Mr. Rem picked up where she left off as Mr. Rem truthfully and refreshingly told the Mayor in no uncertain terms that he was the "worst Mayor ever" during the town hall meeting that the Mayor conducted on 2/19/20 in Forest Hills in Queens. The Mayor's office arranged for that 2/19/20 town hall to be recorded on video that is available on the Internet at https://www.youtube.com/watch?v=5le6DCaxiG8. Along with the discussion that I presented about the fantastic Black woman who attended the Mayor's 9/28/17 town hall, this discussion about Mr. Rem is being presented to clearly establish the fact that the Defendants in this action illegally subjected me to a double-standard with respect to my ability to attend public town hall meetings, public resource fair meetings, and public hearings that the Mayor conducted as they illegally discriminated against me and used a fraudulent pretext in doing so as they illegally subjected me to an abuse of process, standardless discretion, and flagrant violation of my First Amendment rights and Fourteenth Amendment rights that pertain to **a)** selective-enforcement

that corresponds to the class-of-one theory and is predicated upon an illegitimate animus and invidious discriminatory intent, **b)** due process, and **c)** equal protection. This is proven by the fact that those defendants treated the fantastic Black woman who attended the Mayor's 9/28/17 town hall and that I discussed earlier and Mr. Rem on 2/19/20 much differently than they treated me by allowing them to attend and remain in the town hall meetings that the Mayor conducted on those dates even after they criticized the Mayor and other members of his administration while attending them.

12.     The next screenshot is from that video and shows Mr. Rem at the elapsed time of 1 hour, 37 minutes, and 55 seconds in that video as he **a)** exercised his First Amendment rights by lawfully reminding Bill de Blasio that he was the "worst Mayor ever" and **b)** received cheers from the audience in response for being so honest about that view concerning Mr. de Blasio that I certainly share. Mr. Rem is shown in this screenshot on the right as he stood and wore a hooded sweatshirt that had a red hood, red sleeves, and gray backside. When the Mayor entered the room that hosted that town hall on 2/19/20, he was met with a chorus of boos from its audience. Those who did so besides perhaps Mr. Rem were not forced to leave that town hall. That fact underscored the fact that it is entirely lawful behavior to criticize the Mayor and other government personnel who attend public forums that the Mayor conducts as they're conducted and as such personnel attend them.



13.     The next screenshot is from that same video and shows the Mayor making a hand signal to Defendant Redmond at the elapsed time of 1 hour, 38 minutes, and 23 seconds to criminally retaliate against Mr. Rem in response to Mr. Rem's valid criticism of the Mayor and Richard Carranza during that public forum. Mr. Carranza is the Chancellor of the DOE and was characterized as a racist by Mr. Rem during that town hall. By directing Mr. Redmond then through the use of that hand signal, the Mayor clearly demonstrated that he was acting in concert with Mr. Redmond to have Mr. Rem coerced to leave that town hall in violation of the First Amendment and Fourteenth Amendment with respect to both Mr. Rem as a speaker and those who sought to continue to receive Mr. Rem's speech as he attended that town hall.



14.     The totality of what is shown and heard in that video sufficiently establishes that Mr. de Blasio retaliated against Mr. Rem during that town hall in violation of **a)** Mr. Rem's First Amendment rights, **b)** other laws that include 18 U.S.C. §245(b)(5), NYPL §240.20, and New York State's Open Meetings Law, and **c)** the First Amendment right that other people who shared Mr. Rem's views and didn't share his views had to continue to hear what Mr. Rem had to say during that public forum while both they and Mr. Rem remained in that room as that town hall continued to be conducted.

15.     That 2/19/20 town hall meeting was co-sponsored by a variety of groups instead of having been organized and conducted strictly by the Mayor's office. In her capacity as the moderator of that 2/19/20 hall instead of someone else, Ms. Koslowitz's duties were identical to those that New York City Councilman Corey Johnson performed on 3/15/17 during the town hall meeting that the Mayor conducted. Specifically, just like how Mr. Johnson did on 3/15/17 during the town hall meeting that he then conducted with the Mayor, it was strictly Ms. Koslowitz' job during the Mayor's 2/19/20 town hall to control the length of time that people could speak to the

Mayor after she gave them a chance to do so as that town hall was conducted. The point here is that only Ms. Koslowitz was authorized to interfere with Mr. Rem's lawful freedom of expression that he directed against the Mayor during that 2/19/20 town hall because she was the moderator of that public forum instead of someone else.

16.     This fact is significant largely because though Ms. Koslowitz clearly proved that she does not support the First Amendment as she criticized Mr. Rem in response to him having lawfully exercised his First Amendment rights during that 2/19/20 town hall by criticizing the Mayor and Mr. Carranza, the video recording of that town hall that was recorded as a result of arrangements that the Mayor's office made does not indicate that she communicated anything to end Mr. Rem's remarks to the Mayor during that public forum.

17.     The next screenshot is from that same video and shows Defendant Redmond, Defendant Ringel, Mr. Rem, and the Mayor in it at the elapsed time of 1 hour, 38 minutes, and 25 seconds as Mr. Redmond appears to be clearly scowling to express anger about how Mr. Rem was fabulously criticizing the Mayor in front of an appreciate audience.



18.     Shortly thereafter, Defendant Redmond illegally coerced Mr. Rem to leave that public

forum in violation of his constitutional right to remain in it and continue to receive the cheers

and applause from its audience that he received for his leadership and honesty by having told

him that he was the worst Mayor ever. The next screenshot is from the elapsed time of 1 hour, 38

minutes, and 27 seconds in that video and shows Defendant Redmond as he was about to assault

Mr. Rem with right hand by illegally grabbing Mr. Rem's left arm in flagrant violation of Mr.

Rem's Fourth Amendment rights.



19.     Although it may appear from the next screenshot that is from the elapsed time of 1 hour,

38 minutes, and 29 seconds in that video that Mr. Rem punched the Mayor in his face that would

make me and other New Yorkers quite happy, it is far more likely that what is shown in that

screenshot indicates that Mr. Rem yanked his left arm away from Defendant Redmond's illegal

grasp of it in response to Mr. Redmond having illegally grabbed it.



20.      The next screenshot is from the elapsed time of 1 hour, 37 minutes, and 58 seconds in that video and shows Mr. Rem as he pointed at the Mayor while he finished his outstanding criticism of the Mayor then and received well-deserved applause from an unknown man who appears in the upper-right corner and stood up from his seat to pay respect to Mr. Rem for his leadership and outspokenness by taking off the gloves and showing the Mayor up in such a refreshing way during that public forum.



21.     The next screenshot is also from the elapsed time of 1 hour, 37 minutes, and 58 seconds in that video and shows Mr. Rem as he received well-deserved applause from a woman on the far-left as well as the man on the right who continued to applaud Mr. Rem.



22.     The following is a relevant excerpt from *Robar v. Village of Potsdam Board of Trustees*, No. 8: 20-cv-0972 (LEK/DJS) (N.D.N.Y. Sept. 21, 2020) that addressed a legal standard that pertained to an application for a preliminary injunction to uphold First Amendment rights that was granted through that decision:

> ""Violations of the First Amendment are presumed irreparable." Tunick v. Safir, 209 F.3d 67, 70 (2d Cir. 2000). The Supreme Court has declared that "the loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Bery, 97 F.3d at 693 ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction."); Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984) (noting that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," and collecting cases)."

23.     In *Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011), the U.S. Supreme Court issued the following findings about the First Amendment that are very relevant to my claims in this action and the relief that I seek to be granted:

> "Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and—as it did here—inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate."

24.     Similarly, the judge who issued the decision in *Center for Bio-Ethical Reform, Inc. v. Black*, 234 F. Supp. 3d 423 (W.D.N.Y. 2017) cited *Snyder v. Phelp* in the following pertinent excerpt from it that is also very relevant to my claims in this action and the relief that I seek to be granted:

> ""[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago. v. Mosley,* 408 U.S. 92, 95-96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). State actors are "not permitted to privilege the feelings or viewpoints of one group over the viewpoints of another group." *See Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). "[U]nder our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers, or simply because bystanders object...." *Bachellar v. Maryland,* 397 U.S. 564, 567, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970). Indeed, "[a]s a Nation, we have chosen ... to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v.*

*Phelps,* 562 U.S. 443, 460-61, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011). It is well settled that "the right to engage in peaceful and orderly political demonstrations is, under appropriate conditions, a fundamental aspect of the `liberty' protected by the Fourteenth Amendment." *Shuttlesworth v. City of Birmingham, Ala.,* 394 U.S. 147, 161, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (Harlan, J., concurring)."

**The fact that Defendant Ridener told me on 11/13/19 that I could attend the public town hall meeting that the Mayor conducted in Queens on that date right after I began to tell Mr. Ridener that I had just been illegally kicked out of a public meeting and was then also being illegally prevented from entering New York City Hall's grounds sufficiently confirms that I had a Fourteenth Amendment due process and equal protection right as well as a First Amendment right retrospectively to have been able to attend the Mayor's 11/2/17 town hall meeting in Queens:**

25.      On 11/13/19, I recorded a video recording at 11:01 am that has the filename of "IMG_1379.MOV" as I stood just outside of the entrance to City Hall by Broadway. That video recording is available on the Internet at

https://drive.google.com/open?id=1LPyr5MAgkvzGLjuHDYNzKOUvelCRHB28. Among other things, that video recording recorded a face-to-face conversation that I had with Defendant Ridener as he stood near the NYPD guardhouse that is located just inside of the entrance to City Hall by Broadway. My conversation with Ridener begins at the elapsed time of 1 minute and 5 seconds in that video as I called out to him from where I stood as he coincidentally happened to then be crossing paths with me as he approached that entrance to enter City Hall's grounds. The next screenshot is from the elapsed time of 1 minute and 49 seconds in that video and clearly shows Mr. Ridener as he was then continuing to confirm that I could attend the public town hall meeting that the Mayor would conduct on that date in Queens from within the room in which it

would be conducted as it would be conducted.



26.     A jacket that was then worn by Rafael Perez of the City Council is shown on the left side

in the preceding screenshot. Mr. Perez works for the City Council as its Chief Sergeant-at-Arms

and is in charge of security matters pertaining to the City Council. I struck up that conversation

with Mr. Ridener as Mr. Perez and NYPD Officer Lin (shield #: 25714) were illegally preventing

me from entering City Hall's grounds while I was conducting myself in an entirely lawful

manner in stark contrast to them in flagrant violation of my rights pursuant to the First

Amendment, Fourteenth Amendment, Fourth Amendment, and New York State's Open

Meetings Law. Right before they began to illegally prevent me from entering City Hall's grounds, New York City Councilman Ritchie Torres subjected me to illegal witness tampering, First Amendment retaliation, whistleblower retaliation, viewpoint discrimination, standardless discretion, and an abuse of process in violation of my rights pursuant to the First Amendment, Fourteenth Amendment, and New York State's Open Meetings Law as I briefly testified in the public hearing that the City Council's Committee on Oversight and Investigations conducted on that date nearby at 250 Broadway in Manhattan. Mr. Torres also illegally terminated my testimony before I completed it within the 2-minute period that I was originally given to testify in that hearing. Moreover, Mr. Torres also illegally directed Sergeant Bradley of the City Council to coerce me to leave the room in which that public hearing was being conducted before it ended in violation of my constitutional rights. The preceding set of facts confirms that I retrospectively had a Fourteenth Amendment due process and equal protection right as well as a First Amendment right to have been able to attend the Mayor's 11/2/17 town hall meeting in Queens.

**My conversations with David Cole of the ACLU and Arthur Eisenberg of the New York Civil Liberties Union on 10/30/17 about attending public forums that the Mayor conducted:**

27.      On 10/30/17, I attended a meeting that was about the U.S. Constitution that Arthur Eisenberg of the NYCLU and David Cole of the ACLU conducted at the Fordham Law School that is located at 150 West 62nd Street in Manhattan. Those who organized that meeting arranged for it to be recorded on video that is available on the Internet at https://livestream.com/accounts/14230140/events/7870400/videos/165193623. During that

meeting's question and answer session with its audience, I told Mr. Eisenberg and Mr. Cole that I was both a U.S. Navy veteran and a whistleblower. I also told them that the Mayor's NYPD security detail had been illegally preventing me from attending public forums that the Mayor had been conducting. I told them that as I asked them how I could get legal representation from their organizations to address that problem. Mr. Eisenberg was then the NYCLU's legal director and Mr. Cole was then the ACLU's national legal director. In response, Mr. Eisenberg clearly told me that I had a legal right to attend the Mayor's public forums as long as I was not disrupting those public forums. The conversation that I had with both of them during that meeting during which I made the remarks to them that I just discussed and Mr. Eisenberg gave me the answer that I just discussed begins at the elapsed time of 55 minutes and 25 seconds in the video recording of that meeting. I'm shown later in that video at the elapsed time of 1 hour, 6 minutes, and 12 seconds as I talked with Mr. Eisenberg as I wore a white sweater and was carrying a backpack. The next screenshot shows both Mr. Cole on the left and Mr. Eisenberg on the right immediately after Mr. Eisenberg told me that I had a right to attend the Mayor's public forums while I was not disrupting those meetings.



## **LEGAL STANDARDS**

1.      I incorporate by reference the statements that I made in all of the preceding paragraphs as though fully set forth herein.

2.      In the interests of brevity and pursuant to FRCP Rule 10(c), I incorporate by reference as though fully set forth herein the "Legal Standards" section that appears in the following:

a.      The First Amended Complaint that I filed in K4 on 10/5/20. That submission corresponds to docket number 4 in that case.

b.      The complaint that I filed in K5 on 9/25/20. That submission corresponds to docket number 2 in that case.

c.      The complaint that I filed in K6. That submission corresponds to docket number 2 in that case.

d.      The First Amended Complaint hat I filed in K7 on 10/18/20. That submission

corresponds to docket number 3 in that case and the "Legal Standards" section within it starts on page 97.

e.        The complaint hat I filed in K8 on 10/25/20. That submission corresponds to docket number 2 in that case and the "Legal Standards" section within it starts on page 68.

3.        By illegally preventing me from attending the Mayor's 11/2/17 town hall, those who did so and illegally didn't intervene on my behalf to stop and otherwise reverse that violated my First Amendment right to communicate directly to government officials that is articulated as follows in _Kittay v. Giuliani_, 112 F. Supp. 2d 342 (S.D.N.Y. 2000):

> "The right to petition in general guarantees only that individuals have a right to communicate directly to government officials, and that individuals have the right of access to the courts to redress constitutional violations. _See McDonald v. Smith,_ 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985); _Mozzochi v. Borden,_ 959 F.2d 1174, 1180 (2d Cir.1992)"

4.        According to _Bloomberg v. The New York City Department of Education_, No. 17-cv-3136 (PGG) (S.D.N.Y. Sept. 24, 2019), the Mayor, members of the City Council, and other government officials were explicitly prohibited by from conducting town hall meetings and other similar meetings inside of schools controlled by the DOE after school, unless the following prerequisites were satisfied:

a.        "Candidate forums are permitted provided all candidates are invited to participate."

b.        "Permit applications for candidate forums must include a written representation that all candidates have been invited to participate."

5.        The preceding prerequisites clearly confirm that they were designed to foster discussion and debate by political rivals in government elections in accordance with the intent of New York State's Open Meetings Law. This point is reinforced by the fact that the preceding excerpts apply

to the additional excerpt from *Bloomberg v. The New York City Department of Education* that

confirms it:

> "No rallies, forums, programs, etc., on behalf of, or for the benefit of any elected official,
> candidate, candidates, slate of candidates or political organization/committee may be held
> in a school building after school/business hours, except as indicated in paragraphs II.C
> and II.D below."

6.      The prohibition that I just discussed is discussed in greater detail in a memorandum that

was issued by the DOE on 6/22/09 and is shown in a PDF file that is available on the Internet at

https://cdn-blob-prd.azureedge.net/prd-pws/docs/default-source/default-documentlibrary/d-130-

6-22-2009-final-remediated-wcag2-0.pdf.

7.      That PDF file corresponds to regulation number D-130 that was established by a DOE

Chancellor that remained in effect on and after 11/2/17. The prohibition that I discussed above

appears on page 6 within that regulation. Information on that page indicates that prohibition

stems from New York State Education Law section 414 and policies by the DOE.

8.      There is no reason to believe that the Mayor, members of the Mayor's administration, and

members of the City Council complied with the prerequisites for being able to lawfully conduct a

public town hall meeting within the school that hosted the Mayor's 11/2/17 town hall by having

invited people to attend that town hall who were rivals of the Mayor in the 2017 New York City

government elections. Concerning this point, Politico New York published a news article on

2/29/16 on the Internet at https://www.politico.com/states/new-york/albany/story/2016/02/avella-

outraged-by-lateinvite-to-de-blasio-town-hall-031750 that is entitled "Avella Outraged by Late

Invite to De Blasio Town Hall" that was written by Laura Nahmias. That article reported about a

claim that was made by New York State Senator Tony Avella that the Mayor's administration

failed to invite him to attend a town hall meeting that the Mayor would conduct until it was too

late for Mr. Avella to be able to attend it. That article further reported that Mr. Avella was a critic

of the Mayor and his administration and believed that the Mayor's staff deliberately waited to

invite him to attend the Mayor's town hall meeting that the Mayor held on 2/29/16 in Queens

until it would be too late for Mr. Avella to attend it.

9.      The following findings that were issued in _Walsh v. Enge_, 154 F. Supp. 3d 1113 (D. Or.

2015) concern prospective exclusions from public forums and are therefore extremely relevant to

my claims in this action that concern my having been illegally and prospectively barred without

due process from attending the Mayor's 11/2/17 town hall:

> This case requires the Court to decide whether the First Amendment allows a Mayor or
> his or her designee, acting pursuant to a city ordinance, to exclude a person, potentially
> indefinitely, from attending future City Council meetings to which the public is otherwise
> invited to attend and present their opinions simply because the person has been disruptive
> at previous meetings. The First Amendment protects, among other things, "freedom of
> speech" and "petitioning for a governmental redress of grievances." U.S. Const. amend. I.
> The First Amendment is incorporated into the Fourteenth Amendment and thus applies to
> the states and local governmental bodies. _Gitlow v. New York,_ 268 U.S. 652, 666, 45
> S.Ct. 625, 69 L.Ed. 1138 (1925). No appellate opinion of which this Court is aware has
> ever held that the First Amendment permits prospective exclusion orders from otherwise
> public city council meetings. A presiding officer may remove a disruptive individual
> from any particular meeting, and a sufficiently disruptive person may even be prosecuted
> for such conduct if public law permits. But no matter how many meetings of a city
> council a person disrupts, he or she does not forfeit or lose the future ability to exercise
> constitutional rights and may not be prospectively barred from attending future meetings.
> Our democratic republic is not so fragile, and our First Amendment is not so weak.

10.     The following findings from _Frain v. Baron_, 307 F. Supp. 27 (E.D.N.Y. 1969) is also

relevant to my claims in this action for reasons that are sufficiently self-explanatory:

> "Fear of disorder, which the City cites to justify its policy, has been ruled out as a
> ground for limiting peaceful exercise of First Amendment rights. _Edwards v. South
> Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)_."

11.     The U.S. Supreme Court issued the following critically significant findings in _Cohen v.

California_, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971):

> a.      "It may be that **one has a more substantial claim to a recognizable privacy
>         interest when walking through a courthouse corridor** than, for example,
>         strolling through Central Park"

b.   "Finally, in arguments before this Court much has been made of the claim that Cohen's distasteful mode of expression was thrust upon unwilling or unsuspecting viewers, and that the State might therefore legitimately act as it did in order to protect the sensitive from otherwise unavoidable exposure to appellant's crude form of protest. Of course, the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense. See, *e.g.*, *Organization for a Better Austin v. Keefe*, 402 U. S. 415 (1971). While this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue, *e.g.*, *Rowan v. Post Office Dept.*, 397 U. S. 728 (1970), we have at the same time consistently stressed that "we are often `captives' outside the sanctuary of the home and subject to objectionable speech." *Id.*, at 738. The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections."

c.   "it is nevertheless often true that one man's vulgarity is another's lyric."

d.   ""[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." *Baumgartner v. United States*, 322 U. S. 665, 673674 (1944).

Finally, and in the same vein, we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views. We have been able, as noted above, to discern little social benefit that might result from running the risk of opening the door to such grave results."

e.   "The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. See *Whitney v. California*, 274 U. S. 357, 375377 (1927) (Brandeis, J., concurring)."

12.   The admission tickets that were issued by the Mayor's staff for town hall meetings that the Mayor conducted were functionally equivalent to press credentials that grant members of the

press access to meetings that government officials conduct. What follows is a relevant excerpt

from _Karem v. Trump_, No. 19-cv-5255 (D.C. Cir. June 5, 2020) that addressed what is required

of due process in the context of a denial of access to government officials through the revocation

of a press credential. In short, that lawsuit led to Brian Karem having a press credential revoked

from him by the Whitehouse reinstated.

> "A fundamental principle in our legal system," the Supreme Court observed in _FCC v. Fox Television Stations, Inc._, 567 U.S. 239 (2012), "is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." _Id_. at 253. Such "[e]lementary notions of fairness," the Court explained in _BMW of North America, Inc. v. Gore_, 517 U.S. 559 (1996), "dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that [the government] may impose." _Id_. at 574. "This requirement of clarity[,] . . . essential to the protections provided by the Due Process Clause of the Fifth Amendment," _Fox Television_, 567 U.S. at 253, "is implicated" whenever the government imposes "civil penalties," _Gore_, 517 U.S. at 574 n.22 (emphasis omitted). Where such penalties "threaten[] to inhibit the exercise of constitutionally protected rights[,] . . . a more stringent vagueness [and fair-notice] test should apply." _Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc._, 455 U.S. 489, 498–99 (1982).
>
> That "essential . . . protection[]" of fair notice applies here. _Fox Television_, 567 U.S. at 253. As we explained in _Sherrill_, "the interest of a bona fide Washington correspondent in obtaining a White House press pass . . . undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." 569 F.2d at 130–131. And because "any deprivation" of a protected liberty interest must "be effected pursuant to constitutionally adequate procedures," _Brandon v. District of Columbia Board of Parole_, 823 F.2d 644, 648 (D.C. Cir. 1987), a duly issued hard pass may not be suspended without due process. Accordingly, "[e]lementary notions of fairness" required that Karem "receive fair notice not only of the conduct that [would] subject him to punishment, but also of the . . . magnitude of the sanction that [the White House] might impose." _Gore_, 517 U.S. at 574. Furthermore, because the suspension of a hard pass, like the denial of a hard pass, "implicate[s]" "important first amendment rights," _Sherrill_, 569 F.2d at 130, we evaluate Karem's suspension under a particularly "stringent vagueness [and fair-notice] test," _Village of Hoffman Estates_, 455 U.S. at 498–99.
>
> Applying that test, we think Karem's due process claim is likely to succeed because, on this record, nothing put him on notice of "the magnitude of the sanction"—a month-long loss of his White House access, an eon in today's news business—that the White House "might impose" for his purportedly unprofessional conduct at the non-press-conference event. _Gore_, 517 U.S. at 574.

13.    The following is a relevant excerpt from _Kass v. City of New York_, 864 F.3d 200 (2d Cir.

2017) that addresses the matter of illegal dispersal orders that law-enforcement personnel issue.

> "New York courts have held that "a refusal to obey such an order [to move] can be justified
> only where the circumstances show conclusively that the police officer's direction was purely
> arbitrary and was not calculated in any way to promote the public order." _People v. Todaro,_
> 26 N.Y.2d 325, 328-29, 310 N.Y.S.2d 303, 258 N.E.2d 711 (1970) (quoting _People v.
> Galpern,_ 259 N.Y. 279, 284-85, 181 N.E. 572 (1932)); _Crenshaw v. City of Mount Vernon,_
> 372 Fed.Appx. 202, 206 (2d Cir. 2010) (summary order) (same)."

14.    The following findings from _Henry v. Wyeth Pharmaceuticals, Inc._, 616 F.3d 134 (2d

Cir. 2010) address scenarios in which supervisors like **a)** Defendants de Blasio, Carrion,

Redmond, and Stribula act like mob bosses while using subordinates and others that include **b)**

Defendants Ringel, Atcheson, Galante, Ramos, and Mason like henchmen, agents, and proxies to

carry out their dirty work to commit criminal acts against others and otherwise violate the rights

of others:

> We believe the court erred in this instruction. In _Gordon v. New York City Bd. of
> Educ.,_ 232 F.3d 111, 116 (2d Cir. 2000), we stated, "Neither this nor any other circuit has
> ever held that, to satisfy the knowledge requirement, anything more is necessary than
> general corporate knowledge that the plaintiff has engaged in a protected activity." We
> then rejected the argument that in order to satisfy the causation requirement, a plaintiff
> must show that the particular individuals who carried out an adverse action knew of the
> protected activity. _Id._ at 117. Instead, we indicated that a jury may
>
> find retaliation even if the agent denies direct knowledge of a plaintiff's protected
> activities, for example, so long as the jury finds that the circumstances evidence
> knowledge of the protected activities or the jury concludes that an agent is acting
> explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge.
>
> _Id. See also Gorman-Bakos v. Cornell Coop Extension of Schenectady County,_ 252 F.3d
> 545, 554 (2d Cir.2001) (noting that a plaintiff can establish causation by showing
> protected activity was closely followed in time by adverse employment action); _Kessler
> v. Westchester County Dep't of Soc. Servs.,_ 461 F.3d 199, 210 (2d Cir.2006).
> _Gordon_ directly addressed the situation in which a corporate agent _carries out_ an adverse
> employment action on the _orders,_ explicit or implicit, of a superior with knowledge that
> the plaintiff has engaged in a protected activity. However, in order to show causation in
> the sense required by _McDonnell Douglas_ — that is, a causal connection between the
> protected activity and the adverse employment action — it is not necessary that the
> supervisor who has knowledge of the plaintiff's protected activities have _ordered_ the

agent to impose the adverse action. A causal connection is sufficiently demonstrated if the agent who decides to impose the adverse action but is ignorant of the plaintiff's protected activity acts pursuant to *encouragement* by a superior (who has knowledge) to disfavor the plaintiff.

15. *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111 (2d Cir. 2000) is cited in *Henry v. Wyeth Pharmaceuticals, Inc.* and includes the following related findings:

> The lack of knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment. *See Alston,* 14 F.Supp.2d at 312-13. A jury, however, can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge. *See id.* at 311. This is so, moreover, regardless of whether the issue of causation arises in the context of plaintiff's satisfaction of her *prima facie* case or as part of her ultimate burden of proving that retaliation "played a motivating role in, or contributed to, the employer's decision." *Renz v. Grey Advertising, Inc.,* 135 F.3d 217, 222 (2d Cir.1997)

> Accordingly then, to the extent that the district court charged the jury that the very *agents* of the Board who engaged in retaliatory actions against Gordon had to know of her protected activity, it erred.

16. The following findings from *Housing Works, Inc. v. Turner*, 00 Civ. 1122 (LAK)(JCF) (S.D.N.Y. Sept. 15, 2004) address an ongoing pattern of retaliation and how retaliatory intent may be proven that includes by a pattern of unequal treatment without any rational basis:

> The plaintiff can demonstrate a causal connection between its protected activities and the defendants' adverse actions either "indirectly by means of circumstantial evidence, . . . or directly by evidence of retaliatory animus." Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2003) (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)); Kantha v. Blue, 262 F. Supp. 2d 90, 103 (S.D.N.Y. 2003). Summary judgment is inappropriate when "questions concerning the employer's motive predominate the inquiry." Morris, 196 F.3d at 110. "Nonetheless, we have held that a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link . . . Instead, he must produce `some tangible proof to demonstrate that [his] version of what occurred was not imaginary.'" Cobb, 363 F.3d at 108 (quoting Morris, 196 F.3d at 111)).

> A plaintiff's circumstantial evidence of retaliation could include the timing of the defendant's actions, such as when the alleged retaliation closely follows the plaintiff's speech. Morris, 196 F.3d at 110; McCullough v. Wyandanch Union Free School District, 187 F.3d 272, 280 (2d Cir. 1999). The plaintiff can also proffer evidence of unequal

treatment, or an ongoing campaign of retaliation. <u>Hampton Bays Connections, Inc. v. Duffy, 127 F. Supp. 2d 364, 374 (E.D.N.Y. 2001); Economic Opportunity Commission of Nassau County, Inc. v. County of Nassau, 106 F. Supp. 2d 433, 437 (E.D.N.Y. 2000)</u> (citing <u>Gagliardi v. Village of Pawling, 18 F.3d 188, 195 (2d Cir. 1994)</u>).

The defendants' arguments with respect to causation will be discussed in relation to each of the adverse actions alleged.

17.　　The following is a relevant excerpt from <u>Musso v. Hourigan, 836 F.2d 736 (2d Cir. 1988)</u>.

>　　"As a general rule, a government official is not liable for failing to prevent another from violating a person's constitutional rights, unless the official is charged with an affirmative duty to act. *See, e.g., <u>Rizzo v. Goode,</u>* 423 U.S. 362, 376-77 (1976); <u>Doe v. New York City Dep't of Social Servs.,</u> 649 F.2d 134, 141 (2d Cir.1981)</u>."

18.　　42 USC §1986 includes the following relevant provisions that are applicable partly about New York City government personnel who had opportunities to intervene on my behalf to attend the Mayor's 11/2/17 town hall:

>　　"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action"

19.　　New York City Charter §1116 includes the following provisions that are applicable partly about New York City government personnel who had opportunities to intervene on my behalf to attend the Mayor's 11/2/17 town hall and did not do so:

>　　a.　　Any council member or other officer or employee of the city who shall wilfully violate or evade any provision of law relating to such officer's office or employment, or commit any fraud upon the city, or convert any of the public property to such officer's own use, or knowingly permit any other person so to convert it or by gross or culpable

neglect of duty allow the same to be lost to the city, shall be deemed guilty of a

misdemeanor and in addition to the penalties imposed by law and on conviction shall

forfeit such office or employment, and be excluded forever after from receiving or

holding any office or employment under the city government.

b.        Any officer or employee of the city or of any city agency who shall knowingly

make a false or deceptive report or statement in the course of duty shall be guilty of a

misdemeanor and, upon conviction, forfeit such office or employment.

20.        NYPL §195.00 concerns official misconduct and includes the following terms that are

applicable partly about New York City government personnel who had opportunities to intervene

on my behalf to attend the Mayor's 11/2/17 town hall and did not do so:

> A public servant is guilty of official misconduct when, with intent to obtain a benefit or
> deprive another person of a benefit:
>
> 1. He commits an act relating to his office but constituting an unauthorized exercise of his
> official functions, knowing that such act is unauthorized; or
>
> 2. He knowingly refrains from performing a duty which is imposed upon him by law or is
> clearly inherent in the nature of his office.
>
> Official misconduct is a class A misdemeanor.

21.        The following is a relevant excerpt from _Puckett v. City of Glen Cove_, 631 F. Supp. 2d

226 (E.D.N.Y. 2009) that confirms that I had a First Amendment right to criticize government

personnel without being retaliated against for doing so:

> "Plaintiff must first allege that she engaged in protected activity to state a First
> Amendment claim of retaliation. **The First Amendment p**rotects the right of access to
> the courts, and **an individual's right to complain to public officials**. _Lewis v. Casey_,
> 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (right of access); _Monsky v.
> Moraghan_, 127 F.3d 243, 246 (2d Cir.1997) (right of access); _Patriots Way, LLC v.
> Marconi_, 2007 WL 988712 *4 (D.Conn.2007); _see Colondres v. Scoppetta_, 290
> F.Supp.2d 376, 381 (E.D.N.Y.2003) (right of access is "bound up" with the First
> Amendment right to petition the government); _Gagliardi_, 18 F.3d at 194-95 (right to
> complain to public officials protected by First Amendment). **These First Amendment**

**rights include the right to be free from retaliation for their exercise**. _Colondres_, 290 F.Supp.2d at 382; _see Patriots Way_, 2007 WL 988712"

22.     The following are pertinent findings that were issued in _Elrod v Burns,_ 427 US 347 (1976):

    a.    "The timeliness of political speech is particularly important. _See Carroll v. Princess Anne_, 393 U. S. 175, 182 (1968); Wood v. Georgia, 370 U. S. 375, 391-392 (1962)."

    b.    "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

23.     The following is a pertinent excerpt from the Second Circuit's decision in _Hansen v. Harris_, 619 F.2d 942 (2d Cir. 1980) that concerns government estoppel:

"The Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents."

24.     The following excerpt from _Glus v. Brooklyn Eastern Dist. Terminal_, (359 U.S. 231, 79 S. Ct. 760, 3 L. Ed. 2d 770 (1959) reinforces this point:

"To decide the case we need look no further than the maxim that no man may take advantage of his own wrong."

25.     The following findings from _People v. Howard_, 50 N.Y.2d 583, 430 N.Y.S.2d 578, 408 N.E.2d 908 (1980) sufficiently confirm that I had a clear legal right to be left alone and allowed to attend the Mayor's 11/2/17 town hall because I was conducting myself in an entirely lawful manner at the site of that town hall on 11/2/17:

    a.    "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away. His refusal to answer is not a crime. Though the police officer may endeavor to complete the interrogation, he **may not pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime**, seize or search the individual or his possessions, even though he ran away."

    b.    "But while the police had the right to make the inquiry, defendant had a constitutional right not to respond. This is so both because the Fifth Amendment to the United States Constitution and its State counterpart (New York Const, art I, § 6) permitted him to remain silent and because the Fourth Amendment and its State counterpart (art I, § 12) protect him from detention amounting to seizure unless there is probable cause. As Mr. Justice **BRANDEIS put it long ago in _Olmstead v United States_ (277**

**US 438, 478), defendant had "the right to be let alone."''**

(boldface formatting added for emphasis)

26.     Findings were issued in both _People v. Alba_, 81 A.D.2d 345, 440 N.Y.S.2d 230 (App.

Div. 1981) and _Dotson v. Farrugia_, No. Civ. 1126 (PAE) (S.D.N.Y. Mar. 26, 2012) that address

unofficial arrests of an individual's ability to move about freely by a show of authority without a

legal justification in violation of the Fourth Amendment. That is exactly what transpired on

11/2/17 at the site of the Mayor's 11/2/17 town hall as members of the NYPD and Mayor's staff

that included Defendant Ringel illegally prevented me from being able to lawfully walk into the

school that hosted the Mayor's 11/2/17 town hall in order to lawfully exercise my First

Amendment and Fourteenth Amendment right to attend that public forum within the gym in

which that town hall was conducted and lawfully continue to exercise those rights and others of

mine while doing so.

## MAIN STATEMENT OF FACTS

1.     I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.     The illegal acts and omissions that were committed against me on 11/2/17 at the site of

the Mayor's 11/2/17 town hall meeting that concern my claims in this action were a microcosm

of a much larger, pervasive, systemic, and longstanding campaign and pattern of illegal customs,

practices, and policies that included flagrant violations of my First Amendment and Fourteenth

Amendment rights that were jointly devised, coordinated, implemented, executed, and covered-

up by senior decision-making members of the NYPD and members of the Mayor's staff against

me in relation to my efforts to lawfully attend public town hall, public resource fair, and public

hearings in accordance with my constitutional rights that members of the public conducted in a

collaborative manner with the Mayor, Mr. Banks, and other City of New York and State of New

York personnel. Defendants de Blasio, O'Neill, Vance, Jr., Byrne, Jr., James, Shorris, and other

City of New York, State of New York, and federal government personnel that include members

of the City Council that include Defendant Lander and Stephen Levin tacitly condoned those

illegal acts and omissions against me.

3.       When I tried to attend the Mayor's 11/2/17 town hall I had ongoing litigation partly

through my HRA lawsuit in which I was pursuing entirely valid claims against defendants in this

action for having been previously barred from public forums that the Mayor and Mr. Banks

conducted that included town hall and resource fair meetings. The discussion that I presented

earlier in this complaint that began on or about page 35 and concerned e-mail messages that were

sent and received by Defendants Redmond, Ramos, Carrion, Stribula, and other members of the

Mayor's staff and NYPD about me and was partly about town hall meetings that the Mayor

conducted pertained to a conspiracy that existed among them and others to illegally violate my

rights to attend public town hall meetings and public resource fair meetings that the Mayor

conducted with others while I had ongoing litigation against HRA in which I also asserted

entirely valid claims on 5/19/17 against Defendant Redmond and others for having illegally

prevented me from attending the Mayor's 4/27/17 town hall meeting. Since much of those e-mail

messages that are shown in the 16-page PDF file to which I referred on or about page 35 in this

complaint and concerns that earlier discussion were provided to me by the Mayor's office with

redactions applied to them, I urge this Court to immediately compel the City of New York to

immediately provide me non-redacted and unedited copies of the e-mail messages that are shown

in that PDF file to better facilitate my ability to prove my claims in this action on the merits. As a

reminder, the following is a link to that PDF file on the Internet:

https://drive.google.com/file/d/16wSpJ7kk-aOtx7Bkg8MeqUpyWd5Io2hR/view?usp=sharing

4.      While trying to lawfully attend the town hall meetings, resource fair meetings, and public hearings that the Mayor conducted with Mr. Banks and others on and after 4/27/17, I sought to lawfully try to have Mr. Banks fired for cause, Urban's contracts with the City of New York to be cancelled immediately for cause, and all of the personnel of HRA, DHS, and DSS to be replaced largely to prevent further atrocities from occurring to those who resided in the building in which I reside as a consequence of fraud and negligence by personnel of HRA, DHS, DSS, Urban, and others. However, I was illegally prevented from being able to do so. As I sought to do so, I took it upon myself to be an advocate for those who resided in the building in which I reside that is a shelter for military veterans that is subsidized by taxpayers and comparable to notoriously horrific NYCHA housing in that respect. Defendant City and NYCHA were sued by the DOJ in the lawsuit that corresponds to _USA v. New York City Housing Authority_, No. 18-cv-5213, (WHP) (S.D.N.Y. November 14, 2018) because of fraud and negligence that the Mayor's administration perpetrated as a slumlord in regards to NYCHA housing after defendants in this action and other members of the Mayor's staff and the NYPD stole the outcomes of the 2017 New York City government elections for the Mayor's benefit and their own. Such fraud and negligence by NYCHA and the Mayor's administration was illegally covered-up prior to the 2017 New York City government elections to protect the re-election interests of the Mayor and his administration. The written transcript that was prepared from the public hearing that U.S. District Judge William Pauley conducted on 9/26/18 in _USA v. New York City Housing Authority_, No. 18-cv-5213, (WHP) (S.D.N.Y. November 14, 2018) confirms that I testified to him during that hearing. As I did so, I correctly and analytically pointed out to him that there

really isn't any meaningful difference between how HRA and NYCHA operate directly and indirectly as slumlords of public housing. I recall that he gave short shrift to my testimony then. My testimony in that hearing occurred after Defendant James engaged in grandstanding during that hearing through her remarks before she rushed away from the duties that she then had as New York City's Public Advocate to accord proper due process to the rest of the public who were also there to testify. Defendant James instead rushed out of that courtroom immediately after she finished grandstanding with the testimony that she delivered. Perhaps the deaths of Robert Vargas and Gilda Giscombe that occurred thereafter in the building in which I reside due to negligence by both Urban and HRA and were preventable will now spur Judge Pauley to visit wherever they may be buried and humbly apologize to them and their families while buying the arrogance and narrow-mindedness that he showed to me on 9/26/18. I will discuss the deaths of both Mr. Vargas and Ms. Giscombe in greater detail shortly.

5.      Largely as a result of the fact that I was illegally prevented from attending many public town hall meetings and public resource fair meetings that the Mayor conducted with Mr. Banks and others on and after 4/27/17 prior to the 2017 New York City government elections that were conducted in September of 2017 and November of 2017, Bill de Blasio was able to steal his re-election win as New York City's Mayor to remain the a bastard mayor. That occurred as a result of significant criminal assistance of the defendants in this action and others by engaging in voter suppression, voter fraud, and whistleblower retaliation at the same time that atrocious, complicit, and pervasive news censorship by the press facilitated that.

6.      If not for my having been illegally prevented from attending public town hall meetings and public resource fair meetings that the Mayor conducted with Mr. Banks and others on and after 4/27/17, it clearly stands to reason that I would be able to use Robert Vargas as a witness in

litigation that I have against Defendant City, Urban, HRA, Mr. Banks, and others. However, I

will never have the opportunity to do so nor to speak to Mr. Vargas again because Mr. Banks,

Ann Marie Scalia of HRA, and personnel of Urban significantly contributed to the circumstances

that caused his death to occur on or about 8/11/20 in the apartment in which he resided in the

building in which I reside roughly 8 days after I sent the following e-mail message about Mr.

Vargas and his needs to Mr. Banks and Ms. Scalia at 1:27 pm on 8/3/20:

> **From:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Question about helping a disabled military veteran in my building
> **Date:** August 3, 2020 at 1:27:32 PM EDT
> **To:** "Scalia, Ann Marie" <scaliaa@dss.nyc.gov>
> **Cc:** "banksst@dss.nyc.gov" <banksst@dss.nyc.gov>, "Calhoun, Martha"
> <calhounm@dss.nyc.gov>
>
> Ms. Scalia,
>
> I'm sending you this to find out what you, Mr. Banks, and HRA is willing to do to help the
> disabled military veteran who lives in apartment 1D in the building in which I reside who
> needs an air conditioner to be installed in his living room.
>
> He told me yesterday that Urban Pathways, Inc.'s personnel told him that though it has an air
> conditioner to install that is located in the basement of that building, it will take 2 weeks from
> when he was told last week for bars to be cut outside of his living room window to install
> that air conditioner.
>
> I previously talked with you and Mr. Banks on his behalf and i also testified on his behalf
> during a City Council public hearing.
>
> The person I'm talking about has had several strokes and can barely move.
>
> It is unconscionable for HRA to allow him to have to sweat in his apartment only because
> Urban's personnel, its contractors, and HRA won't get off of their fat ass to abide by
> applicable health and safety laws in the middle of Summer.
>
> I'm not anticipating a response to this e-mail and will likely use it in my federal lawsuit to
> further establish that HRA is blatantly disregarding its legal duties with its business partners.
>
> From,

| Towaki Komatsu

7.      After I sent that e-mail message, I received an e-mail message from Ms. Scalia on

8/10/20 at 10:42 pm. The header section from that e-mail message and a relevant excerpt from it

about Mr. Vargas is shown next.

> **From:** "Scalia, Ann Marie" <scaliaa@dss.nyc.gov>
> **Subject:** RE: Update
> **Date:** August 10, 2020 at 10:42:40 PM EDT
> **To:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
> **Cc:** "Aaronson, Nicola" <aaronsonn@dss.nyc.gov>, "Clary, Carin" <claryc@hra.nyc.gov>,
> "Wilkinson, Thatiana" <wilkinsont@hra.nyc.gov>, "Galindo, Daniel"
> <galindod@hra.nyc.gov>, "Jennifer, kelly" <Kellyjen@hra.nyc.gov>
>
>
> Regarding the disabled veteran you referred to below we are look into this but we will not be
> able to communicate with you regarding this individual and his circumstances.

8.      The following is a link to an audio recording that has the filename of "Robert_Vargas on

8-2-20 at 9_11 pm_20200802 211142.m4a" that I recorded on 8/2/20 at 9:11 pm while I talked

with Mr. Vargas in the kitchen area within his apartment as he was then telling me that he

urgently needed to have an air conditioner to be installed in his apartment for his health after he

had suffered numerous strokes:

https://drive.google.com/file/d/1kgqME-
aLSNUjKknYGY9lX03pfYBCQmM6/view?usp=sharing

9.      Mr. Vargas is clearly heard in that audio recording at the elapsed time of 35 seconds as he

made a remark to me in which he rhetorically asked whether those who were depriving him of an

air conditioner in his apartment wanted someone else to die in the building in which I reside after

a nice woman whose name was Gilda Giscombe died in it in December of 2019 due to

negligence by HRA, DHS, and Urban's personnel. I talked with Mr. Vargas on 8/2/20 while it

had recently been both hot and humid in the building in which I reside that is poorly ventilated

due to negligence by Urban, HRA, DHS, HPD, and OTDA. Mr. Vargas and I are heard in that audio recording at the elapsed time of 1 minute and 7 seconds as we talked about Gilda's death. Mr. Vargas told me that she collapsed in the lobby of the building in which I reside in December of 2019 before she asked a security worker who then worked in that building to help her to reach her apartment on the third floor in that building. Mr. Vargas told me that the security worker refused to assist her. Ms. Giscombe was found dead in her apartment a few days later.

10.     Prior to Mr. Vargas' death, I also recorded a video recording of a conversation that I had with him on 12/19/19 at 2:25 pm as I stood in the lobby of the building in which I reside and talked with him as he stood just inside of his apartment. Back then, things we talked about that are heard in that video were the circumstances surrounding Gilda's death that suggested that Urban is liable for negligence in regards to it, the fact that he was a disabled military veteran, the fact that he wasn't having necessary repairs made in his apartment due to negligence by both Urban and HRA, and the fact that I was viciously assaulted in that building by my former roommate. That video recording is available on the Internet at

https://drive.google.com/file/d/1KRAiloeCKFB_aWofL7cMIV14C6R0Gx1s/view?usp=sharing.

11.     The following is a link to a video recording that has the filename of "FDNY forcing open Robert Vargas' apartment door on 8-11-20 at 3_39 pm_IMG_3624.MOV" that I recorded on 8/11/20 at 3:39 pm while I stood in a public area on the first floor of the building in which I reside as a recorded members of the New York City Fire Department ("FDNY") while they broke open the front door to Mr. Vargas' apartment:

https://drive.google.com/file/d/1BGbVCcAlTCTy_WpODblxPbh7H-q1zYnk/view?usp=sharing

12.     The next screenshot is from the elapsed time of 2 seconds in that video and shows 3 members of the FDNY as one of them was using a tool to force open the front door to Mr.

Vargas' apartment in the building in which I reside. They had been asked to come to that

building then because Mr. Vargas was no longer responding to people who were checking up on

his welfare and the front door to his apartment was locked from the inside.



13.     The following is a link to a video recording that has the filename of "Urban staff member

in front of apartment building on 8-11-20 at 4_04 pm with a FDNY ambulance in front and

EMTs inside of the building by Roberts apartment_IMG_3636.MOV" that I recorded on 8/11/20

at 4:04 pm while I stood in front of the building in which I reside and recorded a FDNY

ambulance that was there while paramedics assigned to it were inside of the building in which I

reside and outside of Mr. Vargas' apartment as they were then there to respond to his death:

https://drive.google.com/file/d/1dAFNodgC63nglKYenr0Djgva_UpXJjY9/view?usp=sharing

14.      The next screenshot is from the elapsed time of 14 seconds in that video and shows FDNY paramedics as they stood in an area of the lobby of the building in which I reside that is located just outside of Mr. Vargas' apartment.



15.      The following is a link to a video recording that has the filename of "NYC Medical Examiner's Office workers rolling Robert Vargas out of apartment building at 8_53 pm on 8-11-20_IMG_3661.MOV" that I recorded on 8/11/20 at 8:53 pm while I stood in front of the building in which I reside and recorded members of the New York City Chief Medical Examiner's Office as they used a stretcher to roll Mr. Vargas out of the building in which I reside while he was then in a black body-bag:

https://drive.google.com/file/d/1otdIE5Ggj2QMzLvY1c6sSU7XFg3MHet4/view?usp=sharing

16.     The next screenshot is from the elapsed time of 3 seconds in that video and shows the members from the New York City Chief Medical Examiner's Office and the black body-bag that Mr. Vargas was then inside of in front of the building in which I reside.



**Whistleblowing objectives I had for attending the Mayor's 11/2/17 town hall:**

17.     The discussion that follows concerns defective conditions in the building in which I reside that existed on 10/29/17 and still largely exist in the hallway located directly in front of my apartment's entrance that I sought to lawfully discuss with Mr. Banks, the Mayor, other government personnel, members of the public, and journalists while attending the Mayor's 11/2/17 town hall meeting shortly before it began, as it was conducted, and shortly after it ended.

I sought to discuss those defects to have them immediately and properly fixed and to be provided a detailed and objectively credible explanation by Mr. Banks, the Mayor, HPD's Commissioner, and the New York City Department of Buildings' Commissioner why they and others in the Mayor's administration were still paying me and the other military veterans who were residing in the building in which I reside that is publicly-subsidized housing for military veterans such disrespect and disservice by condoning the fact that Urban, HPD, and HRA were all neglecting having necessary repairs made in the building in which I reside shortly before Veterans Day in 2017.  In that sense, I was trying to serve as a tenant representative of those who resided in the building in which I reside to lawfully push for proper living conditions in that building after I was viciously assaulted in it on 7/2/16 due to fraud, forgery, and negligence by HRA and Urban. The next screenshot is from the elapsed time of 11 seconds in the video recording that has the filename of "IMG_2933.MOV" that I recorded on 10/29/17 at 6:58 pm as I stood in the hallway located in front of my apartment's entrance. A big crack in the ceiling in that hallway is shown in that screenshot as water was dripping through it and causing a slipping hazard on the floor in that hallway. That defect has existed since prior to 5/24/17. Tenants in the building in which I reside have told me that property in their apartments has been damaged because of a leak from the roof of the building in which we reside. They told me that such damage occurred long after 11/2/17. Although Urban arranged to have minimal repairs made for that defect, those repairs were patchwork and piecemeal in nature that hasn't fixed that problem. Instead, there continues to be cracks and peeling plaster in that area of the ceiling in that hallway.



18.    The next screenshot is from the elapsed time of 8 seconds in that video and shows plaster that fell from that ceiling to the floor in that hallway in an area near where that floor was wet because of the leaks from that ceiling.



19.    Trash containers appear in that video at the elapsed time of 53 seconds. Those trash

containers were then in a stairwell on the first floor in the building in which I reside in spite of

the fact that HPD issued an order for them to instead be in the basement in that building and

didn't enforce that violation that it issued against Urban. Those trash containers have attracted

insects and were located near the entrance to Robert Vargas' apartment. Mr. Vargas is a former

Army National Guard and U.S. Marines military veteran who was both elderly and disabled. I

discussed him earlier in this complaint and he died on 8/11/20 due to negligence by Mr. Banks,

Ann Marie Scalia of HRA, and Urban's personnel after they continued to neglect his needs after

I sent an e-mail message to Mr. Banks and Ms. Scalia on 8/3/20 about Mr. Vargas' urgent need

for an air conditioner to be installed in his apartment. I also intended to talk with Mr. Banks, the

Mayor, other government officials, and journalists on Mr. Vargas' behalf while attending the

Mayor's 11/2/17 town hall.

20.     The next screenshot is from the elapsed time of 1 minute and 9 seconds in that video and

shows a certificate that HPD issued in the lobby of the building in which I reside that pertained

to visits that its inspectors made to the building in which I reside.



21.     The next screenshot is from the elapsed time of 4 seconds in the video recording that has

the filename of "IMG_2935.MOV" that I recorded on 10/29/17 at 9:37 pm as I stood in the

hallway located in front of my apartment's entrance. A big crack in the ceiling in that hallway is

shown in that screenshot as water was dripping through it and causing a slipping hazard on the

floor in that hallway.



22.     The next screenshot is from the elapsed time of 10 seconds in that video as I still stood in that hallway. Pieces of plaster from that ceiling that fell to that floor are shown in this screenshot that also shows wet areas on that floor that were a slipping hazard.



23.     The next screenshot is from the elapsed time of 17 seconds in that video as I still stood in that hallway. The door for the entrance to apartment 4C is shown in this screenshot while that door was fully closed. Due to how that door was defectively installed, it does not fully close in a way that causes the upper-right corner of that door to be up against its doorframe when it is closed. That circumstance causes a gap to exit in that area of that doorway when that door is shut

that allows a burglar to insert a crowbar to break open that door.



24.     The next screenshot is from the elapsed time of 5 seconds in the video recording that has the filename of "IMG_2936.MOV" that I recorded on 10/29/17 at 9:40 pm as I stood in the hallway located in front of my apartment's entrance. A big hole in the ceiling in that hallway is shown in that screenshot as water was dripping through it and causing a slipping hazard on the floor in that hallway. I never touched that ceiling and instead positioned my cell phone very close to that hole as I recorded that video.



25.     Prior to my arrival on 11/2/17 to the site of the Mayor's 11/2/17 town hall meeting, both Defendants Miller and Stribula had a very good idea about the subject matter for much of the whistleblowing that I intended to lawfully engage in while attending that public forum within the room in which it would be conducted as it would be conducted. This is because I previously sent e-mail messages to Ms. Stribula on 3/16/17 at 10:47 pm and to Mr. Miller on **a)** 4/11/17 at 7:17 pm, **b)** 4/11/17 at 7:46 pm, and **c)** 4/18/17 at 2:54 pm in which I summarized some of the subjects about which it was objectively reasonable to believe I would thereafter attempt to lawfully engage in protected whistleblowing on an ongoing basis while attending public town hall meetings, public resource fair meetings, and public hearings that the Mayor conducted.

26.     The following lists what some of my primary objectives were in broad terms that focused on whistleblowing that I sought to lawfully engage in while attending the Mayor's 11/2/17 town hall and while waiting to be granted access to the school that hosted it while I would wait on

10/2617 outside of the building in which it would be hosted and interact with members of the public and journalists:

a.      I sought to engage in extensive protected whistleblowing about matters of both public concern and private matters while attending that public forum as **a)** reporters, members of the public, and numerous government officials were present and nearby and **b)** that public forum was recorded on video that was broadcast on the Internet that could greatly amplify the message that I was trying to widely broadcast through word-of-mouth advertising. However, hindsight sufficiently confirms that the defendants in this action and others were hell-bent on trying to illegally prevent me from being able to exercise my legal right to take advantage of public town hall meetings, public resource fair meetings, and public hearings that the Mayor conducted with Mr. Banks and others to use them and the resources that they made available to get the messages out that I was lawfully attempting to broadcast as I sought for those messages and viewpoints of mine to achieve the greatest possible reach largely through word-of-mouth advertising that could occur **a)** at the sites of those public forums as they were being conducted and **b)** as a result of those who watched the video recordings of those public forums and may have chosen to engage in such advertising.

b.      The subject matter of whistleblowing that I intended to lawfully engage in while attending the Mayor's 11/2/17 town hall largely concerned the sum and substance of my HRA lawsuit that was a complex hybrid proceeding, illegal acts and omissions that had been committed against me since 4/11/17 in regards to public forums that the Mayor and Mr. Banks conducted and also included the scheduled 4/12/17 oral arguments hearing in my HRA lawsuit that Jeffrey Mosczyc illegally caused me to be deprived of just 1 day

prior to that scheduled hearing. On 4/11/17, HRA also illegally manipulated OTDA during a fair hearing that OTDA pointlessly conducted between HRA and I after OTDA illegally refused to fully enforce a fair hearing decision that one of its administrative law judges issued on 9/15/16 in my favor that I discussed with New York City Councilman Stephen Levin on 4/27/17 as I testified to him in a public hearing that the City Council's Committee on General Welfare conducted. HRA manipulated OTDA on 4/11/17 by managing to have a new administrative law judge who was then assigned to the fair hearing that OTDA then conducted between HRA and I to disregard the fact that an attorney for HRA named Marin Gerber flagrantly violated res judicata and committed wire fraud during that hearing through her remarks as both OTDA and I separately recording audio recordings of that hearing that was conducted by telephone. That hearing was conducted by telephone only because OTDA had been illegally preventing me from having such hearings face-to-face in its offices located at 14 Boerum Place in Brooklyn following 7/5/16. On 7/5/16, an administrative law judge who was assigned to OTDA illegally and abruptly terminated a face-to-face fair hearing that OTDA conducted between HRA and I in OTDA's offices located at 14 Boerum Place in Brooklyn while OTDA recorded that hearing on audio.  She did so while I was in the middle of attempting to lawfully answer a question that I was asked during that hearing just 3 days after I was viciously assaulted in the living room of where I reside by my former roommate (Ronald Sullivan) that fraud and negligence by HRA, Urban, Services for the Underserved, Inc. ("SUS") enabled. That assault was both entirely foreseeable and preventable. It occurred after Mr. Sullivan attempted to assault me in that same living room on 5/12/16 and was physically restrained by one of Urban's personnel who then

happened to be in that living room as Mr. Sullivan was making verbal threats against me before he suddenly rushed toward me to try to assault me. I then promptly reported that attempted assault on 5/12/16 mainly through cell phone text messages to someone named Molly McCracken of SUS to have her act as an intermediary between Urban and I to arrange for Mr. Sullivan to be immediately evicted from the building in which I reside because he had proven that he was a clear and unacceptable threat to my safety in that building. I also made telephone calls on 5/19/16 to Lisa Lombardi and Ronald Abad while they were then among Urban's senior management to try to persuade them to immediately evict Mr. Sullivan for the same reasons. However, all of my requests for him to be evicted were denied. Instead, I received more than 15 punches from Mr. Sullivan's fists to an area near my left temple on my head in the living room of where I reside on 7/2/16 when Mr. Sullivan exploded as the time bomb that I correctly recognized him to be on 5/12/16. On or about 2/24/17, Bronx Criminal Court Judge Cori Weston issued a fraudulent determination in the case of _People v. Sullivan_, No. 2016BX042188 (Bronx Crim. Ct. Feb. 24, 2017) in which she claimed that Mr. Sullivan was not guilty for assaulting me on 7/2/16 in the living room of where I reside after she abused her discretion by suppressing a critically significant security log as evidence in the criminal case that the Bronx DA commenced against Mr. Sullivan for assaulting me on that date in my living room as the Bronx DA committed prosecutorial misconduct in that case in a number of significant ways that prejudiced my right to have Mr. Sullivan to be properly prosecuted for assaulting me. Bill de Blasio appointed Cori Weston as a judge and I have held him liable for doing so. I certainly intended to engage in protected whistleblowing against the Mayor during the Mayor's 11/2/17 town hall about the fact that he appointed

Cori Weston to be a judge and the harm that caused me as a result of Judge Weston

having fraudulently determined that Mr. Sullivan was not guilty for having assaulted me

partly by fraudulently concealing material evidence. The Mayor also appointed David

Kirschner to be a judge and that enabled Mr. Kirschner as a Bronx Criminal Court judge

to free a gang-member named Jose Gonzalez, who then killed a FDNY paramedic as he

stole an ambulance that was assigned to her. The New York Post published a news article

on 3/20/17 about how Mr. Gonzalez killed Ms. Arroyo and how Judge Kirschner enabled

that to occur. That news article is entitled "Judge Was Soft on Accused EMT Killer

Weeks Before Rampage", was written by Larry Celona, and is available on the Internet at

https://nypost.com/2017/03/20/judge-was-soft-on-accused-emt-killer-weeks-before-

rampage/. That news article was published less than one month after Judge Weston

fraudulently determined that Mr. Sullivan was not guilty of having viciously assaulted me

on 7/2/16. The findings in _Johnson v. NYC Health & Hosps_, 246 A.D.2d 88, 676

N.Y.S.2d 38, 676 N.Y.S. 38 (App. Div. 1998) confirm that security logs are admissible as

evidence in criminal cases. The security log that I sought to have accepted as evidence in

the criminal case against Mr. Sullivan for assaulting me was updated by security

personnel who worked for Urban in the building in which I reside. That log contained

critically significant information about how Mr. Sullivan was observed as exhibiting an

angry demeanor as he fled from the building in which I reside after he viciously assaulted

me in the living room of where I reside on 7/2/16. Additionally, Mr. Sullivan made

incriminating remarks to a witness named Larry Kayatt on 7/2/16 as Mr. Sullivan fled

from the building in which I reside after assaulting me in it. Mr. Kayatt thereafter told me

both prior to 11/2/16 and on 8/29/17 how Mr. Sullivan described to him on 7/2/16 as he

fled from that building about precisely how he assaulted me on 7/2/16 in the living room

of where I reside. Mr. Kayatt told me then that Mr. Sullivan told him that he (Mr.

Sullivan) "bitch-slapped" me and hit me with an open hand as he criminally assaulted me

on 7/2/16. Also, I legally recorded an audio recording of my conversation with Mr.

Kayatt at 4:01 pm on 8/29/17 as he shared that information about Mr. Sullivan with me. I

have played back that audio recording while testifying in public hearings that the City

Council conducted and using that recording in conjunction with the testimony that I

provided. Also, I sent an e-mail message to Hayden Briklin of the Bronx DA on 11/2/16

at 6:37 pm in which I provided her Mr. Kayatt's name to have her team use him as a

witness in the criminal case that her team commenced against Mr. Sullivan for having

assaulted me on 7/2/16. Mr. Briklin was involved in the criminal case against Jose

Gonzalez that led to Judge Kirschner ordering him to be released from custody before he

killed Ms. Arroyo. Also, the Bronx DA negligently didn't appeal the decision that Judge

Weston issued in the criminal case against Mr. Sullivan to exclude the security logs as

evidence to the greatest extent that its prosecutors. While he was the assistant district

attorney for the Bronx DA who prosecuted the criminal case at trial against Mr. Sullivan

for assaulting me, Scott McDonald, Jr. as well as a female supervisor of his instead

merely debated the matter of the admissibility of the security logs with Judge Weston in

her courtroom. They did so in spite of the fact that the Bronx DA could have formally

pursued an appeal to an appellate court about Judge Weston's arbitrary and capricious

decision to exclude those security logs from the evidence that she would consider in that

case. The Bronx DA also never used any witness in that criminal case against Mr.

Sullivan other than me in spite of what Mr. Kayatt and others knew about that assault and

how Mr. Sullivan was observed to have an angry demeanor as he fled from the building

in which he assaulted me. The Bronx DA also waited until October of 2017 to arrange for

me to be issued an order of protection against Mr. Sullivan for having assaulted me on

7/2/16. That caused me to have to continue to have Mr. Sullivan as my roommate in the

same apartment in which he viciously assaulted me at the same time that I was battling to

recover from the concussion and trauma that assault caused me. All of this information

were among the subjects of additional protected whistleblowing about which I intended

to engage in whistleblowing against the Mayor, the Bronx DA, Judge Weston, the

NYPD, HRA, and Urban during the public town hall meetings and public resource fair

meetings that the Mayor conducted on and after 4/27/17. Returning to my discussion

about OTDA, though it is responsible for providing proper oversight over how HRA

operates as well and is also responsible with HRA for providing proper oversight over

how Urban operates as the landlord of the building in which I reside, hindsight confirms

that no such oversight has existed over HRA nor Urban. Similarly, no proper oversight

over how OTDA operates has existed. After my 7/5/16 OTDA fair hearing was illegally

terminated by the administrative law judge assigned to it in retaliation for entirely valid

complaints that I lawfully reported to her during that hearing about the fact that she

wasn't paying proper attention to the information that I was communicating during that

hearing at the same time that I was battling a concussion that was developing in my head

as well as justifiable rage against HRA for my having been assaulted on 7/2/16 partly

because of fraud and negligence that it and Urban committed against me, Samuel

Spitzberg of OTDA sent me a letter dated 7/21/16 in which he implicitly acknowledged

the fact that my 7/5/16 OTDA fair hearing had been illegally terminated in violation of

my rights pursuant to the First Amendment and Fourteenth Amendment. On 7/5/16, prior

to leaving the building in which my 7/5/16 OTDA fair hearing was conducted, I lawfully

expressed outrage to OTDA personnel in a public waiting area in that building about the

fact that my 7/5/16 OTDA fair hearing was illegally terminated in violation of my rights

after I travelled all the way from the Bronx to Brooklyn to attend that hearing and was

heavily suffering from the effects of having been viciously assaulted just 3 days earlier.

OTDA never accorded me any due process in regards to its decision to illegally ban me

from returning to its offices in Brooklyn after 7/5/16. Instead, OTDA's personnel have

repeatedly lied to me and negligently condoned fraud by HRA against me following

7/5/16 that concerned material matters. Such negligence contributed to the circumstances

that enabled Mr. Vargas' death. Additionally, OTDA has illegally never conducted fair

hearings for additional claims that I asserted against HRA that I brought to OTDA's

attention on 2/9/17 in a 62-page fax that I transmitted to OTDA on 2/9/17 to have OTDA

conduct fair hearings between HRA and I within 30 days in accordance with OTDA's

own policies. In short, I also intended to try to engage in extensive protected

whistleblowing against OTDA while attending the Mayor's 11/2/17 town hall.

Concerning what I just discussed about OTDA, it's necessary to bear in mind that the site

of the Mayor's 11/2/17 town hall isn't very far from OTDA's offices in Brooklyn that are

located at 14 Boerum Place. It's also necessary to keep in mind that in his capacity as a

member of the City Council, Defendant Lander was among others who were supposed to

be providing proper oversight over how HRA operated that he egregiously wasn't before

he served as the moderator for the Mayor's 11/2/17 town hall.

c.        The subject matter of whistleblowing that I intended to lawfully engage in while

attending the Mayor's 11/2/17 town hall also concerned the sum and substance of the

face-to-face conversations that I had with the Mayor and Mr. Banks prior to 11/2/17 that

dated back to 3/1/16 with respect to Mr. Banks and 3/15/17 with respect to the Mayor as

both the Mayor and Mr. Banks had proven to be con artists as far as I was concerned. I

sought to lawfully and widely apprise voters and potential voters as well as political

rivals of the Mayor and members of the City Council while attending public forums that

the Mayor conducted with others that New Yorkers sorely needed a complete overhaul of

New York City's government personnel and that the primary way to get that done was by

immediately firing the Mr. De Blasio, his entire administration, and the entire City

Council as well as other New York City government personnel through the power of their

votes.

d.       Additional whistleblowing of public concern about which I intended to engage in

while attending the Mayor's 11/2/17 town hall was against whistleblower news censors in

journalism.

e.       Clarification about matters that I intended to engage in whistleblowing about

while attending such public forums that the Mayor conducted is readily apparent by the

sum and substance of the testimony that I gave during public hearings that committees of

the City Council conducted on the following dates that were recorded on video as a result

of arrangements that the City Council made:

i.       4/27/17: General Welfare Committee. That video is available on the Internet

at https://councilnyc.viebit.com/player.php?hash=yT2sfbuWriiW. I addressed

New York City Councilman Stephen Levin as I testified in that hearing. My

testimony in that video begins at the elapsed time of 3 hours, 27 minutes, and

one second and lasted until the elapsed time of 3 hours, 29 minutes, and 28 seconds.

ii.     6/14/17: Committee on Public Safety. That video is available on the Internet at https://councilnyc.viebit.com/player.php?hash=YXl0VS6f0vsZ. I primarily addressed New York City Councilwoman Vanessa Gibson at the end of my testimony in that hearing as I then testified to her and others. My testimony in that video begins at the elapsed time of 2 hours, 54 minutes, and 42 seconds and lasted until the elapsed time of 3 hours, 58 minutes, and 28 seconds.

iii.    6/19/17: Committee on Oversight and Investigations. That video is available on the Internet at https://councilnyc.viebit.com/player.php?hash=mpfP5DcsXgf5. I testified then to former New York City Councilman Vincent Gentile and former New York City Councilwoman Elizabeth Crowley. My testimony in that video begins at the elapsed time of 35 minutes and 19 seconds and lasted until the elapsed time of 50 minutes, and 55 seconds.

iv.     6/27/17: General Welfare Committee. That video is available on the Internet at https://councilnyc.viebit.com/player.php?hash=5dKD0m59T0oF. I testified then to New York City Councilman Ben Kallos. My testimony in that video begins at the elapsed time of 4 hours, 42 minutes, and 50 seconds and lasted until the elapsed time of 4 hours, 51 minutes, and 37 seconds. I testified during that hearing partly about the fact that I was being illegally prevented from attending public forums that the Mayor had been conducting since 4/27/17 with other government officials.

v.   10/2/17: Committee on Veterans. That video is available on the Internet at https://councilnyc.viebit.com/player.php?hash=iL2CQdQxyO6c. I testified then to New York City Councilman Eric Ulrich. My testimony in that video begins at the elapsed time of 2 hours, 8 minutes, and 3 seconds and lasted until the elapsed time of 2 hours, 26 minutes, and 3 seconds. I also testified during that hearing partly about the fact that I was being illegally prevented from attending public forums that the Mayor had been conducting since 4/27/17 with other government officials.

vi.   10/16/17: Committee on Courts and Legal Services. That video is available on the Internet at https://councilnyc.viebit.com/player.php?hash=6D4LixzIe9Bs. I testified then to New York City Councilman Rory Lancman. My testimony in that video begins at the elapsed time of 2 hours, 43 minutes, and 4 seconds and lasted until the elapsed time of 2 hours, 26 minutes, and 3 seconds. I testified during that hearing partly about the fact that I was being illegally prevented from attending public forums that the Mayor had been conducting since 4/27/17 with other government officials. The next screenshot is from what appears at the elapsed time of 2 hours, 39 minutes, and 26 seconds in that 10/16/17 hearing as I testified about the fact that I was being illegally prevented from attending public town hall meetings and resource fair meetings that the Mayor had been conducting.



In response to that specific testimony about illegal acts and omissions against me at public forums, I reasonably expected Mr. Lancman to immediately directly or indirectly intervene on my behalf in some way that would ultimately cause that illegal practice to immediately stop. However, he unconscionably did nothing about that. The video recording of that 10/16/17 hearing also recorded Mr. Lancman on audio as I testified in it while Mr. Lancman was rude to me by answering a telephone call that he received instead of letting it go to voicemail and properly paying complete attention to my testimony. While I have testified in public hearings that the City Council has conducted in City Hall, I have observed Defendants Redmond, Mason, and other members of the Mayor's NYPD security detail as they conducted surveillance against me. Since the public hearings that the City Council

conducts are broadcast over the Internet on video in real-time as they are being conducted, all of the defendants in this action and others had the opportunity to watch my testimony in such public hearings before I attempted to attend the Mayor's 11/2/17 town hall.

vii.   10/23/17: Committee on Contracts. That video is available on the Internet at https://councilnyc.viebit.com/player.php?hash=EjQEYLABfogo. I testified then to New York City Councilwoman Helen Rosenthal and New York City Councilman Ben Kallos. My testimony in that video begins at the elapsed time of 1 hours, 41 minutes, and 18 seconds and lasted until the elapsed time of 1 hours, 46 minutes, and 25 seconds at which point Ms. Rosenthal made largely irrelevant remarks to me to respond to my testimony as she mostly unconscionably stonewalled me about its sum and substance. I testified during that hearing mainly against HRA, NTT, Mr. Banks, and the Mayor in regards to unconscionable procurement practices by the Mayor's administration that has allowed Defendant City of New York's government contracts with NTT to persist in spite of wage-theft that NTT committed against me. I also made remarks in my testimony that concerned illegal acts that were being committed against me to prevent me from attending public town hall meetings and public resource fair meetings that the Mayor conducted that prevented me from engaging in protected whistleblowing while attending them that would be against NTT and its business with the City of New York. I explicitly pointed out that the whistleblowing that I sought to engage in during such public forums was tied to decisions that voters needed to make in the 2017

New York City government elections about how they wanted to be New York City's Mayor as a result of that election. The next screenshot is from the elapsed time of 1 hour, 45 minutes, and 27 seconds in that video as I rhetorically asked Ms. Rosenthal whether I should be able to walk through the doors of public town hall meetings and public resource fair meetings that the Mayor had been conducting and would continue to conduct to give myself opportunities to talk with members of the public about unconscionable procurement practices by the Mayor's administration pertaining to its contracts with NTT to allow such members of the public to make better informed decisions as to whether the Mayor and his administration represented their interests and values and deserved their votes or needed to be fired through the 2017 New York City government elections.



On a related note, the City Council arranged for a written transcript to be

prepared as a PDF file from that 10/23/17 public hearing. That transcript is available on the Internet at

https://legistar.council.nyc.gov/View.ashx?M=F&ID=5532414&GUID=8D913B81-28F5-48A0-8B37-BABCAACEAC8C. What follows is an entirely accurate account of the remarks that I made while I testified in that hearing between the elapsed times of **a)** 1 hour, 44 minutes, and 52 seconds and **b)** 1 hour, 45 minutes, and 53 seconds in the video recording that the City Council arranged to be recorded of that hearing. This account corresponds to the text that appears between lines 4 and 23 that appear on page 97 of the written transcript that the City Council arranged to be prepared from that hearing. In short, as I testified then, I brought up a type of issue that I would have otherwise likely tried to discuss with members of the public about how their taxes should not be used to support companies that commit wage-theft to avoid having their money kept in the wrong hands while attending public town hall meetings and public resource fair meetings that the Mayor conducted prior to 10/23/17 and would continue to try to ask them during further town hall meetings and resource fair meetings that he would continue to conduct.

> "outright fraud? Also, while we're here, there's a decision that voters need to make on November 7th in terms of who they want to be the next Mayor. So, if I tried attending the Mayor's public town hall meetings, resource fairs to essentially service as a whistleblower...to exercise my First Amendment rights in front of a public audience to say, 'You know, we've never met, but here's some proof that your tax dollars are being used to support a company that still hasn't paid me for the last five years when I used to work 50 hours per week at Credit Suisse, had those timesheets approved'? Yeah, shouldn't I be able to walk through those doors and...'My fellow'...you know, 'New

> Yorkers'…know…'Here's somebody that your tax dollars are having to subsidize only because of the fact that I brought this to Steven Bank's attention on July 18th in the resource fair in Kew Gardens. I handed him a report. I gave him the emails confirming all…all my claims are entirely valid. I can fully account for the fact that someone"

f.      Additional clarification about matters that I intended to engage in whistleblowing about while attending such public forums that the Mayor conducted is readily apparent by the sum and substance of the conversations that I had with Marcia Kramer of CBS New York and Juliet Papa of 1010 WINS on 6/15/17 during a town hall meeting that CBS New York conducted in Corona in Queens that it recorded on video and is shown in a news report that is available on the Internet at

http://newyork.cbslocal.com/2017/06/15/queens-election-town-meeting/. Erin Durkin attended that town hall. During that town hall's video, I talked with Ms. Kramer and Ms. Juliet in Ms. Durkin's immediate presence during two separate periods and engaged in protected whistleblowing about a variety of matters while doing so. Such matters included whistleblowing that was about my having been illegally prevented from attending public town hall and resource fair meetings that the Mayor conducted on 4/27/17, 5/23/17, and 6/8/17. The periods in that video recording during which I talked with Ms. Kramer and Ms. Juliet were between the following elapsed times in that video:

  i.   **a)** 40 minutes and 22 seconds and **b)** 47 minutes and 17 seconds.

  ii.  **a)** 56 minutes and 33 seconds and **b)** 57 minutes and 45 seconds.

g.      Further clarification about matters that I intended to engage in whistleblowing about while attending such public forums that the Mayor conducted is readily apparent by the sum and substance of the conversations that I had with the following government officials that were recorded on video and otherwise on audio:

i.  3/15/17 and 7/18/17: With the Mayor during the town hall and resource fair
    meetings that he conducted on those dates. The next screenshot shows me as I
    began talking with the Mayor during the Mayor's 3/15/17 town hall that the
    Mayor's office arranged to be recorded on video that is available o the
    Internet at https://www.youtube.com/watch?v=i5LjWB2d2vc.  The screenshot
    corresponds to what appears in that video at the elapsed time of 2 hours, 1
    minute, and 18 seconds.



A whistleblower news censor in journalism named Michael Gartland attended

that meeting along with Defendants Stribula and Redmond. Paola Ruiz of the

Mayor's staff also attended that meeting. I talked with both Ms. Ruiz and Ms.

Stribula during that meeting and Ms. Stribula gave me her business card then.

While I talked with Ms. Ruiz during that meeting right after I finished talking

with the Mayor during it, I gave her a comment card that I was issued during

that meeting. I wrote a list of issues and whistleblowing information on that card for which I sought assistance from the Mayor's office and never really received in response. I thereafter sent Ms. Stribula and Ms. Ruiz a detailed e-mail message on 3/16/17 at 10:54 pm that was partly against HRA and its business partners that include Urban and NTT. No one replied to that e-mail message. Instead, hindsight clearly suggests that I was illegally retaliated against by **a)** Ms. Stribula and other members of the Mayor's CAU that include Defendant Ringel and **b)** members of the Mayor's NYPD security detail that include Defendant Redmond in relation to my efforts to lawfully attend further public forums comprised of town hall meetings, resource fair meetings, and public hearings that the Mayor thereafter conducted with other government officials and the public in response to the protected whistleblowing that I engaged in through that 3/16/17 e-mail message. That e-mail message contained a large amount of entirely valid and protected whistleblowing information. I also sent that e-mail message then to others that included the following people as both courtesy-copy ("Cc") recipients and blind courtesy copy ("Bcc") recipients:

| # | Recipient Name | E-mail | Cc or Bcc? |
|---|----------------|--------|------------|
| 1 | ABC News | iwitness@abc.com, | Bcc |
| 2 | Matthew Chayes | matthew.chayes@newsday.com | Bcc |
| 3 | Yoav Gonen | ygonen@nypost.com | Bcc |
| 4 | Errol Louis | errol.louis@charter.com | Bcc |
| 5 | Jeff C. Mays | jeffcmays@gmail.com | Bcc |
| 6 | Laura Nahmias | LNahmias@Politico.com | Bcc |
| 7 | Madina Toure | mtoure@observer.com | Bcc |
| 8 | Paola Ruiz | pruiz@cityhall.nyc.gov | Cc |

| 9 | New York City Public Advocate's office | gethelp@pubadvocate.nyc.gov | Cc |
| 10 | Lourdes Rosado | lourdes.rosado@ag.ny.gov | Cc |
| 11 | Melissa Mark-Viverito | mmark-viverito@council.nyc.gov | Cc |

The next table contains additional information about some of those e-mail

recipients.

| # | Recipient Name | Notes |
|---|---|---|
| 1 | Matthew Chayes | He works for Newsday and is a whistleblower news censor in journalism. |
| 2 | Yoav Gonen | He then worked for the New York Post and now works for a news organization named "The City". He is a whistleblower news censor in journalism. |
| 3 | Errol Louis | He works for Spectrum News and is a whistleblower news censor in journalism. |
| 4 | Jeff C. Mays | He works for the New York Times and is a whistleblower news censor in journalism. |
| 5 | Laura Nahmias | She then worked for Politico and now works for New York Daily News. She is a whistleblower news censor in journalism. |
| 6 | Madina Toure | She then worked for a news organization named Observer and now works for Politico. She is a whistleblower news censor in journalism. |
| 7 | Lourdes Rosado | She was then the head of the civil rights division of the New York State Attorney General's office. I previously met her on 3/13/17 and she gave me her business card then. |
| 8 | Melissa Mark-Viverito | She was then the Speaker of the City Council. I previously met her on 3/13/17 during the meeting in which I met both Ms. Rosado and Jeff C. Mays. |

What follows are 2 pertinent excerpts from the e-mail message that I sent to

Ms. Stribula on 3/16/17 at 10:47 pm.

| a) | **From:** Towaki Komatsu <towaki_komatsu@yahoo.com><br>**Subject:** Follow-up re: 3/15/17 town hall request made to Mayor de Blasio for pro-bono legal representation |

**Date:** March 16, 2017 at 10:54:24 PM EDT
**To:** sstribula@cityhall.nyc.gov
**Cc:** pruiz@cityhall.nyc.gov, gethelp@pubadvocate.nyc.gov, lourdes.rosado@ag.ny.gov, mmark-viverito@council.nyc.gov

Dear Ms. Stribula,

My name is Towaki Komatsu. I'm the Navy veteran who asked the Mayor questions last night at the town hall in Chelsea.

I'm sending you this message to follow-up on the request I made to Mayor de Blasio at the town hall yesterday for pro-bono legal representation to address significant problems I have that include, but are not limited to the following:

**b)**

b) Wage-theft by a company named NTT Data, Inc. that New York City, New York State, and federal agencies have contracts with.

c) Fraud by one of New York City's shelter providers named Urban Pathways, Inc.

The following is a link to the video from last night's town hall meeting:

https://www.youtube.com/watch?v=i5LjWB2d2vc&sns=em

My conversation with the Mayor stretches from the 2-hour, 18-minute, and 50-second mark in the video to the 2-hour, 21-minute, and 9-second mark in the video.

Although the Mayor expressed last night that he would try to get me legal help for wage-theft problems from the New York City Department of Consumer Affairs, he didn't address whether he would be willing to help me to get legal help for frivolous lawsuits by a slumlord and fraud by one of New York City's shelter providers that I made HRA aware of as early as March of 2016, which was prior to my having been assaulted in that shelter by my former roommate on 7/2/16 that Urban Pathways, Inc. and HRA are negligently liable having enabled.

In addition, during my chat with the Mayor, I didn't have time to make him aware of the fact that HRA has been violating a judge's decision since 9/15/16 that was issued in my favor on

|  | that date by an administrative law judge assigned to the New York State Office of Temporary and Disability Assistance ("OTDA") in relation to an appeal I filed. To try to have that matter resolved, I have been dealing directly with Ann-Marie Scalia of HRA's legal team and Samuel Spitzberg of OTDA. I have also had indirect dealings with Martha Calhoun of HRA, the New York City Public Advocate's Office, and the New York City Comptroller's office. In regards to that judge's decision, HRA has defied its binding legal obligation to reimburse me in the amount of roughly $1,300 for storage expense payments HRA fraudulently induced me to pay after it unlawfully refused to pay for those expenses while I was eligible under applicable law to have it do so.<br><br>The following are 3 PDF files that concern the 9/15/16 decision issued by an OTDA judge entirely in my favor that HRA is violating: |
|---|---|
| c) | I urgently need pro-bono legal representation due to appeals that are being filed in housing lawsuits against the slumlord, hearings in a wage-theft lawsuit, and to enforce OTDA's decision against HRA. |

On a related note, when I sent an e-mail message to Mr. Miller that was similar in its content as a blind courtesy copy recipient on 4/11/17 at 7:17 pm, I also sent that e-mail message to the following additional people as I addressed those recipients as a mixture of primary recipients, courtesy copy recipients, and blind courtesy copy recipients for that e-mail message. The next table shows the blind courtesy copy recipients for that e-mail message.

| # | Recipient Name | E-mail |
|---|---|---|
| 1 | ABC News | iwitness@abc.com, |
| 2 | Matthew Chayes | matthew.chayes@newsday.com |
| 3 | Yoav Gonen | ygonen@nypost.com |
| 4 | Gwynne Hogan | ghogan@dnainfo.com |
| 5 | Errol Louis | errol.louis@charter.com |
| 6 | Jeff C. Mays | jeffcmays@gmail.com |
| 7 | Laura Nahmias | LNahmias@Politico.com |
| 8 | Graham Rayman | grayman@nydailynews.com |
| 9 | Madina Toure | mtoure@observer.com |
| 10 | Mr. Banks | banksst@hra.nyc.gov |

| 11 | Ann Marie Scalia of HRA | scaliaa@hra.nyc.gov |
| 12 | Jackie Donovan of OTDA | jackie.donovan@otda.ny.gov |
| 13 | Samuel Spitzberg of OTDA | samuel.spitzberg@otda.ny.gov |
| 14 | Paola Ruiz | pruiz@cityhall.nyc.gov |
| 15 | New York City Public Advocate's office | gethelp@pubadvocate.nyc.gov |
| 16 | Lourdes Rosado of the New York State Attorney General's Office | lourdes.rosado@ag.ny.gov |
| 17 | Melissa Mark-Viverito while she was the Speaker of the City Council | mmark-viverito@council.nyc.gov |
| 18 | Brian Cook of the New York City Comptroller's Office | bcook@comptroller.nyc.gov |
| 19 | New York State Governor's Office | Press.office@exec.ny.gov |

What follows are 5 pertinent excerpts from the e-mail message that I sent to Defendant Miller and others on 4/11/17 at 7:17 pm.

| a) | **From:** Towaki Komatsu <towaki_komatsu@yahoo.com> **Subject:** Re: Today's Fair Hearing with OTDA & HRA concerning HRA's ongoing & illegal noncompliance with OTDA Judge's 9/15/16 decision for case #: 7316477K **Date:** April 11, 2017 at 7:17:02 PM EDT **To:** otda.dl.hear.upstate.calendar@otda.ny.gov **Cc:** calhounm@hra.nyc.gov, mosczycj@hra.nyc.gov, gerberm@hra.nyc.gov  OTDA,  This is Towaki Komatsu.  As per our discussion during today's 1:30 pm conference call that concerned HRA's ongoing, flagrant, and illegal noncompliance with the decision dated 9/15/16 that was issued by an OTDA judge., attached is the following: |
| b) | b) The e-mail message shown below is one I sent to the Commissioner of HRA and Barbara Beirne of HRA on 4/1/16. By sending that e-mail message, I sought to inform HRA that my landlord (Urban Pathways, Inc.) committed both fraud and forgery to my detriment through a bait-and-switch scheme it carried out with respect to the apartment lease agreement I signed at DHS at 33 Beaver Street in Manhattan on 2/16/16 |

| | |
|---|---|
| | with Lisa Lombardi of Urban Pathways, Inc. When I signed that lease agreement on that date, it happened in a small conference room where there were roughly 6 witnesses present. To be entirely clear and pursuant to the explicit terms in that signed and enforceable lease agreement, the apartment lease agreement I signed on that date was to have apartment number **4C** entirely to myself instead of some other apartment and that apartment was to be made available to me in a fully-furnished state. |
| **c)** | c) The lease agreement I signed on 2/16/16 for apartment **4C**. |
| **d)** | d) The lease agreement for **apartment 4B, Room 1** Urban Pathways, Inc. presented to me on or about 3/6/16 that I never signed and that Urban Pathways, Inc. illegally forged my signature in and for which Urban Pathways substantially changed the terms when it was given to me on or about 3/6/16. |
| **e)** | In addiiton, the HRA evidence packet I received confirms that I reported to HRA on 3/16/16 that my landlord fraudulently altered my apartment lease and forged my signature in it. The last name of the HRA worker seems to be Mensah.<br><br>The primary and entirely baseless argument that HRA's attorney, Ms. Gerber raised during today's conference call for the fair hearing was that I have been residing in permanent housing since March of 2016. Applicable case law is crystal clear that in situations where landlords have committed forgery in lease agreements, a tenant's tenancy is on a month-to-month and at-will basis that can in no way whatsoever be regarded as permanent housing.<br><br>For this reason and the reasons I discussed during today's recorded conference call and the previous fair hearings for this matter, HRA has no defense whatsoever for having flagrantly violated the 9/15/16 OTDA decision and repeatedly committed acts of mail and wire fraud ever since that will impose RICO liability upon it.<br><br>Lastly, though I realize that HRA is blocking receipt of e-mail sent from this e-mail address. That's prerogative and indicative of the refusal by its staff to comply with all applicable law. HRA's hands in this matter and others involving me have always been entirely filthy instead of merely unclean. |

What follows are 2 pertinent excerpts from the e-mail message that I sent to

Defendant Miller and Paola Ruiz of the Mayor's CAU on 4/18/17 at 2:54 pm.

| a) | **From:** Towaki Komatsu <towaki_komatsu@yahoo.com><br>**Subject:** Re: Request for help with getting interview for helpdesk job with Mayor's office<br>**Date:** April 18, 2017 at 2:54:44 PM EDT<br>**To:** "Miller, Harold" <HMiller@cityhall.nyc.gov><br>**Cc:** "Ruiz, Paola" <PRuiz@cityhall.nyc.gov><br><br>Dear Mr. Miller,<br><br>Good afternoon.<br><br>Do you have an update available about whether you were able to persuade either DoITT or the Mayor's Office to grant me a job interview for the 2 jobs with those offices/agencies I recently applied for?<br><br>Incidentally, I received the following notice yesterday from HRA that is still doing business with a firm that committed wage-theft against me, defying a judge's binding decision dated 9/15/16 that I prevailed in to HRA's detriment, and can care less about trying to help me be granted interviews for jobs I'm suited for and could enable me to become self-sufficient: |
| b) | In addition, though HRA's Commissioner lied to my face on the same date and a short time before I met you last week by telling me he was informed that legal aid organizations expressed to HRA there wasn't merit for those organizations to provide me with legal assistance against a former slumlord that filed frivolous lawsuits against me, the following is a copy of the 3/23/17 decision that Queens Supreme Court Judge Joseph Esposito issued entirely in my favor that completely rejects Steven Banks fraudulent claim: |

The next screenshot shows me as I began talking with the Mayor during the Mayor's 7/18/17 resource fair meeting that the Mayor's office arranged to be recorded on video and illegally concealed from the public while the Mayor ran for re-election as well as thereafter in spite of the fact that that video is a public record. The Mayor's office temporarily provided me access to that video recording in response to a FOIL demand that I submitted to it. A video

clip of that recording that I recorded is available on the Internet at

https://drive.google.com/open?id=1-

ZUN22r8q4qARLEbMk8FVg4KuLqfTtcc.  The beginning of that video clip

corresponds to what appears in the video of the Mayor's 7/18/17 resource fair

at the elapsed time of 1 hour, 8 minutes, and 25 seconds. This screenshot is

from what appears in that video clip at the elapsed time of 1 minute and 31

seconds.  NYPD John Doe1 3/18/19 appears on the far-left in it as Mr. Banks,

the Mayor, and Jessica Ramos also appear in it. In addition to Mr. Gartland

and other whistleblower news censors in journalism who attended that

meeting, Gloria Pazmino attended it in her capacity as a whistleblower news

censor in journalism. All of them then sat within roughly 15 from where I then

talked with the Mayor. One of them was then clearly recording my

conversation with the Mayor on audio. Mr. Gartland then still worked for the

New York Post and now works for the New York Daily News. Ms. Pazmino

then worked for a news organization named Politico and now works for

Spectrum News.



ii.    6/26/17: With Defendant O'Neill at the New York City Bar Association that

arranged for the meeting in which I talked with him to be recorded on audio

that is available on the Internet at

http://dts.podtrac.com/redirect.mp3/www2.nycbar.org/mp3/Podcasts/media/po

lice_commissioner_audio_2017-06-26.mp3. During that meeting, I had two

face-to-face conversations with Mr. O'Neill. My first conversation with him

during it extends from the elapsed time of **a)** 32 minutes and 38 seconds from

the beginning of that audio recording to **b)** 33 minutes and 36 seconds in that

recording. My second conversation with him then extends from the elapsed

time of **a)** 47 minutes and 4 seconds from the beginning of that recording to **b)**

49 minutes and 14 seconds. Numerous whistleblower news censors in

journalism attended that meeting. The next screenshot is from a video

recording that I recorded during that meeting that shows microphones that are

labeled with information that correspond to Pix11News, 1010Wins, NBC,

CBS New York, WCBS 880, ABC News, and NBC New York that confirms

that whistleblower news censors from those organizations attended that meeting.



iii.   10/3/17: With Defendant Vance, Jr. at the New York City Bar Association that arranged for the meeting in which I talked with him to be recorded on audio that is available on the Internet at http://dts.podtrac.com/redirect.mp3/www2.nycbar.org/mp3/Podcasts/media/police_commissioner_audio_2017-06-26.mp3. My discussion with Mr. Vance, Jr. during that audio recording extends from the elapsed time of roughly 2 hours, 3 minutes, and 50 seconds to 2 hours, 5 minutes, and 11 seconds. Since

the microphones that were passed to the audience during that meeting were

faulty, it is necessary to significantly amplify the volume of that audio

recording to clearly hear much of what I then discussed with Mr. Vance, Jr.

Defendant Byrne, Jr. is clearly heard in that audio recording as he stated

"Viewpoint discrimination?" in a way that clearly suggested he wasn't' aware

of what viewpoint discrimination entailed in spite of the fact that he was then

the head of the NYPD's legal division. While talking with Defendants Vance,

Jr. and Byrne, Jr. during that meeting, I specifically and clearly asked both of

them to intervene on my behalf to end the NYPD's illegal practice of

preventing me from attending public forums that the Mayor was conducting.

In response, Mr. Vance, Jr. told me then that he wouldn't do so and didn't

know if such acts against me violated any laws. When I immediately

responded to that by telling him that my exclusion from such public forums

constituted violations of federal criminal statutes, Mr. Vance, Jr. irrelevantly

stated that he wasn't a federal prosecutor instead of agreeing to properly and

promptly do his job partly by acting in compliance with 42 USC §1986, his

Fourteenth Amendment affirmative legal duty as a law-enforcement official to

intervene on my behalf to uphold my constitutional rights upon being apprised

that they were being violated, and the constitutional oath that he took upon

becoming an employee of the City of New York. When I talked with Mr.

Byrne, Jr. during that meeting about the fact that members of the NYPD had

been illegally preventing me from attending public forums that the Mayor had

been conducting, he told me that I would have to keep reporting complaints

about that instead of similarly agreeing to uphold his legal duties as a law-enforcement official to properly and promptly intervene on my behalf to end the illegal acts and omissions that were being committed against me by members of the NYPD and members of the Mayor's staff that were causing me to be illegally barred from attending public forums that the Mayor was conducting with others. A whistleblower news censor for the New York Times named Joseph Goldstein attended that meeting at briefly talked with me at the end of that meeting around the same time that I talked with an average and arrogant civil rights attorney named Ron Kuby during that meeting as Mr. Kuby then told me that he would rather walk his dogs than provide me legal representation for the matters that my litigation against Defendant City concerns insofar as that concerns illegal acts and omissions that have been committed against me at public forums that the Mayor conducted with other government officials and members of the public.

iv.   10/13/17: With Defendant Shorris during a meeting that the New York Law School hosted while whistleblower news censors in journalism named Yoav Gonen, Ben Max, Matthew Chayes, and Jillian Jorgensen attended that meeting. Mr. Gonen then worked for the New York Post. He now works for a news organization named "The City". Ben Max runs a news organization named Gotham Gazette. Mr. Chayes works for Newsday. Ms. Jorgensen then worked for the New York Daily News and now works for Spectrum News. Mr. Shorris, Mr. Max, Mr. Chayes, Mr. Gonen, and Ms. Jorgensen appear from left to right in the next screenshot that is from a photograph that the New

York Law School arranged to be taken at the end of that meeting and is available on the New York Law School's web site.



The New York Law School recorded that meeting on video and that video is available on the Internet at

https://www.youtube.com/watch?v=ZEKi8skDT0c. The next screenshot is from the elapsed time of 37 minutes and 54 seconds in that video as I talked with Mr. Shorris during that meeting. This screenshot is from how I played back that video with its closed-captioning feature enabled.



This screenshot accurately reflects the fact that I then asked Mr. Shorris to tell

me when the Mayor's NYPD security detail would stop violating my First

Amendment right to attend public forums that the Mayor conducted as I cited

the landmark and seminal court decision about viewpoint discrimination that

the U.S. Supreme Court issued in *Wood v. Moss*, 134 S. Ct. 2056, 572 U.S.,

188 L. Ed. 2d 1039 (2014) as I then talked with Mr. Shorris. I also told Mr.

Shorris during that conversation that **a)** I had just been illegally prevented

from attending the Mayor's 10/12/17 town hall and **b)** Defendant Redmond

was then both the defendant in a civil right lawsuit (I was then referring to

*Sherrard v. City of New York*) and a member of the Mayor's NYPD security

detail who illegally prevented me from attending public forums that the

Mayor had been conducting. I also told Mr. Shorris during that conversation

that I had previously attended a meeting on 12/16/16 that the New York Law

School hosted in which Mr. Banks made false statements. I talked with Mr.

Banks during that meeting and he lied to my face then about legal assistance

as a whistleblower news censor in journalism named Courtney Gross attended

that meeting. She works for Spectrum News. The New York Law School

arranged to have that 12/16/16 meeting to be recorded on video that is

available on the Internet at

https://www.youtube.com/watch?v=czkZh6cAVWY. My conversation with

Mr. Banks in that video begins at the elapsed time of 48 minutes and 40

seconds. The next screenshot is from the elapsed time of 48 minutes and 51

seconds as I addressed Mr. Banks and discreetly pointed out to him and that

meeting's audience that hindsight confirmed that he lied to my face on 3/1/16

at the Yale Club in Manhattan by having told me then that he would thereafter

try to get me some legal help that I never received and that he instead

fraudulently worked to be withheld from me. I played back that video with its

closed-captioning feature enabled. Mr. Banks also lied about additional

material matters of fact during that 12/16/16 that ultimately significantly

caused or contributed to the death of Robert Vargas on or about 8/11/17 in the

building in which I reside. Mr. Banks clearly stated during that 12/16/16

meeting that he and the Mayor were committed to controlling things that were

within their control. Mr. Vargas would likely still be both alive and a potential

witness of mine if Mr. Banks had been truthful about that remark by him on

12/16/16.



at that event I gave you about five
court transcripts and you told me

The next screenshot is from a photo of Courtney Gross that appears on the

New York Law School's web site that was taken of her during that 12/16/16

meeting with Mr. Banks.



27.     Further clarification about matters that I intended to engage in whistleblowing about while attending the Mayor's 11/2/17 town hall is readily apparent by the sum and substance of what I discussed during numerous 50-h hearings that I participated in prior to 11/2/17 with lawyers about entirely valid claims that I asserted against the City of New York and other defendants in this action that I was permitted to record on audio during most of those hearings. I had one such 50-h hearing on 10/19/17.

28.     Another matter that I intended to engage in whistleblowing about during the Mayor's 11/2/17 town hall concerned an application that I submitted on 10/18/17 to the New York State Supreme Court's Appellate Division's First Department to be granted immediate interim relief. Relief that I then sought to be immediately granted through that application was an issuance of an order by that court that would compel the City of New York to cause its personnel to stop illegally interfering with my constitutional rights to attend public forums that the Mayor conducted. Prior to denying that application on that date, I talked with Judge Richard T. Andrias of that court in the clerk's office of that courthouse on that date. He has since retired as a judge. He told me on 10/18/17 in that clerk's office that he wasn't sure if his court could possibly grant me the relief that I sought through that application and suggested that I might want to try commencing a federal lawsuit instead to be granted that relief. He also then directed personnel who were working in the rear right corner in that office to telephone the New York City Corporation Counsel to discuss my application. The next screenshot is from a draft e-mail message that I saved at 3:22 pm on 10/18/17 in which I recorded information about two people who are named Dan Ramos and Debbie Wolf who worked for that courthouse and witnessed my conversation with Judge Andrias in that clerk's office on 10/18/17.

Towaki Komatsu <Towaki_Komatsu@yahoo.com>  ▢ Drafts - Yahoo!  October 18, 2017 at 3:22 PM

(No Subject)

Dan Ramos (supervising clerk)

Debbie Woll (court attorney for judge)

29.     I have no knowledge about whether such a telephone call was made by that courthouse's

personnel to the New York City Corporation Counsel in response to Judge Andrias' remarks in

that clerk's office about me and the illegal acts that had been committed against me prior to that

date that had been causing me to be barred from public forums that the Mayor had been

conducted and otherwise discriminated against in relation to my efforts to lawfully attend those

public forums in accordance with my constitutional rights. The primary reason why Judge

Andrias denied my application for interim relief about public forums that the Mayor had been

conducting was because no written notice was ever issued to me that informed me that I was

barred from them or that my attendance in regards to them would otherwise be restricted. A true

and accurate copy of the order that Judge Andrias issued on 10/18/17 in response to my

application to the New York State Supreme Court's Appellate Term's First Department for

interim relief appears within the annexed **Exhibit C**.

30.     I also intended to engage in whistleblowing during the Mayor's 11/2/17 town hall about

the fact that Jeffrey Mosczyc filed an affirmation on 10/19/17 in my ongoing HRA lawsuit after

he committed perjury in remarks that he expressed in that affirmation about material matters of

fact.

31.     I also intended to engage in whistleblowing during the Mayor's 11/2/17 town hall about a

meeting that I attended on 10/24/17 in which Jordan Dressler of HRA was part of a panel of

speakers that discussed tenants rights and legal assistance that is discussed next. That meeting was conducted in Harlem at 527 West 125th Street. The panel of speakers at that meeting included the following people:

    a.  Jordan Dressler of HRA. He is the head of its Office of Civil Justice that is responsible or coordinating the provision of pro-bono and lost-cost legal representation and legal assistance to New Yorkers for a variety of legal matters through HRA's business partners that it funds for that purpose and refers people to in order to have them undergo an intake meeting with such partners to determine whether they will be provided such representation and/or assistance by them.

    b.  New York City Councilman Mark Levine.

    c.  Elsia Vasquez. She is the founder of a tenant advocacy organization named P.A.'L.A.N.T.E. Harlem Inc.

    d.  Rodrigo Sánchez-Camus, who works for Northern Manhattan Improvement Corporation ("NMIC") as its Legal Director.

32.    During that meeting, I recorded a video recording at 7:28 pm that is available on the Internet at https://drive.google.com/open?id=1fIKkIA6KjevDPdUH2hPs20kIvw1IK3M of that meeting's speakers.

33.    The next screenshot is from that video and shows Mr. Dressler, Mr. Levine, Mr. Sánchez-Camus, and Ms. Vasquez from left to right.



34.     During that meeting, I talked with Mr. Sánchez-Camus about the fact that I received a

notice via e-mail on 4/11/17 from someone named Adlin Adon from his organization while she

was worked for it as a paralegal. I told him then that she expressed in that notice that NMIC

wouldn't provide me legal assistance nor legal representation in the wake of my having met with

her for a legal intake appointment to ascertain whether NMIC would provide me legal assistance

or legal representation after I had been referred to it by HRA. I asked him then to better explain

why I had been denied that assistance from his legal organization. He lied to me in response by

claiming that his organization couldn't provide me legal representation nor legal assistance for

the types of matters that I sought such legal representation or legal assistance. He did so in spite

of the fact that one of the legal matters for which I sought such assistance from his organization

was a housing matter pertaining to my housing in the Bronx. His organization provides legal

representation and/or assistance for such matters in the Bronx.

35.     I also talked with Mr. Dressler during that meeting. While I talked with him then, he lied

to me by telling me that HRA couldn't cause me to be provided pro-bono or low-cost legal

assistance from HRA's business partners that it funds for the types of legal matters for which I

sought to such assistance.  He told me that after the Mayor told me during the public town hall

meeting that he conducted on 3/15/17 that was recorded on video that the City of New York

could cause me to be provided pro-bono legal representation for wage-theft matters and HRA's

Deputy General Counsel Ann Marie Scalia issued me a binding and fully-enforceable agreement

dated 8/1/17 that lacked any disclaimer, caveat, and qualifying remark in an e-mail message that

I received from her in which she explicitly stated that she and HRA would assist me in "any way

possible". Ms. Scalia sent me that e-mail message in response to having been referred to me by

Mr. Banks following face-to-face conversations that I had with him on 7/18/17 and 7/19/17

during the public town hall meeting and public resource fair meeting that he conducted with the

Mayor on those dates while those were rare instances in which members of the Mayor's NYPD

security detail, other members of the NYPD, and members of the Mayor's staff took a temporary

break from committing criminal acts and omissions against me to briefly allow me to lawfully

exercise my First Amendment right to attend those public forums.  Mr. Dressler was bound by

the terms of the 8/1/17 binding and fully-enforceable agreement that Ms. Scalia issued to me to

assist me in any way possible. New York City Charter §13-b and 18 NYCRR §352.23(a) jointly

also obligated HRA to ensure that I had access to HRA's business partners that provide pro-bono

legal representation and low-cost legal assistance represent or assist me with legal matters for

which I sought such help largely to eliminate my need for further assistance from HRA. I also

recall having talked with Ms. Vasquez during that meeting on 10/24/17 about widespread

corruption in New York City's government. She agreed with me that such corruption existed and

told me that no one was going to help me to contend with and overcome that. The information

that I was told by those who I talked with during that meeting was all the more reason why I

sought to attend the Mayor's 11/2/17 town hall meeting to engage in protected whistleblowing

that would also be about the fact that HRA and its business partners weren't performing their

legal and contractual duty to provide me pro-bono and/or low-cost legal assistance to meet my

legal needs. Prior to attending that 10/24/17 meeting, Mr. Banks lied to my face on 4/11/17 in

Staten Island about why I hadn't received such legal representation or legal assistance from

HRA's business partners as NMIC was one of two organizations that he then lied to me about.

36.      I also intended to engage in whistleblowing during the Mayor's 11/2/17 town hall about

the 50-h hearing that I participated in on 10/19/17 for entirely valid claims that I asserted against

Defendant Redmond in response to him having been recorded on video as he illegally seized and

assaulted me on 7/25/17 in a subway station near City Hall below Broadway near Warren Street.

Mr. Redmond did so in retaliation for my having persisted in lawfully exercising my First

Amendment and Fourteenth Amendment rights in accordance with the MTA's rules in an area in

close proximity to the Mayor and a large group of whistleblower news censors in journalism that

included the following people while the Mayor conducted an illegal publicity stunt in a manner

and in an area in that subway station that flagrantly violated both the MTA's rules and the

constitutional rights that the public had in that subway station to not be obstructed in their ability

to freely assemble and otherwise move about in all public areas in that subway station:

| # | News Censor | Employer on 7/25/17 | Employer on 10/13/20 |
|---|---|---|---|
| 1 | Matthew Chayes | Newsday | Newsday |
| 2 | Erin Durkin | New York Daily News | Politico |
| 3 | Josh Einiger | ABC News | ABC News |
| 4 | Michael Gartland | New York Post | New York Daily News |
| 5 | Mara Gay | Wall Street Journal | New York Times |
| 6 | David Goodman | New York Times | New York Times |
| 7 | Courtney Gross | Spectrum News | Spectrum News |
| 8 | Noah Hurowitz | Unknown | Unknown |
| 9 | Jillian Jorgensen | New York Daily News | Spectrum News |
| 10 | Ben Max | Gotham Gazette | Gotham Gazette |
| 11 | Gloria Pazmino | Politico | Spectrum News |
| 12 | Marc Santia | NBC New York | Unknown |
| 13 | Shant Shahrigian | New York Daily News | New York Daily News |
| 14 | Madina Toure | Observer | Politico |
| 15 | Audrey Wachs | Unknown | Unknown |

37.    The publicity stunt that the Mayor then conducted in that subway station was illegal

partly because it was conducted right next to a staircase and in an area that illegally obstructed

and hindered the movements of the public as well as their right to assemble in the specific area in

which that publicity stunt was illegally conducted. Also, the Mayor illegally used a microphone

during that publicity stunt in violation of the MTA's rules. Members of the Mayor's NYPD also illegally caused a downtown subway train to be held in that subway station without any valid justification in spite of the fact that the Mayor has repeatedly stated that he does not control the MTA. Additionally, I sought to ask those who attended the Mayor's 11/2/17 town hall while attending it and while waiting to be granted access to it if they would be interested in reading the transcript that would be prepared from the 50-h hearing that I participated in against Defendant Redmond on 10/19/17. I sought to lawfully embarrass the Mayor, Mr. Redmond, and other members of the NYPD, and news censors in journalism while making those invitations during that town hall meeting and while waiting to be granted access to it. I sought to do so partly by sarcastically asking the Mayor, Mr. Redmond, and other members of the NYPD, and news censors in journalism if they would like to read that transcript and to precisely, honestly, and fully explain to everyone who attended that town hall meeting on the spot why they wouldn't want to do so. While asking such questions to them then, those questions and their responses would be recorded on video that was being broadcast over the Internet prior to the 2017 New York City general elections. Such questions and answers would allow the public to directly and indirectly fire the Mayor, his entire administration, everyone who was then a member of the City Council, and members of the NYPD directly and indirectly.

38.     Additional whistleblowing that I intended to engage in while attending the Mayor's 11/2/17 town hall concerned the lawsuit of _Sherrard v. City of New York_, No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13, 2018) that was commenced against Defendant Redmond before he committed perjury in relation to it about material matters during a deposition on 5/19/17 and as he testified at trial in it.

39.     Further whistleblowing that I intended to engage in while attending the Mayor's 10/16/17

town hall concerned the needs of other tenants who resided in the building in which I reside that is housing for military veterans that is subsidized by taxpayers and terribly mismanaged by Urban through a contract it has with HRA that has illegally shirked its legal duty to provide proper oversight of how Urban operates as the landlord of that building. Concerning this point, I intended to voluntarily serve as an advocate for the needs of such other tenants in that building while attending those public forums before Mr. Banks, Ann Marie Scalia of HRA, and Urban's personnel significantly caused or contributed to the death of one of those tenants that occurred on or about 8/11/17 by depriving him of an air conditioner in his apartment. His name is Robert Vargas. He was both a U.S. Marines and Army National Guard military veteran who had suffered from numerous strokes. I sent an e-mail message to Mr. Banks and Ms. Scalia on 8/3/20 in which I urged them to immediately cause an air conditioner to be installed in Mr. Vargas' apartment in the building in which I reside. Instead, members of the New York Fire Department broke open the front door to Mr. Vargas' apartment on 8/11/20 and discovered that Mr. Vargas had died in his apartment while there was no air conditioner installed in it. Prior to that date, I twice testified on Mr. Vargas' behalf during public hearings that the City Council conducted. Mr. Banks attended one of them as I testified about Mr. Vargas. Mr. Vargas' death occurred after I was viciously assaulted in the living room of my apartment on 7/2/16 that was largely due to HRA and Urban having illegally subjected me to a bait-and-switch fraud and forgery concerning a binding apartment lease agreement that I signed on 2/16/16 with Urban to be issued apartment 4C in the building in which I reside in its entirety instead of being a shared apartment. If not for that illegal bait-and-switch, I wouldn't have had my 7/2/16 assailant as my roommate because I wouldn't' have had any roommate in the apartment that I would otherwise have resided in within the building in which I reside. That 7/2/16 assault occurred after that assailant tried to assault me

on 5/12/16 in that same living room. I reported that attempted assault and actual assault to try to get my roommate immediately evicted from where I resided. However, that never happened because of criminal negligence by HRA and Urban's personnel that HRA has steadfastly illegally covered-up with Mr. Banks' knowledge and approval. This certainly was also a matter that I intended to engage in whistleblowing about during the Mayor's public forums to befit the public's interests in public safety as well as proper procurement and oversight practices.

**Facts about the Mayor's 11/2/17 town hall:**

40.     In this section, I will refer to video recordings that are listed in the following table that includes links to copies of them on the Internet in support of my claims in this action:

| # | Filename | Date & Time Created | Internet Link |
|---|----------|---------------------|---------------|
| 1 | IMG_2933.MOV | 10/29/17 at 6:58 pm | https://drive.google.com/file/d/1783LDS2wmK wKh1F8sVmPFOJNppff7NpQ/view?usp=shari ng |
| 2 | IMG_2935.MOV | 10/29/17 at 9:37 pm | https://drive.google.com/file/d/1RtPnebfJnlkjC pODTCdfBmCvWBew9ew7/view?usp=sharing |
| 3 | IMG_2936.MOV | 10/29/17 at 9:40 pm | https://drive.google.com/file/d/1RwQxrcxV2VI Y-FeEGKPgRpwCCV37Uw3f/view?usp=sharing |
| 4 | IMG_2998.MOV | 11/2/17 at 6:39 pm | https://drive.google.com/file/d/1eNiVlSMR0i4 4nRyLtfPLHIb5GgFb5j3W/view?usp=sharing |
| 5 | IMG_2999.MOV | 11/2/17 at 6:41 pm | https://drive.google.com/file/d/1P4fXA6emeZ m0IZjNyPjruZb4kWQZeyva/view?usp=sharin g |
| 6 | IMG_3001.MOV | 11/2/17 at 6:50 pm | https://drive.google.com/file/d/1jBspXuAq7Ff Hl9VhJ_fwS81TqAnwzHZr/view?usp=sharing |
| 7 | IMG_3003.MOV | 11/2/17 at 7:12 pm | https://drive.google.com/file/d/162ORRol1VjY 94cYtcKZhUICUkBvtrASp/view?usp=sharing |
| 8 | IMG_3007.MOV | 11/2/17 at 7:51 pm | https://drive.google.com/file/d/1ohuLz7pCC30 o1MHhq7a864i_G65XvqUR/view?usp=sharin g |
| 9 | IMG_3008.MOV | 11/2/17 at 7:51 pm | https://drive.google.com/file/d/1xAxfLSe9fkI0 Auwfi7UKm3HPEhaPPhh4/view?usp=sharing |
| 10 | IMG_3010.JPG | 11/2/17 at 9:15 pm | https://drive.google.com/file/d/1pTYf5odJfIVx 2AeWghTZ9YBa-z-Vzy1K/view?usp=sharing |

| 11 | IMG_3012.JPG | 11/2/17 at 9:57 pm | https://drive.google.com/file/d/1sTqDJawTj0OvxnMnKCMqcO334izu-NlW/view?usp=sharing |
| 12 | IMG_3014.MOV | 11/2/17 at 10:22 pm | https://drive.google.com/file/d/1oCO4s0vWls8gj08fxggqGHbQo2jEhiP5/view?usp=sharing |

41.     The next screenshot is from what appears in the Mayor's 11/2/17 town hall video at the elapsed time of 16 minutes and 38 seconds as I played back that video with the closed-captioning feature enabled. It confirms that the Mayor was then in the middle of telling the audience at that town hall that its members could meet with the other government officials who also attended that town hall at the end of that meeting within the room in which it was conducted to talk with them about whatever was on the minds of the members of the public who attended that town hall and that those government officials would stay there all night to talk with them, if necessary.



42.     By making such remarks then, the Mayor confirmed that town hall was a quorum that was comprised of senior government officials of his administration was present at that town hall and that they would be conducting public business during that meeting by being available for the

audience members to talk with during that meeting. The Mayor's remarks then about that also confirmed that that meeting was mostly a traditional public forum because he explicitly stated that the members of the audience could meet with such senior government officials during that meeting to freely talk with them. That circumstance also largely caused him to be a sideshow and irrelevant during that meeting because the members of the audience weren't allowed to have a free-flowing discussion with him during that meeting in contrast to the free-flowing back and forth discussion that they could instead have with senior government officials of his administration at the end of that meeting that included Mr. Banks.

43.     On 11/2/17, I arrived to the site of the Mayor's 11/2/17 town hall prior to 7 pm to be granted access to that town hall in accordance with my constitutional rights and other applicable laws with respect to being able to attend that town hall from within the room in which it would be conducted. Defendants in this action with whom I talked outside of and in close proximity to the building that hosted that town hall shortly before it began in regards to my efforts to lawfully attend that town hall included, but wasn't limited to the following defendants in this action:

            Gerola, Miller, Mason, Nieves, Ridener, Ringel, and Stribula

44.     Upon my arrival to the site of that town hall, members of the Mayor's staff that included Defendants Miller, Ringel, and Stribula all illegally refused to issue me an admission ticket to enable me to enter the school that hosted the Mayor's 11/2/17 town hall and/or otherwise were acting in concert with those who were directly refusing to do so. As that occurred, Defendants Gerola, Nieves, and Mason similarly and illegally refused to allow me to enter that school to lawfully attend that town hall meeting. Between Defendants Nieves, Gerola, Mason, Stribula, Miller, Ringel, and Ridener, one of them told me on 11/2/17 at the site of that town hall meeting that Defendant Carrion had made a request for me to be prevented from attending that town hall

meeting. The illegal acts and omissions that were committed against me that caused me to be prevented from attending that town hall meeting was in furtherance of an ongoing and longstanding conspiracy dating back to 4/27/17 to continue to violate my civil rights insofar as that concerned violating my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and New York State's Open Meetings Law to lawfully attend public town hall meetings, public resource fair meetings, and public hearings that the Mayor conducted with members of the public and other City of New York and State of New York government personnel. On 11/2/17, I was illegally denied an admission ticket for that town hall meeting after I presented a printed copy of my RSVP for that town hall. That occurred as I walked up to the entrance of the school where they were to lawfully request an admission ticket. I made that request to them then after Defendant Redmond told me face-to-face just one day earlier that the NYPD would not prevent me from being able to attend that town hall meeting as I talked with him on a sidewalk located near the CUNY Graduate Center that is located in a building in Manhattan that is located at the intersection of 34th Street and Fifth Avenue. Mr. Redmond was then at that location to provide security for the Mayor because the Mayor was then participating in a debate nearby on one of the few dates when Mr. Redmond, other members of the Mayor's NYPD security detail, and Defendants Ringel, Miller, Stribula, Ramos, and others weren't committing acts of voter suppression, voter fraud, and whistleblower retaliation against me directly and the general public by extension by causing me to be illegally prevented from attending public town hall meetings, public resource fair meetings, and public hearings that the Mayor had been conducting that were recorded on video that was broadcast live over the Internet to people that included voters, prospective voters, and political rivals of the Mayor in the 2017 New York City government elections.

45.     Prior to learning that I wouldn't be allowed to attend the Mayor's 11/2/17 town hall meeting, I didn't make any crude or offensive remarks to anyone on 11/2/17 while I was at the site of the Mayor's 11/2/17 town hall. I similarly didn't conduct myself in any unlawful, disorderly, nor threatening manner while I was at the site of that town hall meeting.

46.     The admission tickets that were issued to members of the public that enabled them to attend the Mayor's 11/2/17 public town hall meeting were the functional equivalent of a press credential that gives journalists access to areas where government officials are. In the context of a public forum for which I have First Amendment rights of access, peaceful assembly, expressive association, sharing and receiving information, petitioning for redress, I certainly had a due process and equal protection right in having been issued an admission ticket by Defendants Miller, Ringel, and Stribula as well as a property interest in both that admission ticket and the corresponding property interest in access to that town hall that the issuance of that ticket to me would confer upon me. I recall that I told Mr. Nieves on 11/2/17 at the site of that town hall about my earlier conversation with Defendant Redmond about whether I would be permitted to attend that town hall meeting and that Mr. Nieves responded to that by saying the following to me:

         "Well, he's not telling you that now."

47.     That remark by Mr. Nieves prompted me to immediately direct him to call Mr. Redmond on his cell phone to have things resolved properly to enable me to attend that town hall. However, Mr. Nieves told me that he wasn't going to bother Mr. Redmond. Mr. Nieves told me that Mr. Redmond was at his home then. I also recall that as I justifiably **a)** expressed irritation towards Defendants Gerola, Mason, Miller, Nieves, Ridener, Ringel, and Stribula about the fact that I was again illegally being prevented by them from attending a public town hall meeting that

that the Mayor was conducting while I was conducting myself in an entirely lawful manner in stark contrast to them. I also recall that I lawfully engaged in protected whistleblowing partly by apprising members of the public as they arrived at the entrance to the school that hosted that 11/2/17 town hall meeting to enter that school to attend that town hall meeting that I was being illegally prevented from attending it, Mr. Ridener made a remark to me in which he indicated that I could not engage in protesting near the entrance to that school. However, the fact that he and others were illegally preventing me from attending that town hall meeting caused estoppel to apply to prevent his remark about that from being enforceable.

48.       I also recall that I lawfully engaged in such protected whistleblowing by apprising other members of the public that I was being illegally prevented from attending it. I'm referring to a group of people who were jointly protesting against the Mayor and were gathered on a public sidewalk that bordered that school's property in front of that school's entrance.  One of the people who I apprised about the fact that I was then illegally being prevented from attending that town hall meeting is someone named Joseph Concannon. I met him shortly before 6:55 pm on 11/13/17 as he and others were protesting against the Mayor at the same time that he was running against Barry Grodenchik in the 2017 New York City government elections to replace New York City Councilman Barry Grodenchik, who was the moderator of the Mayor's 11/13/17 town hall meeting. The following screenshot is of a draft e-mail message that I saved at 6:55 pm in which I recorded the cell phone number that Mr. Concannon had just provided to me:



Towaki Komatsu <Towaki_Komatsu@yahoo.com>    🗀 Drafts - Yahoo!    November 2, 2017 at 6:55 PM

(No Subject)

646-209-0349

49.     Given the fact that Mr. Concannon was running against Mr. Grodenchik in the 2017 New

York City government elections and the Mayor's 11/2/17 public town hall meeting was

conducted in a school that the DOE controls, key findings that were issued in *Bloomberg v. The*

*New York City Department of Education*, No. 17-cv-3136 (PGG) (S.D.N.Y. Sept. 24, 2019)

confirm that the Mayor's office was required to have invited Mr. Concannon to participate in that

town hall meeting in order for that town hall meeting to have legally been able to have bee

conducted in the school in which it was conducted on 11/2/17. However, there is no reason to

believe that prerequisite was satisfied. In stark contrast, there is every reason to objectively

believe that Mr. Concannon wasn't invited to participate in that town hall meeting and that I was

illegally prevented from being able to attend it because those who organized that town hall

meeting and otherwise conducted it sought to continue to engage in acts of voter suppression,

whistleblower retaliation, and voter fraud in flagrant violation of the Hatch Act just 5 days before

the 2017 New York City government elections on 11/7/17 by significantly minimizing

opportunities that people had to criticize the Mayor, his administration, members of the Mayor's

NYPD security detail, and the Mayor's administration's business partners by illegally denying

such critics and whistleblowers access to public town hall meetings, public resource fair

meetings, and public hearings that the Mayor conducted with respect to denying them access to

the rooms in which they were conducted as they were conducted.

50.     The following screenshot is of an e-mail message that I sent to Judith Le of the CCRB on

11/3/17 at 1:37 pm in which I apprised her of a complaint that I had against **a)** Defendants

Gerola, Mason, and Nieves in response to abusive behavior they engaged in against me on

11/2/17 at the site of the Mayor's 11/2/17 town hall meeting by illegally preventing me from

attending that town hall meeting and by Mr. Gerola having repeatedly used variations of the

word "Fuck" toward me as he put his face within 3 inches of mine while we stood near the

entrance of the school that hosted the Mayor's 11/2/17 town hall and he used such profanity

towards me to deliberately try to harass and intimidate me:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Re: New complaint against Officer Gerola
> **Date:** November 3, 2017 at 1:37:08 PM EDT
> **To:** "Le, Judith (CCRB)" <JLe@ccrb.nyc.gov>
>
> Ms. Le,
>
> Officer Gerola deliberately and illegally used the F word repeatedly to me and within 3
> inches of my face last night while he and other members of the NYPD and Mayor's
> office illegally kept me out of the Mayor's public town hall meeting in Queens.
>
> Detective Nicholas Mason and Lt. Nieves were also involved in keeping me out of it.

51.    Furthermore, while I stood outside of the school on 11/2/17 that hosted that the Mayor's

public town hall meeting on that date and was being prevented from attending that town hall

meeting, Defendant Ringel reprehensibly lied about me by suddenly and fraudulently telling me

out of nowhere that I was a racist. Contrary to his claim and Defendant Redmond who is being

sued by someone named Erin Fitchett for racial discrimination, I have never been a racist. In

fact, I would argue that instead of me being a racist, Mr. Ringel is total trash and cut from the

same soiled, cancerous, and infectious cloth as Nazis, members of the Ku Klux Klan, Jona

Rechnitz, and traitors to Jewish values by virtue of his behavior towards me and others in

violation of our civil rights at public forums. When Mr. Ringel fraudulently told me that I was a

racist on 11/2/17, others stood within earshot of that remark. This means that he caused me

undue and unfounded reputational harm that I believe amounts to stigma-plus defamation against

me as a fraudulent pretext to subject me to a malicious abuse of process to try to justify his

actions and those of others against me at the site of that town hall meeting on 11/2/17 by illegally

preventing me from being able to lawfully attend that town hall meeting. Defendant Miller also

committed slander against me on 11/2/17 at the site of that town hall meeting by fraudulently

telling me I was biased against an Asian male who limps noticeably while walking and works

with the Mayor's CAU. Mr. Miller inexplicably slandered me in that way in spite of the fact that

I asked Mr. Miller on 10/18/17 to provide that Asian male a reasonable accommodation (such as

a ramp) to help him to be able to more easily get up and down stairs at the site of the Mayor's

10/18/17 town hall meeting in Brooklyn that members of the Mayor's staff and members of the

NYPD illegally prevented me from being able to attend in spite of the fact that I conducted

myself in an entirely lawful manner at the site of that town hall meeting and I registered in

advance with the Mayor's office to attend it.

52.    Additionally, Mr. Gerola committed slander and stigma-plus defamation against me on

11/2/17 at the site of the Mayor's 11/2/17 town hall in an area by the entrance to the school that

hosted that town hall meeting by fraudulently referring to me as someone who was emotionally-

disturbed in remarks that he made to two members of the public as they exited the school that

hosted that town hall meeting. I also recall that Mr. Gerola told me on that night in front of the

school that hosted that town hall meeting that he was willing to buy me an airplane ticket to take

me to wherever I wanted to go in order to not have to see me again.

53.    I also recall that a video security camera was installed on 11/2/17 on the exterior of the

school that hosted the Mayor's 11/2/17 town hall meeting in an area that was located near its

entrance and where I stood and interacted with Defendants Gerola, Nieves, Mason, Miller,

Ringel, Ridener, and Stribula. The City of New York has been legally required to have preserved

the entirety of the video recordings that were recorded by that video security camera and all

others that existed at the site of that town hall meeting that recorded the defendants who were at

that site on 11/2/17 and I for the entire period that I was at that site on that date. The next

screenshot is from a screenshot that I took while using the Google Earth software program to examine how the front of the school that hosted the Mayor's 11/2/17 town hall meeting appears. This screenshot shows a video security camera in its top-left corner that is installed in the immediate vicinity of the entrance to that school in an area where I stood as Defendants Gerola, Mason, Nieves, Miller, Ringel, Stribula, and Ridener illegally prevented me from attending the Mayor's 11/2/17 through their illegal acts and omissions as they acted in concert for that purpose. I urge this Court to order the City of New York to immediately provide me a copy of the video recordings that were recorded by that video security camera on 11/2/17 between 5:30 pm and 11:30 pm without anything redacted in it in the file formats of ".mp4", ".mov", or ".avi" that shows the current time in those video recordings.



54.     Also, as the Mayor's 11/2/17 town hall meeting was being conducted, a photographer for the Mayor's office took a photograph from within the room in which that town hall meeting was being conducted. That photograph is available on the Internet at https://www.flickr.com/photos/nycmayorsoffice/24274507108/. The following screenshot is from that photograph and shows a woman in the upper-left corner who then wore a light-blue shirt and had something hanging from her neck.



55.     The next screenshot is from the elapsed time of 10 seconds in the video recording that has

the filename of "IMG_2998.MOV" that I recorded on 11/2/17 at 6:39 pm as I stood near

Defendants Gerola, Mason, members of the public and the woman that I just discussed who wore

a light-blue shirt and had something hanging from her neck in an area that was near the entrance

to the school that hosted the Mayor's 11/2/17 town hall. This screenshot shows that woman on

the left as she stood near Defendant Gerola, who also appears in that screenshot.



56.     The next screenshot is from the elapsed time of 18 seconds in that video and shows a

printed copy of my RSVP for that town hall meeting that I was holding as I'm heard stating that

it was my RSVP for that public forum. I continued to them stand near that entrance.



57.     The next screenshot is from the elapsed time of 6 seconds in that video and shows

Defendant Mason on the left as he stood near the entrance to that school.



58.    At the elapsed time of 7 seconds in that video, I'm heard providing narration for it as I stated that Defendant Redmond had told me that I could attend that town hall meeting and that Defendants Mason and Gerola were contradicting him. What I meant by that was that they were illegally preventing me from attending the Mayor's 11/2/17 town hall meeting as other members of the public were being allowed to walk past me into that school to attend that town hall meeting after they arrived to the site of that town hall meeting after me on 11/2/17.

59.    The next screenshot is from the elapsed time of 14 seconds in that video and shows members of the public being greeted by the woman wearing the light-blue shirt that I discussed above and Defendant Gerola as those members of the public arrived at the entrance of that school

to attend that town hall after me and were allowed to attend it in flagrant violation of my Fourteenth Amendment due process and equal protection rights as those who allowed them to do so illegally subjected me to segregation, discrimination, selective-enforcement, and an abuse of process as they violated my rights pursuant to the First Amendment that includes expressive association and assembly with respect to those who attended that town hall as they did so, the Fourth Amendment by exhibiting a show of authority towards me that subjected me to an unofficial arrest of my ability to walk past them and into that school to lawfully attend that town hall, and the Fifth Amendment by depriving me of my liberty and property rights with respect to my ability to use that school to attend that town hall and the property interests that I had in the admission tickets that were issued to attend that town hall meeting. This screenshot also more clearly shows an unknown male on the far-left who I wish to add as a defendant in this action in the event that he was then a law-enforcement official because he would have then had a Fourteenth Amendment affirmative legal duty to intervene on my behalf to enable me to attend that town hall that he didn't try to perform. I urge this Court to order the City of New York to provide me his identity and inform me whether he was then a law-enforcement official.



60.     The next screenshot is from the elapsed time of 6 seconds in the video recording that has the filename of "IMG_2999.MOV" that I recorded on 11/2/17 at 6:41 pm on the property of that school in an area near the street that bordered it in front of that school. Defendant Miller is shown in it as he was aware that I was being prevented from attending that town hall meeting and was condoning that illegal discrimination. I'm heard providing narration for that video then by stating that Mr. Miller was not allowing me to attend the Mayor's 11/2/17 town hall meeting in violation of my First Amendment rights.



61.    At the elapsed time of 12 seconds in that video, I'm heard stating that Defendant

Redmond had told me that I could attend that 11/2/17 town hall meeting and that Mr. Redmond

had told me that just one night earlier at the site of where the Mayor participated in a debate then.

62.    At the elapsed time of 20 seconds in that video, I'm heard stating that I specifically had

asked Mr. Miller to talk with his supervisor to have him overruled and that he was ignoring me

instead. When I made that remark, I was referring to the fact that I asked Mr. Miller on 11/2/17

at the site of that town hall meeting to talk with his supervisor to cause me to be allowed to

attend that town hall meeting by having Mr. Miller overruled in regards to his actions that were

causing me to be prevented from being able to attend the Mayor's 11/2/17 town hall meeting.

63.    At the elapsed time of 27 seconds in that video, I'm heard asking Mr. Miller who his

supervisor then was as he continued to ignore me and instead was pressing something on a cell

phone that he held with his right hand. I continued to make remarks in which I framed my

question about who his supervisor then was by stating that I sought that information to report a complaint against Mr. Miller to DOI.

64.     At the elapsed time of 31 seconds in that video, I explicitly told Mr. Miller that I wasn't stalking him and was instead asking him for information. In response, Mr. Miller is heard in that video at the elapsed time of 33 seconds as he fraudulently claimed that I was stalking him to concoct a fraudulent pretext to try to justify his illegal behavior towards me instead of acknowledging the clear fact that I was continuing to gather evidence in a lawful manner to use in a lawsuit against him and others for illegally preventing me from attending that town hall meeting.

65.     At the elapsed time of 38 seconds in that video, Mr. Miller again lied by fraudulently claiming that he felt unsafe in spite of the fact that there were the numerous members of the NYPD nearby who were presumably armed and I never communicated any threat against Mr. Miller while I was at the site of that town hall meeting.

66.     At the elapsed time of 40 seconds in that video, I'm heard as I rhetorically asked Mr. Miller if I could please talk to his supervisor as he resumed ignoring me and freely walked away from me that reinforced the fact that I wasn't threatening him nor impeding his ability to freely move about.

67.     The next screenshot is from the elapsed time of 9 seconds in the video recording that has the filename of "IMG_3001.MOV" that I recorded on 11/2/17 at 6:50 pm on the property of that school in an area near the street that bordered it in front of that school as members of the public nearby were protesting against the Mayor while they stood on or near a public sidewalk nearby. Defendant Gerola appears at the beginning of that video. I'm heard providing narration for that video beginning at the elapsed time of 5 seconds in it as I urged Mr. Gerola to tell that crowd and

me why he was illegally preventing me from exercising my First Amendment rights. I was referring to the fact that he and others were then illegally preventing me from being able to attend the Mayor's 11/2/17 town hall meeting. Mr. Gerola never gave me a valid explanation about why I was illegally prevented from attending that town hall meeting.



68.     The next screenshot is from the elapsed time of 10 seconds in that video as I sarcastically urged Mr. Gerola to speak up and exercise his First Amendment rights by telling those who were protesting nearby by that sidewalk and I why he was illegally preventing me from exercising my First Amendment right to attend that town hall meeting. At the elapsed time of 20 seconds in that video, I'm heard providing additional narration for that video while numerous other members of

the NYPD were nearby and illegally didn't try to intervene on my behalf to enable me to attend

the Mayor's 11/2/17 town hall. Although I don't know their identities nor their NYPD shield

numbers, it's entirely conceivable that they were recorded on video or in photographs that were

recorded or otherwise taken by those who were then protesting nearby, journalists who reported

about that protest, video security cameras in that area, and video cameras that may have bee

installed in NYPD vehicles that were nearby. In the narration that I provided in that video at the

elapsed time of 20 seconds, I clearly stated that Defendants Gerola and Ringel (he was also the

standing nearby) were then violating the First Amendment, 18 U.S.C. §245, and 18 U.S.C. §242

in regards to me as I was referring to the fact that they were illegally preventing me from

attending the Mayor's 11/2/17 town hall meeting.



69.     The next screenshot is from the elapsed time of 27 seconds in that video. Defendant

Gerola appears on the left in it and Defendant Ringel appears on the right. Two unknown

members of the NYPD are also shown in it as they stood near doors to that school in a location

that wasn't the entrance to that school that was used to grant members of the public access to it

to attend the Mayor's 11/2/17 town hall. Due to how loudly I spoke as I talked while I recorded

that video, those unknown members of the NYPD were within earshot of my remarks.



70.     The next screenshot is from the elapsed time of 4 seconds in the video recording that has

the filename of "IMG_3003.MOV" that I recorded on 11/2/17 at 7:12 pm on the property of that

school as Defendants Ringel, Gerola, and I walked back towards the entrance of that school. I'm

heard providing narration for that video at that time as I described Mr. Ringel as someone who

was then a senior member of the Mayor's staff and was consistently violating the First

Amendment. What I meant by that remark was that he was consistently violating my First

Amendment rights to attend public town hall meetings that the Mayor had been conducting and

that Mr. Ringel had been violating findings in applicable U.S. Supreme Court decisions by doing

so as he subjected me to illegal viewpoint discrimination as he did so. I also pointed out as I

recorded that video that I wasn't stalking him.



71.     The next screenshot is from the elapsed time of 21 seconds in that video and shows

Defendants Gerola and Ringel from left to right in an area located in front of that school's

entrance that was likely more than 30 feet from that entrance.



72.      The next screenshot is from the elapsed time of 3 seconds in the video recording that has

the filename of "IMG_3007.MOV" that I recorded on 11/2/17 at 7:51 pm as I stood near the

entrance to that school, Defendant Stribula, and a video security camera that was the installed on

the exterior of that school in an area that was located above Ms. Stribula's head in that

screenshot and in front of where she and I then stood. That security camera appears in the upper-

left area in this screenshot.



73.     The next screenshot is from the elapsed time of 2 seconds in the video recording that has

the filename of "IMG_3008.MOV" that I recorded on 11/2/17 at 7:51 pm as I stood near the

entrance to that school and Defendants Stribula, Gerola, Nieves, and Ridener. Mr. Ridener's arm

is shown on the right side of this screenshot.



74.    The next screenshot is from the elapsed time of 5 seconds in that video. I have rotated

what appears then in that video to the right to make what appears in it more comprehensible.

Defendants Ridener and Stribula appear from left to right in this screenshot.



75.     At the elapsed time of 6 seconds in that video, Defendant Gerola tried to engage in obstruction of justice in violation of 18 U.S.C. §1512 by urging me to not use the flash function on my cell phone to record video recording evidence of what was then occurring as I continued to be illegally prevented from attending that town hall meeting. Mr. Gerola was equitably barred from interfering with my ability to gather such evidence on account of the fact that he and others were illegally preventing me from being able to attend that town hall meeting. The next screenshot is from the elapsed time of 9 seconds in that video and shows Defendant Stribula, an unknown male member of the NYPD who wore a blue uniform and a hat, Defendant Nieves, and Defendant Gerola from left to right.



76.     The next screenshot is from the elapsed time of 20 seconds in that video and shows

Defendants Ridener, Stribula, and NYPD John Doe1 11/2/17 from left to right as I'm heard

asking Defendant Nieves who Mr. Ridener was before Mr. Nieves told me that he didn't know.

Right before I asked him that, Mr. Nieves and Mr. Gerola urged me to stand back from where I

then lawfully was as they objected to how I was then using the flash function on my cell phone

to record that video while it was dark outside. Their objections were barred by equitable estoppel

because they were illegally preventing me from being able to lawfully attend that town hall. If

they hadn't been illegally preventing me from attending it, I would have lawfully then been

doing so instead of being outside and recording video recording evidence. The video security

camera that I discussed earlier is also shown in the upper-left area in this screenshot.



77.     The next screenshot is from a photograph that I took of Defendant Gerola at 9:15 pm that

corresponds to the file named "IMG_3010.JPG" as he and I stood in front of the entrance to the

school that hosted the Mayor's 11/2/17 town hall meeting. The facial expression that Mr. Gerola

then exhibited is consistent with the feeling of irritation. I believe that I may have just legally

mocked him right shortly before I took that photograph by making sarcastic remarks about how

he seemed to me to bear a striking resemblance to the lead character in a old TV show named

"Get Smart" as I was also mocking Mr. Gerola's stupidity by doing so. In regards to this point,

such sarcasm was protected speech and triggered by the fact that he was then illegally preventing

me from attending that town hall meeting and I was using that sarcasm to alleviate stress from

his illegal acts against me at his expense. I also believe that it was roughly around that time that

Mr. Gerola suddenly approached me and began launching a tirade that was directed at me like an

angry dog as he put his face within roughly 3 inches of mine as he used variations of the word

"Fuck" to try to harass and intimidate me. If he had made physical contact with me, that certainly

would have given me legal grounds to engage in self-defense against me. I certainly would have

loved the outcome of such self-defense against him that Mr. Gerola wouldn't have enjoyed at all.



78.     The next screenshot is from a photograph that I took of Defendant Mason at 9:57 pm that

corresponds to the file named "IMG_3012.JPG" as he and I stood in front of the entrance to the

school that hosted the Mayor's 11/2/17 town hall meeting. Mr. Mason is shown in that

photograph as he behaved like an idiot as he grabbed his right cheek.



79.     The next screenshot is from the elapsed time of 5 seconds in the video recording that has

the filename of "IMG_3014.MOV" that I recorded on 11/2/17 at 10:22 pm as I stood near the

entrance to that school and Defendants Gerola and Nieves. Defendant Nieves is heard at the

elapsed time of 7 seconds in that video making remarks to me to tell me that he was then offering

to let me enter that school to use a restroom. That offer by him then naturally raises the

fundamental question about exactly why it was that he and Defendants Gerola, Mason, Ringel,

Stribula, and Miller illegally had been preventing me from entering that school earlier on that

date to lawfully attend the Mayor's 11/2/17 town hall meeting. I also recall that Mr. Nieves had

asked me at a different time while I was at that location on 11/2/17 about how I had managed to

reach that location. I told him then that I took a bus and walked a long distance. It was a really

long journey for me to get there.



80.      All of the defendants in this action had a realistic opportunity to have intervened on

and/or prior to 11/2/17 to enable me to attend the Mayor's 11/2/17 town hall meeting. They also

had a legal, ethical, inherent, and affirmative duty to have then intervened on my behalf for that

purpose that is confirmed by what I discussed in the Legal Standards section about them and the

jobs that they then held. Through my remarks to them on 11/2/17 at the site of that town hall as

well as through their own ears and eyes with which they could and should have otherwise made independent assessments about the illegal acts and omissions that were being perpetrated against me in their immediate presence with respect to my efforts to lawfully attend that town hall, sufficient information was available to all of those defendants to have spurred them to have properly intervened on my behalf to attend that town hall. No one did so however as all of them exhibited acceptance of that illegal practice against me. Instead, they allowed other members of the public to attend that town hall who arrived to the site of that town hall after I did for that purpose. That violated my Fourteenth Amendment due process and equal protection rights largely because that was discriminatory against me.

81.     Through their illegal acts and omissions against me, the defendants in this action illegally chilled my First Amendment right to expression as a speaker during the Mayor's 11/2/17 town hall by preventing me from attending it as well as the public's corresponding First Amendment right to receive information from speakers. That also illegally chilled my First Amendment right to receive various information and resources that were made available to those who attended that town hall by doing so. Those illegal acts and omissions flagrantly violated my First Amendment right of assembly in a public forum as well as the remainder of my constitutional rights that applied that that public forum and caused me irreparable harm in that regard. That experience also caused me reputational harm, embarrassment, humiliation, and enormous justifiable anger and stress largely as a result of having been illegally prevented from attending that town hall. That experience also caused me reputational harm as well as enormous embarrassment, humiliation, and justifiable anger and stress largely as a result of having been illegally coerced to leave the line that I lawfully waited in with other members of the public to attend that town hall and thereafter prevented from attending that town hall. That subjected me to undue

stigmatization.  A key but-for cause for that experience was egregiously negligent failure to train and supervise by Defendants Carrion, Redmond, O'Neill, de Blasio, Shorris. Byrne, Jr., Vance, Jr., and other defendants in this action who directly and indirectly supervised those who illegally prevented me from attending that town hall.

82.     To conclude this section, it's worthwhile to emphasize the material fact that the illegal acts and omissions that were committed against me by the defendants who were present at the site of the Mayor's 11/2/17 town hall meeting on 11/2/17 with respect to my efforts to lawfully attend that public forum weren't isolated illegal acts and omissions by them against me that occurred on just that date for that specific public forum. Instead, the table shown next identifies additional public forums since 4/27/17 that the Mayor and others conducted at which the defendants that my 11/2/17 claims concern committed very similar illegal acts and omissions against me prior to 11/2/17 that among other things **a)** illegally prevented me from attending those public forums altogether, **b)** caused me to be illegally segregated from the room in which town hall meetings were conducted by being restricted to attending them from overflow rooms, **c)** prevented me from attending press conferences that were open to the public to attend, and **d)** caused me to be criminally assaulted, stalked, and harassed by them on a public sidewalk that was adjacent to a building that hosted a public town hall meeting that the Mayor conducted on the date it was conducted.

| # | Defendant | Summary of some of the illegal acts & omissions |
|---|-----------|-------------------------------------------------|
| 1 | Gerola | • Illegal exclusion from public town hall meetings and resource fair meetings that the Mayor conducted:<br><br>  5/23/17, 6/8/17, 7/12/17, 9/14/17, 9/26/17, 9/27/17, 9/28/17<br><br>• Illegal failure to intervene to uphold my constitutional rights at public forums that the Mayor conducted as other members of the NYPD violated them: |

| | | |
|---|---|---|
| | | 4/27/17, 5/23/17, 6/8/17, 7/12/17, 9/14/17, 9/26/17, 9/27/17, 9/28/17 |
| 2 | Mason | • Illegal exclusion from public town hall meetings and resource fair meetings that the Mayor conducted:<br><br>  9/14/17, 9/26/17, 9/28/17, 10/4/17, 10/12/17<br><br>• Illegal exclusion from a press conference that was open to the public:<br><br>  10/3/17 at City Hall that involved a press conference that was conducted by people who pushed for reforming the NYPD.<br><br>• Illegal failure to intervene to uphold my constitutional rights at public forums that the Mayor conducted as other members of the NYPD violated them:<br><br>  9/14/17, 9/26/17, 9/28/17, 10/4/17, 10/12/17 |
| 3 | Miller | • Illegal exclusion from public town hall meetings and resource fair meetings that the Mayor conducted:<br><br>  4/27/17, 10/12/17, 10/18/17<br><br>• Illegal failure to intervene to uphold my constitutional rights at public forums that the Mayor conducted as other members of the NYPD violated them:<br><br>  4/27/17, 9/26/17, 10/12/17, 10/18/17 |
| 4 | Nieves | • Illegal exclusion from public town hall meetings, resource fair meetings, and public hearings that the Mayor conducted:<br><br>  5/23/17, 7/12/17, 8/30/17, 9/14/17, 9/26/17, 10/25/17, 11/27/17<br><br>• Illegal failure to intervene to uphold my constitutional rights at public forums that the Mayor conducted as other members of the NYPD violated them:<br><br>  4/27/17, 5/23/17, 7/12/17, 8/30/17, 9/8/17, 9/14/17, 9/26/17, 10/4/17, 10/25/17, 11/27/17<br><br>• Illegal stalking, harassment, seizure, assault, detention, and restraint on and retaliation for First Amendment activities at a public press conference that the Mayor conducted:<br><br>  4/27/17, 5/23/17, 8/30/17, 10/25/17, 11/27/17 |

| | | |
|---|---|---|
| | | • Illegal harassment, First Amendment retaliation, and ejection from a town hall that the Mayor conducted:<br><br>  8/30/17 |
| 5 | Redmond | • Illegal exclusion from public town hall meetings, resource fair meetings, and public press conferences that the Mayor conducted:<br><br>  4/27/17, 7/25/17, 8/30/17, 10/25/17, 11/27/17<br><br>• Illegal stalking, harassment, seizure, assault, detention, and restraint on and retaliation for First Amendment activities at a public press conference that the Mayor conducted:<br><br>  7/25/17<br><br>• Illegal harassment, First Amendment retaliation, and ejection from a town hall that the Mayor conducted:<br><br>  8/30/17<br><br>• Illegal failure to intervene to uphold my constitutional rights at public forums that the Mayor conducted as other members of the NYPD violated them:<br><br>  5/23/17, 6/8/17, 7/12/17, 7/25/17, 9/14/17, 9/28/17, 10/25/17 |
| 6 | Ringel | • Illegal exclusion from public town hall meetings that the Mayor conducted:<br><br>  4/27/17, 9/26/17, 10/18/17, 10/26/17<br><br>• Illegal failure to intervene to uphold my constitutional rights at public forums that the Mayor conducted as members of the NYPD and/or other members of the Mayor's CAU violated them:<br><br>  4/27/17, 8/30/17, 9/26/17, 10/18/17, 10/25/17, 11/30/17 |

| 7 | Stribula | • Illegal exclusion from public town hall meetings that the Mayor conducted:<br><br>    6/8/17, 10/12/17, 11/30/17 (she tried to illegally prevent me from attending the Mayor's 11/30/17 town hall before she was overruled)<br><br>• Illegal failure to intervene to uphold my constitutional rights at public forums that the Mayor conducted as members of the NYPD and/or other members of the Mayor's CAU violated them:<br><br>    4/27/17, 6/8/17, 7/12/17, 8/30/17, 10/18/17, 10/26/17 |
|---|---|---|

## **CAUSES OF ACTION**

1.    I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

**CLAIM #1:**    Violations of the First Amendment right of access to a public forum, to protest in a public forum, to record audio and video recordings in a public forum, to take photographs in a public forum, to receive information in a public forum, to have the opportunity to talk with journalists in a public forum, to distribute whistleblowing literature in a public forum, to engage in lawful assembly in a public forum, to engage in freedom of expression in a public forum, to otherwise engage in whistleblowing and criticism of government officials in a public forum, to engage in expressive association, and to petition government officials in a public forum for redress of grievances

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola, Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos, Shorris, Vance, Jr.)

1.    I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.    I also incorporate by reference as though fully set forth herein the decision that was issued on 5/19/20 in *Dunn v. City of Fort Valley,* No. 19-cv-287(TES) (M.D. Ga. May 19, 2020) due to relevant findings it contains about First Amendment rights in public forums, supervisory

liability, and other pertinent things.

3.      My right to lawfully communicate ideas and views with others in a public forum in a

manner that doesn't disrupt how that public forum is conducted while valid time, place, and

manner restrictions do not exist to prohibit such communication in a public forum was

acknowledged the following remark that U.S. District Judge Lorna Schofield expressed in the

decision that she issued in _Gonzalez v. City of New York_, No. 14 Civ. 7721 (LGS) (S.D.N.Y.

Sept. 29, 2016):

> "Two branches of First Amendment claims are relevant to the present case: (a)
> interference with the right to protest in a public forum and (b) retaliation for exercising
> First Amendment rights."

4.      More importantly, my right to lawfully communicate ideas and views in a public forum

in a manner that doesn't disrupt how that public forum is conducted while valid time, place, and

manner restrictions do not exist to prohibit such communication in a public forum was confirmed

by the following excerpt from _Occupy Nashville v. Haslam_, 949 F. Supp. 2d 777 (M.D. Tenn.

2013):

> "a state may not restrict First Amendment rights, absent valid time, place, or manner
> restriction. _See Dean,_ 354 F.3d at 551; _Galvin v. Hay,_ 374 F.3d 739, 751 (9th
> Cir.2004) (**"As speakers may generally control the presentation of their message by
> choosing a location for its importance to the meaning of their speech, speakers may
> ordinarily— absent a valid time, place and manner restriction—do so in a public
> forum."); _Childs v. Dekalb Cnty., Ga.,_ 286 Fed.Appx. 687, 693-94 (11th
> Cir.2008)** (denying qualified immunity and stating that, based on Supreme Court
> precedent, "police officers have known for decades that protestors present on public
> property have a First Amendment right to peacefully express their view, in the absence of
> narrowly tailored ordinances restricting the time, place, or manner of the speech")."
>
> (boldface formatting added for emphasis)

5.      Due to the facts and circumstances that I have discussed at length and with sufficient

specificity in this pleading, I have decisively established that the Defendants identified above

that this claim concerns were personally involved in having willfully, callously, and wantonly

illegally violated my First Amendment rights in relation to my efforts to have attended the Mayor's 11/2/17 town hall.

6.     I have further established that the defendants that this claim concerns violated my First Amendment right of access to public records that include comment cards that were likely made available in the building that hosted the Mayor's 11/2/17 town hall that were made available strictly to the members of the public who were permitted to attend that town hall.

7.     Ms. Ramos is also liable for this cause of action due to her role as co-conspirator in that conspiracy as she illegally deceived Ms. Durkin on 6/28/17 and 6/29/17 in e-mail messages that she sent to Ms. Durkin about me and the illegal acts that continued to be illegally committed against me on 11/2/17 and prevented me from being able to lawfully attend the Mayor's 11/2/17 town hall. Ms. Ramos sent those e-mail messages to Ms. Durkin about me in furtherance of a fraudulent scheme to try to illegally cover-up such illegal acts and omissions that were committed against me. Relevant findings that support this assertion about Ms. Ramos' liability exist in the decisions that were issued in *US v. Blackmon*, 839 F.2d 900 (2d Cir. 1988), *Escalera v. Samaritan Village Men's Shelter*, No. 17-cv-4691 (CM) (S.D.N.Y. Sept. 27, 2019), *US v. Basey*, 816 F.2d 980 (5th Cir. 1987), *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995), *Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999), and *Dunn v. City of Fort Valley*, No. 19-cv-287(TES) (M.D. Ga. May 19, 2020).


**CLAIM #2:**      **First Amendment Retaliation, Viewpoint Discrimination, and Standardless Discretion in Denying Access to a Public Forum**

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola, Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos, Shorris, Vance, Jr.)

1.     I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #3:**              <u>**Violations of the Fourth Amendment**</u>

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #4:**              <u>**Violations of the Fifth Amendment**</u>

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #5:**              <u>**Violations of the Fourteenth Amendment**</u>
                          <u>**Substantive Due Process Rights**</u>

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.


**CLAIM #6:**         <u>**Violations of Procedural Due Process**</u>

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola, Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.


**CLAIM #7:**         <u>**Violations of the Fourteenth Amendment**</u>
<u>**Equal Protection Rights**</u>

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola, Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.


**CLAIM #8:**         <u>**Violations of the Fourteenth Amendment**</u>
<u>**Prohibitions Against Selective-Enforcement**</u>

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola, Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #9:**                    **Failure to Intervene in Violation of the**
                                **Fourteenth Amendment**

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #10:**                    **Failure to Train and Supervise**

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #11:**      **Violation of the New York State's Open Meetings Law**

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.


**CLAIM #12:**                              **Abuse of Process**

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.


**CLAIM #13:**                              **Deliberate Indifference**

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.


**CLAIM #14:**      **Fraudulent Misrepresentation and Fraudulent Inducement**

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #15:**          <u>**Violation of New York State General Business Law 349**</u>

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #16:**                          <u>**Negligence**</u>

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #17:**                      <u>**Municipal Liability**</u>

**(Against Defendant City of New York)**

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      Defendant City of New York is liable for this claim due to the information that I presented in this complaint.

**CLAIM #18:**      **Intentional and Negligent Infliction of Emotional Distress**

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola, Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #19:**      **Conspiracy to Violate Civil Rights and Cover-Up Such Abuse**

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola, Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #20:**      **Unjust Enrichment**

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola, Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #21:**                          <u>**Public and Private Nuisance**</u>

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #22:**          <u>**Violations of the Hatch Act (see 5 U.S.C. §1502(a)(1))**</u>

(Against Defendants City of New York, Carrion, Ridener, Miller, Ringel, Stribula, Gerola,
Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos,
Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #23:**                          <u>**Stigma-Plus Defamation**</u>

(Against Defendants Ringel, Gerola)

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

    forth herein.

2.  The defendants that this claim concerns are liable for it due to the information that I

    presented in this complaint.

## DEMAND FOR A JURY TRIAL

1.      I demand a trial by jury in this action on each and every one of my damage claims.

## PRAYER FOR RELIEF

WHEREFORE, this Court should accept jurisdiction over this entire matter and grant me additional relief by:

1.      Causing this Court to exercise supplemental jurisdiction over K1, K3, K4, K5, K6, K7, and K8 before then consolidating them with this action that will result in having this action to control how all of that litigation is conducted. This request stems from a common nucleus of operative fact and is pursuant to FRCP Rule 42.

2.      Empaneling a jury to hear and decide this case strictly on its merits.

3.      Granting me the following additional relief against the defendants individually and jointly:

a.      Compensation for violations of my constitutional rights, defamation, abuse of process, nuisance, unjust enrichment, wire fraud, and fraudulent misrepresentations as well as pain, suffering, mental anguish, and humiliation that I experienced due to the illegal acts and omissions by the defendants.

b.      Declaratory, injunctive, and equitable relief through the issuance of an order that voids the results of the 2017 New York City government elections for the jobs of New York City Mayor, New York City Councilmember, Bronx District Attorney, Queens Borough President, New York City Comptroller, and New York City Public Advocate primarily because it is reasonable to believe that results of those elections were materially tainted by voter fraud, voter suppression, and whistleblower retaliation in violation of 5 U.S.C.

§1502(a)(1) that occurred partly by illegally:

    i.    Preventing whistleblowers from attending public forums that the Mayor conducted with them and were partly used as campaign events to attract various types of support from voters and prospective voters.

    ii.    Segregating and discriminating against whistleblowers at such public forums.

c.    Declaratory, injunctive, and equitable relief in accordance with findings expressed in *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899 (8th Cir. 2012) through the issuance of an order that enjoins Defendant City's personnel and agencies from continuing to commit illegal acts and omissions against me that violate my rights.

d.    Further declaratory, injunctive, and equitable relief through the immediate issuance of an order that:

    i.    Prohibits all members of the NYPD from deliberately making any physical contact with me while I am conducting myself in a lawful manner.

    ii.    Requires all members of the Mayor's NYPD security detail to not come within 10 feet from me while they are on-duty as members of the Mayor's NYPD security detail and I am conducting myself in a lawful manner, unless I explicitly grant consent for that to occur.

    iii.    Requires all members of the Mayor's CAU to not come within 10 feet from me while I am conducting myself in a lawful manner and they are on-duty as members of the Mayor's CAU, unless I explicitly grant consent for that to occur.

    iv.    Prohibits Defendant City's personnel from illegally interfering with my ability to attend public forums that the Mayor may conduct from within the room in which he does so as he does so.

v.    Prohibits Defendant City's personnel from illegally interfering with the rights that other people have to lawfully attend public forums that the Mayor conducts that may allow others and I to exercise our First Amendment right to observe, hear, and enjoy lawful speech and other expression that such people may engage in to criticize the Mayor and others during them.

vi.   Prohibits Defendant City's personnel from illegally interfering with the First Amendment and Fifth Amendment rights that people have to **a)** bring literature and signs with them into rooms in which the Mayor conducts public forums, **b)** lawfully distribute such literature during those meetings without disrupting those meetings, **c)** distribute such literature and otherwise show it and signs in the rooms in which the Mayor conducts such meetings before they begin and after they end, and **d)** Keep such literature and signs with them as the Mayor conducts such public forums.

vii.  Requires Defendant City to grant access to public forums that the Mayor conducts inside of buildings based on the order in which members of the public line up directly outside of those buildings shortly before those meetings begin to be granted access to the room in which the Mayor conducts such public forums on those dates.

viii. Prohibits Defendant City from allowing its personnel to prevent members of the public from attending public forums that the Mayor conducts inside of buildings from within the rooms in which he does so while sufficient seating is available in those rooms.

ix.   Orders Defendant City to immediately cause all members of the NYPD who are

present in areas where the Mayor conducts public town hall meetings, public resource meetings, public hearings, and press conferences that the public may observe to wear body-cameras that are always on and always recording both audio and video recordings.

x.    Orders Defendant City of New York to provide all audio and video recordings from such body-cameras in unedited and non-redacted form along with their audit trail records to allow for an independent forensic analysis within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)** the members of the NYPD wearing those body-cameras.

xi.    Orders Defendant City to immediately cause clear audio recordings to be recorded of all verbal communications that members of the NYPD have while they are on-duty as members of the NYPD and present in areas where the Mayor conducts public town hall meetings, public resource meetings, public hearings, and press conferences that the public may observe.

xii.    Orders Defendant City of New York to provide all such audio recordings in unedited and non-redacted form that includes information that identifies the date and time when those recordings began to be recorded as well as the speakers heard in those communications that are personnel of Defendant City within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)** the members of the NYPD heard in those audio recordings while they are being recorded.

xiii.    Orders Defendant City to immediately cause all other electronic communications (such as e-mail messages, cell phone text messages, and encrypted

communications) that are engaged in by those who are part of the Mayor's NYPD security detail to be recorded and preserved for possible use in litigation by people that they commit illegal acts and omissions against.

xiv.   Orders Defendant City to provide all such electronic communications within 24 hours in unedited and non-redacted form that includes information that identifies the date and time when those communications occurred and the identities of those who engaged in them to members of the public who have adverse encounters with members of the Mayor's NYPD security detail to the extent that those communications concern those adverse encounters.

xv.   Orders Defendant City to provide me copies of all communications that its personnel have had about me since 2/1/16 in unedited and non-redacted form. This includes, but is not limited to all of the following:

    1)   All communications that have taken place by using personally-owned devices, personal e-mail accounts, personal encrypted messaging accounts, and personal cell phone plans as well as by using computers and other devices that are owned or leased by Defendant City and e-mail, cell phone, and encrypted messaging accounts that are administered and/or controlled by Defendant City.

e.   Further declaratory, injunctive, and equitable relief through the immediate issuance of an order that:

i.   Orders Defendant City to immediately cause the CCRB and DOI to be provided all video recordings within 24 hours after a complaint is reported to them about

illegal acts and omissions that are committed by members of the NYPD and other personnel of Defendant City that are recorded by video security cameras that Defendant City controls. This includes, but is not limited to illegal acts that are related to public forums that the Mayor conducts and occur on the dates and at the locations where the Mayor conducts them.

ii.   Further orders Defendant City to make those video recordings available within 24 hours in unedited and non-redacted form to those who report such illegal acts and omissions to the CCRB and DOI.

iii.   Orders that the following Defendants are also required to be fired at the earliest possible instead of practical or convenient time from the jobs that they hold with Defendant City of New York largely pursuant to Section 1116 of the New York City Charter in response to the illegal acts and omissions that they committed against me in relation to my efforts to have lawfully attended the Mayor's 11/2/17 town hall and that they are prohibited from being employed by Defendant City again:

Carrion, Ridener, Miller, Ringel, Stribula, Gerola, Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos, Shorris, Vance, Jr.

iv.   Orders the following defendants to immediately and fully reimburse the City of New York with pre-judgment and post-judgment interest for the total value of pay and benefits that they received that directly correspond to the length of time during which they were involved in the illegal acts and omissions that were committed against me in relation to my efforts to have lawfully attended the Mayor' 11/2/17 town hall:

Carrion, Ridener, Miller, Ringel, Stribula, Gerola, Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos, Shorris, Vance, Jr.

v.    Restrains Defendant City's personnel and agencies from continuing to commit illegal acts and omissions against me that violate my rights, especially in all areas that are public forums.

vi.   Restrains the City of New York from allowing the NYPD to provide more security and law-enforcement that would benefit members of the press in public forums and other public areas than what members of the NYPD extended to me on 11/2/17 in relation to my efforts to attend the Mayor's 11/2/17 town hall meeting on the grounds that such greater security and law-enforcement would violate my Fourteenth Amendment rights that pertain to selective-enforcement, equal protection, due process, and discrimination.

vii.  Declares that the ban that the Mayor announced that prohibits large gatherings of people in New York City and protests from being conducted is overly broad, pretextual, void, and unenforceable largely because it impermissibly violates core First Amendment rights as well as Fifth Amendment and Fourteenth Amendment rights that pertain to due process, selective-enforcement, equal protection, and liberty.

viii.  Further declares that though it may possibly be advisable to wear a face mask in New York City, no one is required to do so partly because **a)** members of the NYPD are not themselves wearing face masks outside and **b)** doing so impedes the flow of oxygen to healthy people and impermissibly infringes upon the First Amendment rights that people have to engage in freedom of expression, such as

by having people see them smiling, expressing affection by kissing, being able to yawn without having to wear a face mask, and having other facial expressions that they make seen by others. Although it is potentially dangerous to one's health to engage in a wide variety of other activities that include driving a car because of the possibility that a drunk driver may pass by and having a drink in a bar because there is a possibility to breathe in second-hand smoke, bans on driving and visiting bars have not been imposed due to such risk factors.

ix.   Similarly declares that the social-distancing restrictions in New York State are overly broad, void, and unenforceable for the same reasons just discussed and declares that those restrictions have been selectively-enforced by the NYPD in violation of the Fourteenth Amendment.

f.    Declaratory relief by declaring that the Mayor's 11/2/17 town hall was a public forum that was subject to New York State's Open Meetings Law and that all actions that were taken in relation to that meeting are void pursuant to Section 107 of New York State's Public Officer Law because that town hall meeting was conducted in violation of New York State's Open Meetings Law.

g.    Injunctive and equitable relief by ordering Defendant City to immediately provide me the following in unedited and non-redacted form:

i.    Copies of all video recordings and photographs that were recorded and otherwise taken by Defendant City's personnel inside of the building that hosted the Mayor's 11/2/17 town hall meeting between the time when **a)** the first member of the public entered that building on 11/2/17 in relation to attending that town hall meeting and **b)** everyone who attended that town hall meeting exited that building

after it concluded on 11/2/17.

ii.   Copies of all video recordings and photographs that were recorded and otherwise taken by Defendant City's personnel in the areas where I interacted with the defendants on 11/2/17 at the site of the Mayor's 11/2/17 town hall meeting while they and/or others illegally prevented me from attending that town hall meeting through their illegal acts and omissions.

iii.   Copies of all records that have been in the possession of Defendant City's personnel that pertain to the deliberations, planning, coordination, execution, and cover-up that took place in regards to my having been illegally:

1)   Prevented from attending the Mayor's 11/2/17 town hall meeting.

iv.   Copies of all records that have been in the possession of Defendant City's personnel that describe staff assignments that were issued to the members of the Mayor's staff, the Mayor's CAU, the members of the Mayor's NYPD security detail, and the other members of the NYPD who were assigned work to do in relation to the Mayor's 11/2/17 town hall meeting.

v.   Copies of all records that have been in the possession of Defendant City's personnel that consist of the names and contact information for the members of the public who registered to attend the Mayor's 11/2/17 town hall meeting as well as the names and contact information for the journalists who attended that town hall meeting.

h.   Injunctive and equitable relief by ordering Defendant City of New York to immediately provide me all video recordings as an ".avi", ".mp4", or ".mov" computer file that were recorded on 2/19/20 by all video security cameras that were installed in the school

and are controlled by DOE that hosted the town hall meeting that the Mayor conducted on

that date between the times when the first member of the public was allowed into that school

for the purpose of attending that town hall until everyone who attended that town hall exited

that school.

i.      Compensation for all costs and attorney fees that are related to my pursuit of this civil

action.

j.      Equitable and injunctive relief that authorizes me and others that I may ask to help me

to paint, write, or draw any message or image of any size indefinitely throughout New York

City without needing pre-approval from anyone on any public street, sidewalk, public

passageway, concourse, and park indefinitely by using resources that will be provided to me

by the City of New York for that purpose.

k.      Equitable and injunctive relief that orders the City of New York to cause its NYPD to

accord whatever messages and images that I may paint, write, or draw in public areas

throughout New York City to receive equal law-enforcement protection that is accorded to

Black Lives Matter signs on streets in New York City, especially the one located in front of

Trump Tower in Manhattan.

l.      An award of damages against the following defendants pursuant to 18 U.S.C. §1986

for having not intervened on my behalf in relation to my effort to have attended the Mayor's

he Mayor's 11/2/17 town hall meeting:

> Carrion, Ridener, Miller, Ringel, Stribula, Gerola, Mason, Nieves, Redmond, NYPD
> John Doe1 11/2/17, de Blasio, Byrne, Jr., O'Neill, Ramos, Shorris, Vance, Jr.

m.      An award of damages against the following defendants pursuant to New York State

General Business Law §349 for deception in relation to my efforts to have attended the

Mayor's 11/2/17 town hall meeting with respect to how those defendants conducted

themselves as criminal accomplices instead of the law-enforcement personnel that they

technically were on 11/2/17:

> Gerola, Mason, Nieves, Redmond, NYPD John Doe1 11/2/17, Byrne, Jr., O'Neill, Vance, Jr.

n.      An award of punitive damages for all of my claims set forth in this pleading.

o.      An award of pre-judgment and post-judgment interest.

p.      Declares that the Mayor's 11/2/17 town hall was illegally conducted inside of a

public school.

q.      Equitable and injunctive relief that orders the City of New York to remove all

obstructions from public sidewalks, public streets, public parks, and public concourses that

include traditional public forums within 24 hours that the NYPD and Mayor's office has set

up and otherwise allowed to exist on them and to not setup such obstructions again in such

public areas nor otherwise allow them to exist on and in them without prior approval by this

Court. The existence of such obstructions on sidewalks violates New York City

Administrative Code §16-122(b). Also, such obstructions impermissibly infringe upon and

otherwise burden the First Amendment rights that people have to lawfully walk, bicycle, and

otherwise freely move about and congregate in such areas – especially on sidewalks and in

parks that are traditional public forums – while some who seek to do so may have various

disabilities that include blindness and physical ailments. Allowing such obstructions to exist

on public sidewalks, in public streets, in public parks, and on public concourses in New York

City is clearly inequitable and quite literally an insult to injury with respect to my claims in

this action that largely concern illegal acts and omissions that were committed against me

while no pandemic existed in New York City that prevented me from lawfully attending

public forums. It is patently inequitable to my countervailing interest and ability to lawfully exercise my constitutional rights on public sidewalks and in parks to be curtailed by the NYPD and Mayor's administration during the ongoing Coronavirus pandemic to accommodate such things as outdoor dining after the NYPD and Mayor's administration flagrantly, willfully, criminally, and repeatedly violated my constitutional rights to lawfully attend public forums inside of buildings that the Mayor and other government officials conducted. In the same way that I took a risk that I would be illegally prevented from lawfully attending such public forums that the Mayor conducted while no pandemic existed in New York City as I visited the sites where those public forums were conducted on the dates when they were conducted, the owners of restaurants and other businesses that would benefit by being able to expand their operations on public sidewalks and in public parks in New York City at the expense of my First Amendment, Fifth Amendment, and Fourteenth Amendment rights to freely make use of all areas on such public sidewalks and public parks that are traditional public forums took a risk that circumstances beyond their control would possibly arise that would materially and repeatedly disrupt their ability to operate their businesses. A reasonable, equitable, and creative accommodation may be made for owners of businesses that wish to conduct their operations outside by having this Court order the immediate bulldozing of City Hall; the NYPD headquarters, precincts, and training facilities, and Gracie Mansion to allow such businesses to promptly expand their operations on account of the fact that those locations have been the primary sanctuaries of mobsters dressed as government officials and members of the NYPD that committed illegal acts and omissions that rigged and stole the 2017 New York City government elections through voter suppression, voter fraud, whistleblower retaliation, and terrorism that persists against New

Yorkers.

r.      Equitable relief that will have this Court adopt the practice in _USA v. Donziger_, No. 11-cv-0691(LAK)(RWL)(S.D.N.Y.) to similarly appoint private prosecutors to commence criminal prosecutions against the defendants that this action concerns in response to criminal acts and omissions that they committed and/or condoned against me that are addressed in this complaint to remedy the fact that prosecutors have negligently refused to do so.

s.      Orders the City of New York to immediately implement a procedure by which all members of the public can obtain free, unedited, and non-redacted copies of all video recordings within 48 hours after they are recorded by video security cameras that are controlled by the NYPD that will begin in the next 7 calendar days for which the following relevant facts apply to befit the public's interest in government transparency, accountability, being accorded proper due process while testifying in public hearings and otherwise talking with government officials, and having a means with which to measure the extent to which **a)** due process is and isn't accorded to members of the public during such interactions members of the news media inappropriately and consistently censor those who testify in public hearings that aids and abets greater societal ills that include terrorism by the NYPD, voter suppression, whistleblower retaliation, viewpoint discrimination, and voter fraud:

   i.      Such video recordings to be made available to the public within 48 hours include those that are recorded inside of City Hall's building in all areas in which public hearings are conducted as well as all other public areas inside of City Hall's building.

   ii.     Such video recordings to be made available to the public within 48 hours include those that are recorded by all video security cameras of those areas by

video security cameras that are controlled by the NYPD.

    iii.    Such video recordings to be made available to the public within 48 hours also include those that are recorded outside of and in the immediate vicinity of City Hall's building of the property of City Hall for all areas of that property.

    iv.    Such video recordings to be made available to the public within 48 hours include those that are recorded by all video security cameras of the areas just discussed by video security cameras that are controlled by the NYPD.

    v.    Such video recordings to be made available to the public within 48 hours also include those that are recorded of all areas of the sidewalks and other passageways and walkways that immediately surround City Hall's property.

    vi.    Such video recordings to be made available to the public within 48 hours include those that are recorded by all video security cameras of the areas just discussed by video security cameras that are controlled by the NYPD.

    vii.    Such video recordings to be made available to the public within 48 hours must be made available as types of video recordings that that have the file extension of ".mp4", ".avi", and ".mov" that can readily be played back on computers that run the operating systems for Windows and Macintosh computers without the need for special software to do so.

    viii.    Such video recordings to be made available to the public within 48 hours must include information in them that show the date and time when they were recorded.

t.    Restrains the City of New York from transferring the NYPD's authority to issue and revoke press credentials to another entity within Defendant City's government.

u.       Immediately revokes the NYPD's authority to issue and revoke press credentials and

empowers me and a group of other whistleblowers who are independent of the influence of

both **a)** Defendant City and **b)** alleged news organizations to act in the NYPD's place to

determine who will and will not have press credentials issued to them as well as those who

will have their existing press credentials revoked to befit the public's interest in transparency,

government accountability, and inappropriate and complicit censorship by the press that aids

and abets societal ills within an illegitimate, corrupt, and dysfunctional government.

v.       Declares that New York City has proven to be and remains an anarchist jurisdiction

largely because of illegal acts and omissions that the defendants in this action criminally

perpetrated in New York City in relation to the constitutional rights that people have to

lawfully attend and participate in public forums in New York City.

w.       Declares that all restrictions that have been established in New York City by New

York State Governor Andrew Cuomo. Defendant de Blasio, and the NYPD that restrict

peaceful **a)** protesting and demonstrating activities outdoors and indoors and **b)** gatherings of

people indoors and outdoors for other purposes that may possibly include obtaining

information from witnesses and formulating plans to establish a class-action lawsuit against

the City of New York in relation to this case and related litigation that I commenced

impermissibly violate the First Amendment, are overly broad, is clear standardless discretion,

are an unlawful prior restraint on First Amendment rights, are being selective-enforced in

violation of the Fourteenth Amendment, and are void.

x.       Injunctive and equitable relief by ordering Defendant City to immediately provide me

within 24 hours all "Unusual Occurrence Reports" and related reports that members of the

NYPD were required to complete in relation to their acts and omissions against me that

caused and otherwise enabled me to have been prevented from attending the Mayor's 11/2/17 town hall meeting.

y.      Orders the City of New York to immediately close the buildings in which New York City's Housing Courts operate that the City of New York maintains until 60 days after the following occurs:

      i.      All New York City public libraries have fully re-opened to allow all members of the public to use the Internet access and other resources that such libraries make available that would be of benefit to pro se litigants who need Internet access and may not otherwise have that with which to:

          1)   Engage in legal research and prepare legal papers to properly prepare for legal proceedings assigned to New York City's housing courts.

          2)   Search for and apply for employment opportunities.

          3)   Stay abreast of news pertaining to the coronavirus and how best to take care of themselves, their families, and friends to stay healthy during the ongoing coronavirus pandemic.

          4)   Engage in research to make contingency plans about housing and other matters.

          5)   Stay abreast of news pertaining to upcoming government elections that directly impact their life.

z.      Such other, further, and different relief as the interests of justice and equity may require.

Dated:       New York, New York
             November 1, 2020

                                              From,


                                              s_/Towaki Komatsu

                                              *Plaintiff, Pro Se*
                                              802 Fairmount Pl., Apt. 4B
                                              Bronx, NY 10460
                                              (347) 872-1205
                                              Towaki_Komatsu@yahoo.com

# Exhibit A



**Council Member Barry Grodenchik**
with Queens Borough President Melinda Katz
State Senator Leroy Comrie
& Assembly Member David Weprin
present

WORKING FOR **COUNCIL DISTRICT 23**



# TOWN HALL
## - with -

# Mayor Bill de Blasio

**THURSDAY,** November 2nd at 7:00PM
DOORS OPEN AT 6:00PM AND CLOSE AT 7:30PM
FIRST COME, FIRST SERVED

Martin Van Buren High School
230-17 Hillside Avenue
Queens Village, NY 11427

**Space is limited - please RSVP by November 1st at 5PM**



Mayor's Community
Affairs Unit

**TOWN HALL** CO-SPONSORS
**QUEENS** Community Board **13**
**105TH PRECINCT** Community Council
**CROSS ISLAND** Y
**SAMUEL FIELD** Y
**SNAP** Innovative Senior Center

**TO RSVP**
**Visit:** www.nyc.gov/cd23townhall
**Email:** queenstownhall@cityhall.nyc.gov
**or Call:** (212) 788-1453

ACCESS PROVIDED:

Please contact us if you have any additional accessibility needs.



OverviewNewsMayor's BioOfficials

**Thank you for your RSVPing for our upcoming mayoral town hall. This message will serve as confirmation of your registration.**

**Doors will open at 6pm and all seats are first come, first serve. Please arrive early to ensure seat availability.**

# __Exhibit B__

| | |
|---|---|
| **From:** | Stribula, Shauna |
| **Sent:** | Thursday, April 27, 2017 2:46 PM |
| **To:** | @CAU3; Gold, Jennifer; McCrayer, Jenika |
| **Subject:** | Updated Staff Plan |

**Staff Plan**
**CM Van Bramer 4/26 Town Hall**

**Load in:**

*Captains* are listed first and underlined.

*Outside*



- Amoy/Eden/Sadaf: Check In RSVP line
- Harold: Manage non-rsvp line

*Inside*

**During event:**

- Mic Runners Shift Teams:

# Exhibit C

# SUMMARY STATEMENT ON APPLICATION FOR
# EXPEDITED SERVICE AND/OR INTERIM RELIEF
### (SUBMITTED BY MOVING PARTY)

Date __10/18/17__

Title of Matter: Towaki Komatsu v.                                   Index/Indict # __100054/2017__

New York City Human Resources Administration

Appeal by _Petitioner_ from   order / judgment / decree   of   Supreme / Surrogate's / Family

County __New York__

Court entered on _August 21_ , 20 _17_

Name of Judge __Nancy Bannon__

Notice of Appeal filed on _September 29_ , 20 _17_

If from administrative determination, state agency __New York City Human Resources Administration__

Nature of action or proceeding __Hybrid article 78__

Provisions of   order / judgment / decree   appealed from _____

This application by   appellant / respondent   is for _Due to the space constraints here, please refer to the attached sheet that is entitled "Interim Relief Sought."_

If applying for a stay, state reason why requested _____

Has any undertaking been posted __No__                    If "yes", state amount and type _____

Has application been made to court below for this relief __Yes__            If yes, state Disposition __Denied__

Has there been any prior application herein in this court __No__            If "yes", state dates and nature _____

Has adversary been advised of this application __Yes__            Does he/she consent __I do not know__

Attorney for Movant | Attorney for Opposition

Name Towaki Komatsu, Pro Se | Jeffrey Mosczyc

Address 802 Fairmount Place | 150 Greenwich St.

Apt. 4B | 38th Fl.

Bronx, NY 10460 | New York, NY 10007

Tel. No. 718 - 450 - 6951 | 929 - 221 - 6558

Appearing by _____

(Do not write below this line)

**DISPOSITION**

Interim stay denied, however, the
Court takes No position as to any
purported exclusion orders issued by
any public or private entity. No such order
or orders are before the Court.

10/18/17

Justice Richard T. Andrias Date

Motion Date 11/24/17 ___ Opposition 11/10/17 ___ Reply 11/24/17

EXPEDITE _____ PHONE ATTORNEYS _____ DECISION BY _____

ALL PAPERS TO BE SERVED PERSONALLY.

serve motion papers +
copy of this order

Court Attorney

"Revised 02/01"